No. 23-35543

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

SHOSHONE-BANNOCK TRIBES OF THE FORT HALL RESERVATION,
*Plaintiffs/Appellees*,

v.

UNITED STATES DEPARTMENT OF THE INTERIOR, UNITED STATES
BUREAU OF LAND MANAGEMENT, AND LAURA DANIEL-DAVIS,
PRINCIPAL DEPUTY ASSISTANT SECRETARY FOR LAND AND
MINERALS MANAGEMENT,
*Defendants/Appellants*,

AND

J.R. SIMPLOT COMPANY,
Defendant-Intervenor.

On Petition for Permission to Appeal from the United States District Court for the
District of Idaho (No. 4:20-cv-553) (Hon. B. Lynn Winmill)

**FEDERAL APPELLANTS' OPENING BRIEF**

TODD KIM
*Assistant Attorney General*
ROBERT J. LUNDMAN
DANIEL J. HALAINEN
ANDREW M. BERNIE
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Avenue N.W.
Washington, D.C. 20530
(202) 514-4010
andrew.m.bernie@usdoj.gov

i

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................1

STATEMENT OF JURISDICTION.................................................................4

STATEMENT OF THE ISSUES.......................................................................5

PERTINENT STATUTES AND REGULATIONS .................................................6

STATEMENT OF THE CASE...........................................................................6

      A.     The 1898 Agreement and 1900 Act ................................6

      B.     National Environmental Policy Act ................................7

      C.     Federal Land Policy and Management Act............................8

      D.     Factual background ..........................................................10

      E.     Prior Proceedings .........................................................14

SUMMARY OF ARGUMENT .........................................................................18

STANDARD OF REVIEW ..............................................................................21

ARGUMENT ..................................................................................................22

I.     Section 5 of the 1900 Act does not bar the United States from disposing of the lands under FLPMA.............................................22

II.    The appraisal complied with FLPMA's regulations. ....................32

III.   BLM reasonably determined that the public interest would be served by the Exchange. ......................................................38

IV.   BLM reasonably determined that consideration of Simplot's design options was not necessary to conduct an adequate analysis of environmental considerations...........................46

CONCLUSION ................................................................................................50

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Atlantic Richfield Co. v. Christian*,
140 S. Ct. 1335 (2020) ..................................................................30

*Bolt v. United States*,
944 F.2d 603 (9th Cir. 1991) .........................................................22

*Bowman Transportation Inc. v. Arkansas-Best Freight System*,
419 U.S. 281 (1974) ......................................................................43

*California Wilderness Coalition v. U.S. Department of Energy*,
631 F.3d 1072 (9th Cir. 2011)........................................................45

*Center for Investigative Reporting v. United States Department of Justice*,
14 F.4th 916 (9th Cir. 2021)...........................................................24

*Conservation Congress v. Finley*,
774 F.3d 611 (9th Cir. 2014) ............................................................8

*Desert Citizens Against Pollution v. Bission*,
231 F.3d 1172 (9th Cir. 2000) ..................................... 16, 35, 36, 38

*Earth Island Institute v. United States Forest Service*,
87 F.4th 1054 (9th Cir. 2023)...........................................................7

*Gulf Restoration Network v. Haaland*,
47 F.4th 795 (D.C. Cir. 2022) ................................................... 47, 48

*Jam v. International Finance Corporation*,
139 S. Ct. 759 (2019) ....................................................................25

*Montana v. Blackfeet Tribe of Indians*,
471 U.S. 759 (1985) ......................................................................31

*National Mining Association v. Zinke*,
877 F.3d 845 (9th Cir. 2017) .........................................................21

*National Parks & Conservation Association v. BLM*,
606 F.3d 1058 (9th Cir. 2010)...................................... 16, 36, 37, 42

*Native Ecosystems Council v. Marten,*
883 F.3d 783 (9th Cir. 2018)........................................................................21

*North Idaho Community Action Network v. Department of Transportation,*
545 F.3d 1147 (9th Cir. 2008)......................................................................42

*Paulsen v. Daniels,*
413 F.3d 999 (9th Cir. 2005)........................................................................45

*Posadas v. National City Bank of New York,*
296 U.S. 497 (1936) .....................................................................................24

*Ranchers Cattlemen Action Legal Fund v. USDA,*
499 F.3d 1108 (9th Cir. 2007)......................................................................21

*Reese v. BP Exploration (Alaska) Inc.,*
643 F.3d 681 (9th Cir. 2011)........................................................................38

*Rocky Mountain Oil & Gas Association v. Watt,*
696 F.2d 734 (10th Cir. 1982)................................................................ 8, 24

*San Luis & Delta-Mendota Water Authority v. Jewell,*
747 F.3d 581 (9th Cir. 2014)........................................................................21

*Shoshone-Bannock Tribes of Fort Hall Reservation v. Department of Interior,*
No. 4:10-CV-004-BLW, 2011 WL 1743656 (D. Idaho May 3, 2011) ...............11

**Statutes**

5 U.S.C. § 706 ..............................................................................................45

5 U.S.C. § 706(2)(A)......................................................................................21

28 U.S.C. § 1292(b) .........................................................................................5

30 U.S.C. §§ 22-76........................................................................................23

30 U.S.C. §§ 601-04.......................................................................................23

42 U.S.C. § 4332(2)(C)....................................................................................7

43 U.S.C. § 1701 ...........................................................................................24

43 U.S.C. § 1701(a)(10)...................................................................... 1, 15, 22

43 U.S.C. § 1702 ................................................................................24

43 U.S.C. § 1702(c) ...........................................................................24

43 U.S.C. § 1702(e) ................................................................. 1, 8, 22

43 U.S.C. § 1713 ................................................................................32

43 U.S.C. § 1716 ....................................................................... 1, 8, 32

43 U.S.C. § 1716(a) ....................................................................... 8, 38

43 U.S.C. § 1716(b) .............................................................................9

43 U.S.C. § 1716(d) .............................................................................9

Pub. L. No. 103-332, 108 Stat. 2499 (1994) ....................................23

44 Stat. 566 (May 19, 1926) ..............................................................27

41 Stat. 596 (May 12, 1920) ..............................................................27

Pub. L. No. 58-76, 33 Stat. 153 (1904)........................................ 7, 32

Act of June 6, 1900, 31 Stat. 672 (1900) ....................... 6, 7, 22, 28, 32

## Regulations

43 C.F.R. § 2200.0-5(c) ......................................................................9

43 C.F.R. § 2200.0-5(n) .................................................................. 9, 33

43 C.F.R. § 2200.0-6(b) ........................................................ 16, 39, 40

43 C.F.R. § 2201.3 ........................................................................ 9, 33

43 C.F.R. § 2201.3-2(a) ......................................................................9

**Other Authorities**

16 Fed. Prac. & Proc. Juris. § 3929 .........................................................................31

Uniform Appraisal Standards for Federal Land Acquisitions .................... 34, 35, 37

H.R. Rep. No. 57-3161 (1903).............................................................................27

S. Rep. No. 60, 56th Cong., 1st Sess. (1900).......................................................29

S. Doc. No. 169, 55th Cong., 2nd Sess. (1898) ....................................................6, 7

**INTRODUCTION**

The Federal Land Policy and Management Act (FLPMA) provides "uniform procedures" for disposing of public lands, defines "public lands" to include "any land and interest in land owned by the United States," and expressly authorizes land exchanges. 43 U.S.C. §§ 1701(a)(10), 1702(e), 1716. In 2020, after years of study as well as a comprehensive environmental analysis, the United States entered into a land exchange (Exchange) with Intervenor-Defendant-Appellant J.R. Simplot Company (Simplot). The federal lands Simplot acquired in the Exchange were owned at one time by the Shoshone Bannock Tribes of the Fort Hall Reservation (Tribes or Plaintiffs), but the Tribes ceded the lands to the United States in 1898 in exchange for fixed sums.

The Tribes challenged the Exchange. On motions for summary judgment, the district court rejected the vast majority of their FLPMA and National Environmental Policy Act (NEPA) arguments, but held that the Exchange violated a 1900 statute (1900 Act), and found fault with the Exchange on three narrower grounds. The court certified its order for interlocutory appeal, and this Court granted permission to appeal.

This Court should reverse all four of the district court's conclusions adverse to Defendants. The district court's most far-reaching holding was that the Department of the Interior (Interior) had no authority to dispose of the lands at issue

for any purpose, under FLPMA or otherwise, via a land exchange or any other method of disposition.  The district court based this conclusion on a provision of the 1900 Act stating that the lands at issue "shall be subject to disposal under the homestead, townsite, stone and timber, and mining laws of the United States only." All the old homestead, townsite, stone and timber, and mining laws have either been repealed (by FLPMA or before FLPMA) or cannot be used to dispose of federal lands.  Thus, according to the district court, "the federal government does not currently have a viable method for disposing of the ceded lands."  1-ER-18.

The district court's holding that the United States cannot dispose of this property is flawed for several reasons.  Most notably, FLPMA itself repealed many subject-specific statutes that previously governed disposal of public lands, such as the previous homestead and townsite acts, and replaced them with a comprehensive scheme that applies to all public lands managed by the Bureau of Land Management (BLM).  FLPMA thus now occupies the categories set forth in the 1900 Act and serves as the modern version of the homestead, townsite, stone and timber, and mining laws for land disposal purposes.  Allowing disposal of these lands under FLPMA also aligns with the purpose of the 1900 Act, which all evidence suggests was simply intended to make the lands disposable in accordance with the general laws of the United States.  And it makes far more sense than the district court's interpretation, which leaves an unexplained hole in FLPMA's otherwise

2

comprehensive coverage, and requires the United States to retain the ceded lands in perpetuity absent Congressional action.

The district court separately concluded that the Exchange violated FLPMA and implementing regulations requiring that exchanged lands be generally of "equal" value, because the United States' appraisal purportedly did not consider the "unique value" of the land to Simplot. But the regulations do not require consideration of the "unique" value of lands to an acquiring party. In concluding otherwise, the district court misunderstood the valuation regulations, the uniform appraisal standards the regulations incorporate, and the two decisions from this Court on which the district court relied. In any event, the appraiser here did sufficiently consider Simplot's proposed use, which would require rezoning of the property in any event.

The district court's two other holdings adverse to Defendants should also be reversed. First, the court mostly upheld BLM's determination that the public interest would be served by the Exchange but faulted that public-interest determination on one narrow ground: that the record of decision (ROD) for the Exchange did not adequately consider the protection of cultural resources. But the ROD did sufficiently consider this issue and, in any event, BLM's Environmental Impact Statement (EIS) certainly did—and was incorporated into the ROD. Indeed, the district court praised the EIS's analysis of this issue and faulted Interior for not

3

replicating all of the EIS's analysis in the ROD, even though the ROD is expressly *based* on the EIS. Essentially then, the district court concluded that BLM could not rely on its EIS—only the four corners of the ROD—in demonstrating compliance with FLPMA. That proposition is inconsistent with precedent and inappropriately elevates form over substance. And even if the district court were right on this point, the error it purported to identify would be harmless and not a basis for disturbing the ROD in any event.

Finally, the district court held that Interior violated NEPA in one respect, by not considering the environmental impact of specific design options Simplot might use in gypstack and cooling-pond construction. But Interior explained that Simplot's choices would be constrained by state and federal environmental permitting requirements. Interior was entitled to assume effective enforcement by state and federal regulatory authorities.

## STATEMENT OF JURISDICTION

The district court certified its order for interlocutory appeal on June 30, 2023. 1-ER-5. The United States filed a conditional petition for permission to appeal on July 10, 2023, and Simplot also filed a petition for permission to appeal on July 10,

2023, within the ten-day period set forth in 28 U.S.C. § 1292(b). This Court granted both petitions on August 17, 2023.[1]

## STATEMENT OF THE ISSUES

1. Whether the 1900 Act precludes the United States from authorizing the Exchange under FLPMA.

2. Whether FLPMA requires an appraisal to be based on a property's unique value to a private party who is acquiring it for a use that no other party would use the land for, and whether, even if so, the appraisal adequately considered Simplot's proposed use in valuing the lands to be exchanged.

3. Whether Interior's determination that the public interest would be served by the Exchange was inadequate.

4. Whether Interior's conclusion that it did not need to consider specific design options for Simplot's gypstack and cooling-pond construction as part of the Exchange—because those activities would be subject to oversight and approval from federal and Idaho authorities—was unreasonable.

---

[1] The United States opposed certification in the district court and filed an opposition to Simplot's petition for permission to appeal in this Court on the sole ground that, in the United States' judgment, interlocutory appeal would not "materially advance the ultimate termination of the litigation" within the meaning of section 1292(b). The district court rejected that argument, and the motions panel (in granting permission to appeal) necessarily rejected it as well.

**PERTINENT STATUTES AND REGULATIONS**

Pertinent statutes and regulations are set forth in the Addendum.

**STATEMENT OF THE CASE**

**A.      The 1898 Agreement and 1900 Act**

The Fort Hall Reservation, established by treaty in 1868, is the permanent home of the Tribes.  Thirty years after establishment of the Reservation, the Tribes agreed to cede a portion of it to the United States in an 1898 agreement (Cession Agreement).

Congress ratified the Cession Agreement two years later in the 1900 Act.  Act of June 6, 1900, 31 Stat. 672 (1900).  Section 5 of the 1900 Act provides that, after allotments were made to Indians who had settled in the ceded area, "the residue of said ceded lands shall be opened to settlement by the proclamation of the President, and shall be subject to disposal under the homestead, townsite, stone and timber, and mining laws of the United States only."  31 Stat. at 676.  The 1898 Agreement itself did not contain this provision or any provisions about disposal of the ceded lands. Congress only added this provision in the 1900 Act.  *See* 1-ER-17 (district court noting that "the Tribes did not negotiate the disposal requirements as part of the 1898 Cession Agreement").  Indeed, the Senate Report on the 1900 Act indicates that the original "plan of the [Interior] Department had been to dispose of [the ceded] lands by appraisal and sale to the highest bidder for the benefit of the Indians."  *See* S.

6

Doc. No. 169, 55th Cong., 2nd Sess., at 11 (1898). But the Tribes specifically rejected that plan, and instead ceded the surplus lands outright in exchange for fixed sums, "thus leaving it to Congress and the Department to dispose of the same in such manner as may be determined." *Id.* Tribal members living on the Reservation retain certain usufructuary rights on the ceded lands (including to cut timber for their own use, to pasture their livestock, to hunt, and to fish) but only so long as the affected lands remain part of the public domain. 31 Stat. at 674.

The 1900 Act also included provisions regarding disposal of the ceded lands, including that no purchaser can purchase more than 160 acres of ceded lands, and that the ceded lands within five miles of Pocatello must be sold at a public auction. 31 Stat. at 676. Congress removed the auction requirement in 1904. *See* An Act Relating to Ceded Lands on the Fort Hall Indian Reservation, Pub. L. No. 58-76, 33 Stat. 153 (1904) (1904 Act).

**B.      National Environmental Policy Act**

NEPA requires an Environmental Impact Statement (EIS) for "major Federal actions" expected to "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(2)(C). An agency may prepare an environmental assessment (EA) to determine if the proposal's effects would be significant, followed by a finding of no significant impact (FONSI) if the agency finds in its EA that the proposed action will not significantly affect the human environment. *Earth Island Institute v. United*

7

*States Forest Service*, 87 F.4th 1054, 1060 n.1 (9th Cir. 2023). Where an EIS is prepared, that EIS must "'provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment.'" *Conservation Congress v. Finley*, 774 F.3d 611, 616 (9th Cir. 2014) (quoting 40 C.F.R. § 1502.1).

### C.   Federal Land Policy and Management Act

Congress enacted FLPMA in 1976 to "provide guidance and a comprehensive statement of congressional policies concerning the management of the public lands." *Rocky Mountain Oil & Gas Association v. Watt*, 696 F.2d 734, 737, 738 n.2 (10th Cir. 1982) (noting that, before FLPMA, BLM "and its predecessor[s] managed public lands under some 3,000 public land laws"). FLPMA applies to "public lands," defined broadly (with two inapplicable exceptions) to include "any land and interest in land owned by the United States . . . and administered by the Secretary of the Interior though the [BLM], without regard to how the United States acquired ownership." 43 U.S.C. § 1702(e).

Section 206 of FLPMA, 43 U.S.C. § 1716, provides for land exchanges. It states that "[a] tract of public land or interests therein may be disposed of by exchange" if Interior "determines that the public interest will be well served by making that exchange." *Id.* § 1716(a). Section 206 further requires that "[t]he values

of the lands exchanged . . . either shall be equal, or if they are not equal, the values shall be equalized by the payment of money." *Id.* § 1716(b).

To meet FLPMA's equal-valuation requirement for land exchanges, Interior must conduct an appraisal before approving an exchange. *Id.* § 1716(d). The statute sets forth certain broad requirements for appraisals, which Interior has fleshed out via regulations. The regulations mandate that an appraisal "set[] forth an opinion regarding the market value of the lands . . . supported by the presentation and analysis of relevant market information." 43 C.F.R. § 2200.0-5(c). "Market value" is defined as "the most probable price in cash, or terms equivalent to cash, that lands or interests in lands should bring in a competitive and open market under all conditions requisite to a fair sale." *Id.* § 2200.0-5(n).

To estimate market value, the appraiser must "[d]etermine the highest and best use of the property," "[e]stimate the value of the lands and interests as if in private ownership and available for sale in the open market," and "[i]nclude historic, wildlife, recreation, wilderness, scenic, cultural, or other resource values or amenities that are reflected in prices paid for similar properties in the competitive market." *Id.* § 2201.3-2(a). An appraisal must also comply, "to the extent appropriate, with the Department of Justice 'Uniform Appraisal Standards for Federal Land Acquisitions' when appraising the values of the Federal and non-Federal lands involved in an exchange." *Id.* § 2201.3.

### D. Factual background

Simplot has operated phosphate processing facilities known as the Don Plant next to the Fort Hall Reservation, and about two miles northwest of the City of Pocatello, since the 1940s. 3-ER-385. The Don Plant processes phosphate ore to manufacture phosphate fertilizer and feed phosphates. One waste product of this process, phosphogypsum, is mixed with water and pumped into a 240-foot-tall storage facility called a "gypstack," which is spread out over nearly 500 acres. 3-ER-394.

Until 2017, Simplot's gypstack was unlined and discharged contaminants to springs and the Portneuf River, which flows onto the Reservation. Partially as a result, Simplot is subject to multiple consent decrees and administrative consent orders with the U.S. Environmental Protection Agency (EPA) and the Idaho Department of Environmental Quality (IDEQ). 3-ER-385-386; *see also infra* pp. 48-49 (discussing regulatory history further).

Simplot has long sought to acquire additional land adjacent to the Don Plant because its gypstack is projected to reach capacity by 2031 based on recent gypsum production rates. 3-ER-402. When that happens, Simplot indicates that it would need to cease manufacturing at the Don Plant.

Simplot first proposed a land exchange with the United States in 1994, but this proposal stalled because of EPA's then-pending designation of a Superfund site

that encompassed the Simplot facility. *Shoshone-Bannock Tribes of Fort Hall Reservation v. Department of Interior*, No. 4:10-CV-004-BLW, 2011 WL 1743656, at *2 (D. Idaho May 3, 2011). Simplot renewed land exchange discussions in 2002, and BLM approved a land exchange following an EA and FONSI. *Id.* at *4-*7. The Tribes sued Interior, asserting violations of NEPA, FLPMA, and the government's tribal trust duties, but not the 1900 Act. In 2011, the District of Idaho granted the Tribes motion for summary judgment on the grounds that an EIS was required; the court remanded the matter to BLM for the preparation of an EIS and did not reach the remaining issues. *Id.* at *11-*12.[2]

In May 2019, BLM published a Notice of Intent to prepare an EIS for a land exchange and thereafter held two public scoping meetings. 3-ER-356. BLM prepared a draft EIS, which it made available for comment in late 2019. 3-ER-356. The final EIS was published in May 2020. 3-ER-354.

The EIS considered the proposed action, two action alternatives, and a no-action alternative. The Proposed Action was an exchange of 719 acres of Federal land for 667 acres of non-Federal land. 3-ER-368-369. Alternative A included an exchange of the same lands, along with voluntary mitigation parcel A (which

---

[2] The United States did not appeal that decision. Simplot sought reconsideration, which was denied. *See* 2012 WL 314038 (D. Idaho Feb. 1, 2012). Simplot appealed to this Court but voluntarily dismissed that appeal before any briefs were filed. *See* No. 12-35181 (9th Cir. Sept. 17, 2012).

11

included 160 acres of Simplot-owned land in the Blackrock Canyon area), and voluntary donation Parcel B (950 acres of Simplot-owned private property within the Fort Hall Reservation that Simplot would donate to the Bureau of Indian Affairs for the benefit of the Tribes or to the Tribes directly). 3-ER-369-370.

Alternative B, the preferred alternative and a refinement of the proposed action developed in part to address tribal concerns, included the same non-federal lands as Alternative A (including voluntary mitigation parcel A and voluntary donation parcel B), but reconfigured the federal lands the United States would exchange so that BLM would retain "368 acres of Federal lands in the west canyon area that BLM would continue to manage in accordance with the Pocatello [Resource Management Plan] . . . including identified cultural and tribal resources." 3-ER-370-371. Thus, the preferred alternative included an exchange of 711 acres of Federal lands for 827 acres of non-Federal lands as well as a $25,000 donation from Simplot to the Tribes' Language Program. 3-ER-370. The federal lands selected for the Exchange are on Howard Mountain (next to the Don Plant). 3-ER-370. The non-federal lands are located south of Pocatello, Idaho in the Blackrock Canyon area. 3-ER-368-369; *see also* 2-ER-144 (map showing the exchanged lands).

The EIS estimated that each of the action alternatives would extend the life of the Don Plant to 2085 while, under the no-action alternative, the Exchange would not occur and the Don Plant's estimated life would end around 2031. 3-ER-405.

During preparation and finalization of the EIS, BLM consulted with the Tribes on numerous occasions. BLM and the Tribes had staff to staff meetings in December 2018 and March 2019. 3-ER-439. In March 2019, BLM and the Tribes initiated government-to-government consultation to discuss the EIS and, in April 2019, BLM re-initiated consultation under Section 106 of the National Historic Preservation Act. 3-ER-439. BLM also hosted site visits with tribal cultural staff in July and August 2019, and held government-to-government meetings with the Tribes in January and April 2020. 2-ER-135.

To meet its obligations under FLPMA, BLM commissioned an appraisal by a private firm of the lands exchanged under the preferred alternative. The appraisal valued the federal lands at $645,000 and the non-federal lands at $635,000 (thus, at closing, Simplot was required to issue to BLM a cash equalization payment of $10,000). 2-ER-68-69. The appraisal concluded that the highest and best use for the federal lands was "continued agriculture and recreational uses, wildlife habitat, watershed, with speculative investment potential." 2-ER-275. The appraiser then used a sales comparison approach to value the federal lands based on sales of similar nearby lands, ultimately valuing the lands at $900 per acre. 2-ER-276-283.

In August 2020, Interior issued a ROD approving the preferred alternative in the EIS and authorizing the exchange of 713.67 acres of Federal land for 666.46 acres of non-Federal land, along with a 160-acre mitigation parcel (160 acres of

13

Simplot-owned land in the Blackrock Canyon area).  2-ER-124.  The ROD incorporated the EIS in relevant part by stating that it was "[b]ased on the analysis in the EIS."  2-ER-124.  The Exchange was completed in December 2020.  2-ER-70-77.

### E.    Prior Proceedings

In December 2020, three months after the ROD issued, and only ten days before the Exchange was completed, the Tribes filed their Complaint asserting that the Exchange violated the 1898 Agreement and 1900 Act, the Administrative Procedure Act (APA), FLPMA, NEPA, and the 1868 Treaty creating the Reservation.  2-ER-109-118.  The Tribes did not seek a preliminary injunction to stop the Exchange from being completed.  After Simplot intervened, the parties cross-moved for summary judgment on the administrative record.

The district court resolved liability on all claims in its March 31, 2023 order, granting summary judgment to Plaintiffs in part, and to Defendants in part.  1-ER-56-57.  The district court first held that the Exchange violated Section 5 of the 1900 Act.  1-ER-17.  The court noted that the relevant statutory language provides that the ceded lands "shall be subject to disposal under the homestead, townsite, stone and timber, and mining laws of the United States *only*."  1-ER-17 (quoting 31 Stat. at 676) (emphasis supplied by district court).  The court read this language to bar the disposal of lands pursuant to FLPMA.  The court found further support in "the Indian

canon of construction, which requires resolving ambiguities in agreements and treaties with tribes in the tribes' favor." 1-ER-19.

The district court acknowledged that "Congress enacted FLPMA to establish 'uniform procedures for any disposal of public land, acquisition of non-Federal land for public purposes, and the exchange of such lands . . . .'" 1-ER-22 (quoting 43 U.S.C. § 1701(a)(10)). But the court deemed compliance with FLPMA necessary but not sufficient given the more "particular restrictions" imposed by the 1900 Act. 1-ER-22. And the court suggested (without firmly deciding) that the only available remedy for the 1900 Act violation was vacating the exchange, since Interior could not lawfully carry out the Exchange absent congressional action. But because of the importance of the matter and potential practical difficulties of unwinding the Exchange nearly two and a half years after it was completed (at the time), the court stated that it would consider full briefing before deciding on the appropriate remedy. 1-ER-22-23.

The district court further held that Interior's reliance on the appraisal report Interior used for the Exchange was arbitrary and capricious. As noted, that report had concluded that the highest and best use for the federal land was "continued agriculture and recreational uses, wildlife habitat, watershed, with speculative investment potential." 2-ER-275. Based on analysis of recent comparable lands, Interior's appraisal valued the federal land to be exchanged at $900 per acre. The

15

district court did not find fault with this analysis as a general matter. The court instead criticized the appraisal report for not considering the value of the conveyed federal land's use for gypstack development. 1-ER-31. The district court read this Court's decisions in *Desert Citizens Against Pollution v. Bission*, 231 F.3d 1172 (9th Cir. 2000), and *National Parks & Conservation Association v. BLM*, 606 F.3d 1058 (9th Cir. 2010), as requiring consideration of Simplot's proposed use of the parcel in the valuation determination. 1-ER-32.

The district court ruled against Defendants on two other grounds. First, the district court found inadequate Interior's determination that the public interest would be served by the exchange. 1-ER-27. The governing regulation contains eight mandatory factors Interior must consider in making this determination. 43 C.F.R. § 2200.0-6(b). The district court held that Interior had adequately considered all these issues, and appropriately analyzed how the exchange would affect the Tribe's rights under the 1868 Treaty, the 1898 Cession Agreement, and the 1900 Act. 1-ER-25-27. The court determined, however, that the ROD did not adequately balance the protection of cultural resources. As to this point, the district court acknowledged that "the ROD evenhandedly listed many advantages and disadvantages of the land exchange." 1-ER-27. But the court faulted the ROD for not adequately considering that the newly acquired lands do not have the same intrinsic value to the Tribes as the former federal lands conveyed to Simplot, even though the Court acknowledged

16

that the EIS had considered those issues. 1-ER-28 (faulting the ROD for "neglect[ing] many of the considerations noted in the EIS").

Second, the court also found in favor of the Tribes on one NEPA issue, concerning Interior's consideration of Simplot's gypstack and cooling-pond construction. 1-ER-39-41. BLM had concluded that consideration of specific design options was "beyond the scope of this EIS" because these lands would be on private lands following the Exchange and specific design and manufacturing decisions would be subject to federal and state permitting requirements. 3-ER-404 The district court faulted BLM's assumption that it could rely on effective environmental enforcement from other agencies given what the court described as "a decades-long history of enforcement with mixed results." 1-ER-41.

The district court ruled in favor of Defendants on all other issues. 1-ER-56-57.

The district court declined to decide appropriate remedies (and thus did not enter an order appealable as of right), but instead directed the parties to confer and submit proposals for briefing that issue. 1-ER-57. But after Simplot indicated that it intended to seek section 1292(b) certification of the summary judgment order, the district court directed briefing on that issue first. Simplot moved for certification in May, which the district court granted on June 30. 1-ER-2-6. Simplot then timely sought permission to appeal from this Court; the United States opposed Simplot's

17

petition on the sole ground that interlocutory appeal would not materially advance the termination of the litigation, while also filing a protective petition for permission to appeal in the event this court granted Simplot's petition. On August 16, this Court granted both petitions.

## SUMMARY OF ARGUMENT

1. The Exchange did not violate Section 5 of the 1900 Act. That provision allowed disposal of federal lands under broad categories of public-land-disposal statutes then in effect. FLPMA replaced some of these statutes and referred to others, resulting in a unitary and comprehensive land-disposal scheme. The best reading of FLPMA is that it serves as the modern version of the categories identified in the 1900 Act.

That reading is also the only one that is consistent with the purpose of the 1900 Act. There is no dispute that the categories identified in that Act represented essentially the full range of general statutes authorizing Interior to dispose of public domain lands in 1900. The evidence is also clear that Congress did not intend this provision to impose any particular restrictions on the Executive's preexisting land disposal authority, let alone restrictions intended for the Tribes' benefit. It is illogical to read one essentially all-encompassing (for its time) land disposal scheme (the 1900 Act) in concert with a modern all-encompassing land disposal scheme (FLPMA) to collectively *bar* the United States from disposing of particular lands,

18

without a theory as to why Congress would have intended that unusual result for these lands in particular.

2. The appraisal adequately considered Simplot's intended use for the lands. Initially, neither FLPMA's regulations nor the Uniform Appraisal Standards for Federal Land Acquisitions (which the regulations incorporate by reference) require BLM to consider the "unique" subjective value of lands to the acquiring party. The district court faulted the valuation for purportedly not considering Simplot's proposed use of the property for gypstack development. But the Uniform Appraisal Standards do not require consideration of a proposed use for valuation purposes absent a competitive demand for that use, and the district court acknowledged that no other party was competing to build gypstacks on the lands at issue (and no other party has a phosphate plant in the area). The district court also relied on two cases from this Court holding that an appraisal wrongly failed to consider a proposed use. But those cases—which even the district court acknowledged were distinguishable—both relied on the existence of *competing proposals* for the use at issue.

In any event, the record reflects that the appraisal did consider Simplot's proposed use for the land to the extent it would be allowed by future zoning, and neither Plaintiffs (who barely briefed this issue below) nor the district court pointed to evidence that the appraisal undervalued the lands.

19

3.     Interior's public-interest determination was adequate.  The district court almost entirely accepted Interior's determination that the public interest would be served by the Exchange, but held that Interior did not adequately consider the protection of cultural resources.  The district court reached this conclusion only by confining its analysis of this issue to the ROD and refusing to consider the EIS's detailed analysis of this issue.  Indeed, the district court itself characterized the EIS as "consider[ing] and fully disclos[ing] the impacts of the proposed project on cultural resources."  The district court's refusal to consider the EIS (on which the ROD expressly based its approval of the preferred alternative) is contrary to well-settled principles of judicial review of agency action, this Court's caselaw, and common sense.  Any failure to replicate all the EIS's analysis in the ROD itself—as opposed to incorporating it by reference—would also be harmless error.  But even if the district court were correct to limit its consideration to the four corners of the ROD, the ROD adequately considered and balanced the protection of cultural resources.

4.     Interior reasonably declined to consider specific design options for Simplot's cooling ponds and gypstack expansion as outside the scope of the EIS. Interior explained, among other things, that Simplot's preliminary design conceptions would be subject to approval by both the EPA and Idaho officials.  That decision was reasonable, and consistent with the general rule that an agency is

20

ordinarily entitled to assume effective enforcement of statutory and regulatory requirements. This is not the rare case where that assumption and presumption of regularity are overcome. The record shows that, over the last several decades, federal and Idaho officials have aggressively worked to ensure compliance with environmental requirements, and neither the district court nor Plaintiffs provided any reason those officials would fail to do so with respect to new facilities Simplot might construct.

## STANDARD OF REVIEW

This Court reviews the district court's summary judgment order de novo. *Native Ecosystems Council v. Marten*, 883 F.3d 783, 789 (9th Cir. 2018). Under the APA, courts must uphold agency action that is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Ranchers Cattlemen Action Legal Fund v. USDA*, 499 F.3d 1108, 1115 (9th Cir. 2007) (internal quotation marks omitted). Challenges to an agency's compliance with NEPA and FLPMA are also reviewed under the APA's deferential standard of review. *See San Luis & Delta-Mendota Water Authority v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (NEPA); *National Mining Association v. Zinke*, 877 F.3d 845, 866 (9th Cir. 2017) (FLPMA).

# ARGUMENT

**I.     Section 5 of the 1900 Act does not bar the United States from disposing of the lands under FLPMA.**

FLPMA "is a comprehensive land-management act." *Bolt v. United States*, 944 F.2d 603, 608 (9th Cir. 1991). Through FLPMA, Congress intended to establish "uniform procedures" for both "any disposal of public land," as well as "acquisition of non-Federal land for public purposes." 43 U.S.C. § 1701(a)(10).

To that end, FLPMA broadly defines "public lands" to encompass "any land and interest in land owned by the United States . . . without regard to how the United States acquired ownership." *Id.* § 1702(e). FLPMA authorizes Interior to dispose of public land by conducting land "[e]xchanges" if the agency finds that "the public interest will be well served." *Id.*

There is no dispute that FLPMA applies to the Exchange. Indeed, the district court applied FLPMA here to find two other asserted defects associated with the Exchange (holdings that, as discussed further below, were also erroneous). *See infra* pp. 38-50.

The district court nonetheless held that the 1900 Act, which the Tribes did not even invoke in their challenge to Interior's prior attempted exchange with Simplot, barred the Exchange. Section 5 of the 1900 Act states that lands ceded by the Tribes in 1898 "shall be subject to disposal under the homestead, townsite, stone and timber, and mining laws of the United States only." 31 Stat. at 676. The district

court held that FLPMA is not a homestead, townsite, stone and timber, or mining law, and thus the Exchange does not comply with the 1900 Act. *Id.*

The district court's interpretation effectively bars not just this Exchange but any other exchange (or sale, or other disposition of the lands)—including an exchange supported by the Tribes or even an exchange of the ceded lands back to the Tribes. As the district court itself explained the implications of its holding, "because Congress has repealed nearly all the homestead, townsite, stone and timber, and mining laws, the federal government does not currently have a viable method for disposing of the ceded lands." 1-ER-18.[3]

The district court's holding cannot be reconciled with FLPMA. After all, Congress did not simply repeal all of the old homestead, townsite, stone and timber, and mining laws predating the 1900 Act and leave nothing in their place. Instead, FLPMA itself *repealed* many subject-specific statutes that previously governed management and disposal of public lands, such as the homestead and townsite acts, and *replaced* them with a comprehensive scheme that applies to all public lands

---

[3] For instance, neither the Mineral Leasing Act of 1920, 30 U.S.C. §§ 181-287, nor the Materials Act of 1947, 30 U.S.C. §§ 601-04, provides for disposal of the title to underlying public lands along with federal mineral resources. And although the Mining Law of 1872, 30 U.S.C. §§ 22-54, which pre-dates the 1900 Act, is still in effect, it is not currently used to dispose of title to federal lands (with limited exceptions not relevant here) in light of a longstanding statutory moratorium on the accepting or processing of patent applications. *See* Dep't of the Interior and Related Agencies Appropriations Act of 1995, Pub. L. No. 103-332 §§ 112-13, 108 Stat. 2499, 2519 (1994).

managed by BLM. *See* 43 U.S.C. §§ 1701, 1702; 90 Stat. at 2787-89 ("Repeal of laws relating to homesteading and small tracts"); *id.* at 2789-90 ("Repeal of laws related to disposal," including townsite reservation and sale); *see also Rocky Mountain Oil & Gas Association*, 696 F.2d at 747 & 738 n.2 (10th Cir. 1982) (listing "the various homestead laws" as among the "myriad" public laws supplanted by FLPMA). FLPMA's definition of "multiple use" also "includ[es] but []is not limited to" uses for "timber" and "minerals." 43 U.S.C. § 1702(c). Courts must give effect to a "later act" if it "covers the whole subject of the earlier one and is clearly intended as a substitute." *Posadas v. National City Bank of New York*, 296 U.S. 497, 503 (1936); *Center for Investigative Reporting v. United States Department of Justice*, 14 F.4th 916, 927 (9th Cir. 2021). Under the circumstances, FLPMA clearly provides Interior with a source of land disposition authority that is analogous to the old categories that it supplanted.

Thus, the best reading of FLPMA as it pertains to the 1900 Act is *not* that "homestead, townsite, stone and timber, and mining" laws no longer exist for purposes of land disposition. Rather, the correct reading of FLPMA is that FLPMA itself serves as the successor to—and modern version of—the old homestead, townsite, stone and timber, and mining laws of the United States for land-disposal purposes. Under this proper understanding, Section 5 does not prevent the United States from exchanging the ceded lands under FLPMA.

The "reference canon" reinforces that conclusion. As the Supreme Court has explained, "a statute that refers to *another statute* by specific title or section number in effect cuts and pastes the referenced statute as it existed when the referring statute was enacted, without any subsequent amendments." *Jam v. International Finance Corporation*, 139 S. Ct. 759, 769 (2019) (emphasis added). By contrast, "when a statute refers to a *general subject*, the statute adopts the law on that subject as it exists whenever a question under the statute arises." *Id.* (emphasis added). The 1900 Act plainly falls into the latter category. That Act does not refer to any specific disposal laws by name. Rather, it refers to broad categories of public-land-disposal statutes then in effect—homestead, townsite, stone and timber, and mining laws. FLPMA is now, among other things, "the law on the subjects" identified in Section 5 of the 1900 Act—for which it was clearly intended as a substitute. The 1900 Act's reference to these broad categories thus encompasses FLPMA.

To be sure, FLPMA did not expressly repeal the 1900 Act, and FLPMA states that it does "not repeal any existing law by implication,'" 1-ER-19 (quoting 90 Stat. at 2786). But that is beside the point. The United States did not argue below—and we do not argue here—that FLPMA repealed the 1900 Act. *See* 2-ER-64 ("To be clear, we do not argue that FLPMA repealed the 1900 Act. Instead, FLPMA provided BLM with a source of authority like those identified under the 1900 Act to dispose of the ceded lands at issue here.").

25

What is highly relevant, by contrast, is that FLPMA *did* repeal many of the subject-specific statutes identified by category in the 1900 Act, and replaced them with a comprehensive scheme for management (including disposal) of public lands. Sensibly reading FLPMA as the modern version of these laws harmonizes the 1900 Act and FLPMA, and explains why Congress in FLPMA saw no need to repeal the 1900 Act. That reading makes far more sense than the district court's reading— which would read Congress's comprehensive overhaul of public lands disposal in FLPMA as *barring* Interior from disposing of the ceded lands under any circumstance.

The United States' interpretation of FLPMA is also the only interpretation that is consistent with the purpose of the *1900 Act*. The Tribes have not provided any evidence that Congress intended the relevant language to be restrictive, and they have never disputed that the categories of statutes identified in Section 5 of that Act represented essentially the full range of federal general statutes authorizing Interior to dispose of public domain lands in 1900. From the standpoint of the Congress that passed the 1900 Act then, the disposal language of Section 5 simply made the ceded lands broadly available for disposition under all the legal authorities then in effect. Section 5's use of the term "only" in "the homestead, townsite, stone and timber, and mining laws of the United States only" does not suggest otherwise. Given the all-encompassing (for its time) list of land disposal categories, at most Congress's

26

use of "only" in Section 5 simply suggests that Congress intended to expressly bring the ceded lands under the government's general administration of public lands, and to ensure that Interior did not dispose of the lands in some other way outside of that framework.

Indeed, subsequent Congresses certainly understood Section 5 that way. A House Report accompanying the near-contemporaneous 1904 Act (which removed the auction provision for the lands within five miles of Pocatello) described Section 5 as opening the ceded lands "to settlement and appropriation *under the general laws of the United States*." H.R. Rep. No. 57-3161, at 2 (1903) (emphasis in original). And in the decades following the 1900 Act—and prior to FLPMA—Congress enacted other land disposition methods and applied them to the lands covered by the 1900 Act. *See* 44 Stat. 566 (May 19, 1926) (making "applicable to the ceded lands on the former Fort Hall Indian Reservation," a prior statute authorizing the Interior Secretary to sell any isolated or disconnected tract which in his judgment would be proper to expose to sale); 41 Stat. 596 (May 12, 1920) (authorizing conveyance of lands near Pocatello to the City and the State of Idaho). In doing so, Congress evidently saw no need to expressly reconcile them with the 1900 Act—by either striking "only" from the 1900 Act or stating that these later laws applied notwithstanding the 1900 Act—which suggests that those Congresses did not perceive this language in Section 5 as having any particular restrictive purpose.

27

Related to this point, there is also no indication that the broad authorization for Interior to dispose of the lands ceded by the Tribes and made part of the public domain was intended to carry with it a requirement that Interior do so only for the benefit of the Tribes. For starters, under the 1898 Agreement itself, the ceded lands are part of the public domain, and the Tribes do not have any underlying legal or equitable interest in the fee title to those lands. Tribal members residing on the reduced Reservation do have rights to use the ceded lands for certain purposes so long as the lands remain part of the public domain, *see* 31 Stat. at 674, but that does not mean that the provisions specifying the broad means for disposition of the lands by the government were for the benefit of the Tribes.

The 1898 Agreement with the Tribes, moreover, did not contain any provisions about disposal of the ceded lands; Congress only added this provision in the 1900 Act. As the district court correctly acknowledged, "the Tribes did not negotiate the disposal requirements as part of the 1898 Cession Agreement." 1-ER-17.

The background to Section 5, moreover, strongly militates against reading the disposal language as intended to impose particular restrictions for the Tribe's benefit. The Senate Report on the 1900 Act indicates that the original proposal by the government in negotiations with the Tribes included a plan for an irrigation system that would serve some of the surplus lands to be ceded by the Tribes as well

28

as lands retained by the Tribes.  The proposal called for the government to then sell those lands for the benefit of the Tribes, and some of those proceeds would be placed in an account to maintain the irrigation system, which would enable the irrigation system to function and sustain tribal members into the future.  S. Rep. No. 60, 56th Cong., 1st Sess. 10-11.

If such an arrangement had become law and been incorporated into the 1900 Act, the Tribes presumably would have retained an interest in the lands until they were actually sold for their benefit.  And arguably, they also would have then had an interest in the terms on which the lands were actually sold.  The Tribes, however, *rejected* that plan, and instead ceded the surplus lands outright in exchange for fixed sums, "thus leaving it to Congress and the Department to dispose of the same in such manner as may be determined."  Senate Report, *supra*, at 11 (quoting a letter from the Commissioner of Indian Affairs to the Secretary, enclosing a draft bill to approve the agreement); *id.* at 12 ("It will be observed that no provision is made in the proposed bill as to the manner of disposing of the lands ceded by the Indians, as I deem this to be a matter which should be arranged by the Department and the General Land Office.  Any provision for this purpose may be appended as an additional section to the inclosed bill.").

Given the 1900 Act's essentially all-encompassing (for its time) disposal language as well as this background, it would be anomalous to read that Act—

notwithstanding FLPMA's comprehensive land-disposal scheme—to bar the Executive Branch from disposing of this particular federal property via exchange. For its part, the district court thought that Congress's choices indicated its "intent to effectively close the door on disposal of the ceded lands." 1-ER-19. But there is no evidence that Congress intended this unusual choice; rather, as discussed above, all relevant evidence suggests that Congress in 1900 simply intended the ceded lands to be broadly subject to disposition under the authorities then in existence.[4]

In any event, in deciding between two plausible readings of a statute, courts should "avoi[d]" creating "anomalies." *Atlantic Richfield Co. v. Christian*, 140 S. Ct. 1335, 1353 (2020). Here, the district court's reading unquestionably creates an anomaly—it creates a total bar to the disposition of particular federal lands. By contrast, the United States' reading of these statutes creates no such anomaly—it simply subjects the ceded lands to the same unitary, comprehensive land-disposal scheme that applies to public lands generally.

---

[4] The district court also characterized its interpretation as "not absurd." But whether this result—reading FLPMA and the 1900 Act as effecting a total bar on the disposition of these particular lands—rises to the level of creating an absurdity is beside the point. The anti-absurdity canon applies only where the literal text of the statute is susceptible of only one interpretation, which is not the case here. As discussed above, the far better reading of these statutes—and at least a plausible one—is that FLPMA serves as the modern version of the broad disposition methods identified in the 1900 Act, and thus that the Act permits land transfers under FLPMA.

Finally, the district court invoked the principle that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985). The district court's resort to that canon also does not support its conclusion because the court's interpretation does not inevitably or even naturally benefit tribal interests generally. It favors Indians only in the ad hoc sense that this particular Tribe opposes this particular Exchange. The district court's reading would also, as noted, bar a land transfer to the Tribes, as well as a different land transfer the Tribes, or a different tribe altogether, might support. But even if the canon applies, it does not support the district court's reading of FLPMA and the 1900 Act either. Here, the Government's interpretation is by far the best reading of the text of the relevant provisions. And the Government's interpretation is consistent with the purposes of both the 1900 Act and FLPMA, as well as common sense. The district court's interpretation makes a hash of all three. This Court should therefore reject the district court's conclusion and hold that FLPMA authorized the Exchange.[5]

---

[5] In the district court, Plaintiffs made two alternative arguments based on the 1900 Act. The district court declined to reach those grounds. 1-ER-18. Although both are legal arguments based on the text of the 1900 Act (like the argument the district court did reach), it is thus unclear if this Court has jurisdiction to address them now. *See* 16 Fed. Prac. & Proc. Juris. § 3929 (3d ed.) (explaining that, in a section 1292(b) appeal, "the court of appeals will not consider matters not yet ruled upon by the district court" and citing case law). First, Plaintiffs argued that the Exchange violated a provision of the 1900 Act stating that ceded lands within five miles of

## II. The appraisal complied with FLPMA's regulations.

The district court also held that BLM's appraisal was invalid because it did not appropriately consider the land's "uniqu[e]" value to Simplot, as distinct from "generalized demand" for that parcel by "competing" parties. 1-ER-33. That conclusion was incorrect.

The Tribes focused minimal attention on this issue in the district court. The Tribes' only discussion of the appraisal in their summary judgment brief was devoted to an argument that the appraisal did not adequately consider environmental justice concerns or BLM's trust responsibility, 2-ER-66-67—an argument the district court rejected. 1-ER-29 (the Tribes did not "present evidence or argument that the prices paid for similar properties in this competitive market reflect the adverse effects on them" and "[t]here is no evidence that the appraiser deviated from

Pocatello had to be sold at auction. But Congress removed that requirement in 1904. *See* An Act Relating to Ceded Lands on the Fort Hall Indian Reservation, Pub. L. No. 58-76, 33 Stat. 153 (1904). Second, Plaintiffs invoked a provision stating that "no purchaser shall be permitted in any manner to purchase more than one hundred and sixty acres of the" ceded lands. 31 Stat. at 676. This 160-acre limitation appears in a section addressing how the lands were to be initially opened for settlement after individual Tribal allotments were accounted for. That occurred "by the proclamation of the President" in 1902, as the Act directed. 31 Stat. at 676. It is far from clear that Congress intended the 160-acre provision to tie the hands of the Executive in perpetuity. In any event, the 160-acre provision would not apply to Simplot, which is not a "purchaser" of federal lands. This was a land *exchange*, and FLPMA recognizes sales and exchanges as distinct disposal concepts. *See* 43 U.S.C. § 1713 ("Sales of public land tracts"); *id.* § 1716 ("Exchanges of public lands or interests therein . . ."). The surrounding language of this portion of the 1900 Act, referring to a sale "to the highest bidder," further suggests a sale, not a land exchange.

the regulatory standard in this regard"). The Tribes then briefly contended, in a single paragraph of their reply, that the appraisal did not adequately consider Simplot's plan for the land. 1-ER-62. The Tribes developed no meaningful argument that this supposed error resulted in the lands being undervalued.

Perhaps because of this short presentation, the district court's analysis of this issue is not well-considered. The governing regulation defines "market value" as "the most probable price in cash, or terms equivalent to cash, that lands or interests in lands should bring in a competitive and open market under all conditions requisite to a fair sale." 43 C.F.R. § 2200.0-5(n) (emphasis added). And as the district court noted, an appraisal must comply, "to the extent appropriate, with the Department of Justice 'Uniform Appraisal Standards for Federal Land Acquisitions' [UAS] when appraising the values of the Federal and non-Federal lands involved in an exchange." *Id.* § 2201.3.

The district court reasoned that the UAS provides that "[i]f it is solely the government's need that creates a market for the property, this special need must be excluded from consideration by the appraiser." UAS at 23.[6] Because "[n]o provision makes similar exceptions for a private party's intended use or need," 1-ER-34, the court reasoned that the unique use or need of the acquiring party must be

---

[6] *See* The Appraisal Institute, Uniform Appraisal Standards for Federal Land Acquisitions, *available at* https://www.justice.gov/file/408306/download.

considered.  *See also* 1-ER-33 (district court asserting that "no regulatory provision or UAS standard justifies excluding gypstack use from the appraisal simply because its value is particular to Simplot").

The district court's analysis is mistaken for several reasons.  Initially, section 4.10 of the UAS, a provision the district court did not discuss, addresses the exact context here: "Land Exchanges. Federal land exchanges are voluntary real estate transactions between the United States and a nonfederal landowner."  UAS at 185. Section 4.10 provides that "while the nonfederal party's proposed use may well be a feasible highest and best use that must be considered," that is not always the case. *Id*.  "As with any possible highest and best use, neither an existing federal use *nor a nonfederal party's proposed use* can be considered unless there is competitive demand for that use in the private market."  UAS at 186 (emphasis added).  And the basic logic of this provision is similar to the provisions the district court cited:  a party's proposed use for a particular property—whether that party is the Government or a non-federal party—does not always bear on market value; there must be *competitive demand* for that use.  Indeed, right after stating that the government's "special need must be excluded from consideration by the appraiser" (the language the district court cited), the UAS goes on to state that the government's intended use *can be* considered "if there is *competitive demand for that use in the private market*,

separate and apart from the government project for which the property is being acquired." UAS at 23 (emphasis in original).

The district court did not explain how the unique value of the lands to Simplot as a gypstack site created a competitive demand for that proposed use, and there is no indication in the record that there is any competitive demand for gypstack use for this parcel of land. Simplot operates the only phosphate processing plant in the area and there is no indication that any other phosphate processing operation would be interested in shipping gypsum to this location.

The district court concluded that, under this Court's decisions in *Desert Citizens* and *National Parks & Conservation Association*, Simplot's intent to use the lands for gypstack development was "sufficient to show a market demand for that use." 1-ER-32-33. Both of these cases are clearly distinguishable from this one and, indeed, undermine the district court's conclusion.

In *Desert Citizens*, a mining company looked to acquire federal lands to build a regional landfill. 231 F.3d at 1175. The appraisal determined that the highest and best use of the subject lands was "for utilization in conjunction with the current mining operation of the Gold Fields Mesquite Mine." *Id.* at 1182-83. This Court concluded that the appraisal was unreasonable because, among other things, evidence "indicated that the selected lands were expected to be used for landfill purposes, and the existence of *other landfill proposals* in the region indicated a

general market for landfill development." *Id.* at 1181 (emphasis added). Similarly, in *National Parks & Conservation* (another landfill-exchange case), this Court characterized *Desert Citizens* as holding "that the presence of competing proposals alone is sufficient to establish market demand and financial feasibility" and held that other proposals similarly showed market demand and feasibility in that case. 606 F.3d at 1067-68.

This case is the exact opposite. Here, as the district court itself acknowledged, "the Blackrock Land Exchange is distinguishable" since "a gypstack is only valuable to Simplot," "[t]here is not a generalized demand for gypstacks," and there are no "other parties competing to build gypstacks on the federal lands." 1-ER-33. Indeed, there are no other phosphate plants in the area and the federal lands are only valuable to Simplot for its intended use because the lands are adjacent to Simplot's Don Plant—which is not true of any other entity. And assuming it would be permissible to consider Simplot's unique proposed use, this Court's case law does not support the district court's conclusion that it would be arbitrary and capricious not to.

But even if Simplot's intended use required at least some consideration, the appraisal here adequately considered it. The appraisal initially noted that the highest and best use was agricultural uses with speculative investment as allowed by zoning. 2-ER-275. This "as allowed by zoning" qualifier is important. The appraiser explained that the "highest and best use" determination may consider only

36

permissible (legal) uses permitted by zoning.  2-ER-238; *see also* UAS at 23 ("To be a property's highest and best use, the use must be (1) physically possible; (2) *legally permissible*; (3) financially feasible; and (4) must result in the highest value.") (emphasis added).  However, the appraiser immediately noted that "the property has appeal to an adjacent property owner for expansion and investment purposes."  2-ER-275.  That adjacent property owner is Simplot and the company's Don Plant.  *Compare National Parks & Conservation Association*, 606 F.3d at 1067 (appraiser knew about landfill proposal but "explicitly stated that it was not taking 'into consideration any aspect of the proposed landfill project'").

The appraiser's acknowledgment and discussion of market speculation is also an important aspect of the appraisal that the district court ignored.  Sometimes a single market participant can influence real estate prices even if that market participant is the only one who would use the land for a particular proposed use— since the presence of that participant may generate market speculation from others.  But the appraiser here acknowledged that speculative possibility, explaining that "[p]roperty values are higher than supportable by purely agricultural uses with investment speculation and potential for recreation and related uses being strong drivers in the current market" and that "the highest and best use must also include the element of speculation or investment."  2-ER-275.  The appraiser then used a

37

sales comparison approach to value the federal lands based on sales of similar nearby lands.  2-ER-276-283.

Thus, quite unlike *Desert Citizens*—where the appraisal's chosen highest and best use "render[ed] the land virtually valueless in terms of market value," 231 F.3d at 1183 n.11—here neither the district court nor Plaintiffs identified any evidence the appraisal undervalued the lands.  That is no surprise since, again, the Tribes barely briefed this issue.

The appraisal in this case complied with FLPMA's equal-value requirement. This Court should reverse the district court's contrary conclusion.

## III.  BLM reasonably determined that the public interest would be served by the Exchange.[7]

In approving a land exchange, BLM must determine that the public interest will be well served by the exchange.  43 U.S.C. § 1716(a).  Here, BLM determined that the Exchange serves the public interest "because the resource values and the

---

[7] Simplot's petition did not argue that this issue and the NEPA issue the district court resolved against Defendants are controlling questions of law that would independently warrant interlocutory review—and indeed, they probably are not.  But once permission to appeal is granted, this Court "may address any issue fairly included within the certified order because it is the order that is appealable, and not the controlling question identified by the district court." *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 688 (9th Cir. 2011) (quotation marks omitted).  Because these issues were decided in the certified order and were fully briefed below, the United States respectfully submits that it would be far more efficient for this Court to simply decide them now.  Declining to decide them would mean the district court would have to conduct potentially complicated remedy proceedings and this Court might need to decide those issues in a later appeal by one or more parties.

public objectives served by the lands to be acquired outweigh those of the lands to be conveyed." 2-ER-126. BLM based this determination on an extensive analysis of 13 distinct issues impacting the public interest, 2-ER-126-129, and concluded, among other things, that the non-federal lands were equal to or better than those exchanged with respect to recreational opportunities, wildlife habitat, and quality of resources, 2-ER-126-127. The ROD also explained that "the intended use of the conveyed Federal lands will not significantly conflict with established management objectives on adjacent Federal lands and Indian trust lands." 2-ER-127.

In analyzing this issue, the district court acknowledged that judicial review of Interior's public-interest determination is governed by the deferential arbitrary-and-capricious standard. 1-ER-25. And the court upheld virtually all aspects of that determination. In particular, the governing regulation contains eight mandatory factors Interior must consider in making this determination. 43 C.F.R. § 2200.0-6(b). The court held that Interior had adequately considered all these factors. 1-ER-26. And "[t]he considerations that the Tribes say BLM ignored—which are not even mandatory public interest factors—were adequately addressed in the EIS." 1-ER-26. The court also held that Interior appropriately analyzed how the Exchange would affect the Tribe's rights under the 1868 Treaty, the 1898 Cession Agreement, and the 1900 Act. 1-ER-26-27; *see also* 1-ER-26 ("BLM discussed in detail the value of the uses and historical context of the federal lands to be exchanged, the Tribes'

39

exercise of off-reservation treaty rights protected by the Fort Bridger Treaty, the potential presence of burial grounds on the exchanged federal lands, and the impacts on the Tribes' cultural landscape.").

The court nonetheless concluded that the public-interest determination itself—that the land's "resource values and public objectives" if retained "are not more than the resource values . . . and the public objectives they could serve if acquired," 43 C.F.R. § 2200.0-6(b)—did not comply with FLPMA. In reaching this conclusion, the court was explicit that it would "consider[] the ROD only" because "[a]s a NEPA document, the EIS did not—and could not—include the FLPMA public interest determination." 1-ER-27. Even confined to the ROD, the district court *still* concluded that that document "evenhandedly listed many advantages and disadvantages of the land exchange" and adequately balanced the mandatory factors of recreation opportunities and public access, consolidation of lands, protection of wildlife habitats, expansion of communities and fulfillment of public needs, and protection of watersheds. 1-ER-27.

The court determined, however, that the ROD, standing entirely on its own, did not adequately address one particular issue: balancing the protection of cultural resources. 1-ER-27. The district court reasoned that, although the ROD highlighted that there would be a net gain of 113 acres of land available for exercise of off-reservation tribal treaty rights under the Exchange, the ROD did not adequately

consider that the newly acquired lands do not have the same intrinsic value to the Tribes as the former federal lands conveyed to Simplot. 1-ER-28.

The district court's limited critique of the public-interest determination does not withstand scrutiny. As this summary makes clear, the supposed shortcoming the district court identified is entirely dependent on that court's artificial decision to consider only the ROD in evaluating the sufficiency of BLM's public interest determination. Indeed, the court specifically faulted the ROD for "neglect[ing] many of the considerations noted in the EIS." 1-ER-28. And the Court *rejected* Plaintiffs' claim that the EIS failed to take a hard look at the Exchange's impact on cultural resources, ultimately concluding that "the EIS considered and fully disclosed the impacts of the proposed project on cultural resources" as well as "adequately discussed corresponding mitigation measures." 1-ER-52. But it then simply refused to consider any of this in deciding whether BLM's public-interest determination reflected an adequate balancing of the Exchange's effect on cultural resources.

This hyper-formalism fails on multiple levels. Initially, in this precise context, this Court has rejected the proposition that judicial scrutiny of a FLPMA public-interest determination cannot include an EIS. In *National Parks & Conservation Association*, the district court had similarly "[l]ook[ed] only to the Record of Decision" in determining that "BLM did not give 'full consideration' to

41

whether the land exchange is in the public interest." 606 F.3d at 1063.  Considering "the record as a whole," including the EIS, this Court reversed the district court's holding with respect to the public interest determination.  *Id.* at 1069.

In *National Parks & Conservation Association*, the district court decided not to consider the EIS because it wrongly identified a ROD as the agency action under review rather than an Appeals Board decision that incorporated the EIS.  606 F.3d at 1067.  But similarly here, the ROD incorporates the EIS—the decision is "based on the analysis in the EIS."  2-ER-124.  Even assuming the district court were correct in its formalistic conclusion that only the ROD (as opposed to the entire record) could be considered, here the EIS's analysis is part of the ROD insofar as it was incorporated by reference.

Even putting aside this binding precedent, the district court's refusal to consider the EIS defies logic.  First of all, the protection of cultural resources is not exclusively or even primarily a FLPMA concept (which is why Plaintiffs also raised this issue under NEPA).  NEPA requires, among other things, that an EIS include a "discussion" of "'historic and cultural resources.'"  *See North Idaho Community Action Network v. Department of Transportation*, 545 F.3d 1147, 1156 (9th Cir. 2008) (quoting 40 C.F.R. § 1502.16(g)).

More fundamentally and as noted above, the ROD and EIS here are obviously linked.  The ROD *approved* the preferred alternative in the EIS, "implementing the

Blackrock Land Exchange considered in [the] EIS," and the decision is expressly "[b]ased on the analysis in the EIS." 2-ER-124. The EIS is thus part and parcel of the ROD. And even if the agency should have repeated all the analysis from the EIS in the ROD—a cumbersome requirement that does not exist—a court must uphold an agency decision of less-than-ideal clarity if the agency's path can reasonably be discerned (which, at the very least, supports looking to the EIS here). *See, e.g.,* *Bowman Transportation Inc. v. Arkansas-Best Freight System*, 419 U.S. 281, 286 (1974).[8]

As to the EIS that the district court incorrectly refused to consider, that EIS candidly acknowledged that "[t]he Tribes place great intrinsic value on the Howard Mountain area and the Federal lands offered for exchange" and explained in detail why. 3-ER-440. To inform the EIS's consideration of this issue, a Class III cultural resources inventory was conducted on all lands involved in the Exchange, and three sites on the Federal lands were identified as eligible for listing on the National Register of Historic Places. 3-ER-432. The EIS further noted that "[w]hile many of the cultural sites are not recommended as eligible for listing on the [National

---

[8] Indeed, the district court was not even internally consistent in its arbitrary ROD-only approach. In addressing BLM's consideration of the mandatory FLPMA public interest factors, the Court expressly stated that it was reviewing the entire record and liberally cited to the EIS as well as the ROD. 1-ER-26. But consideration of the mandatory public interest factors is just as much a FLPMA task as the public-interest determination itself.

Register of Historic Places], they do provide important cultural history and significance for the Shoshone-Bannock Tribes." 3-ER-432. The EIS listed and discussed cultural sites, as well as examined the direct and indirect impacts and the cumulative effects of each alternative on cultural resources. 3-ER-436-437.

More importantly, the EIS's selection of the preferred alternative—which the ROD adopted—was based in part on the Tribes' concerns regarding protection of cultural resources. The EIS explained that the preferred alternative would "[r]esult in BLM retention of 368 acres of Federal lands . . . including identified cultural and tribal resources," that several important cultural sites "would be retained in Federal ownership," and that Interior had reconfigured the layout of the gypsum stack expansion and cooling ponds to avoid a National Register of Historic Places site. 3-ER-370-371. And the EIS responded to the Tribes' comments on these issues, including their concern that the land likely contains burial sites and other culturally significant sites (by explaining that the surveys conducted on the Federal lands did not identify any burial sites, and "[t]here have been no specifically documented or recorded burial sites on the Federal lands"). 3-ER-532-533. In short, considering the whole record—including the EIS—it is clear that BLM's public-interest determination adequately balanced the protection of cultural resources.

But even if the district court were correct that only the ROD could be considered on this question, the ROD adequately met BLM's burden to balance the

44

protection of public resources. The ROD recounted that BLM consulted with the Tribes multiple times on cultural resources issues and conducted a Class III cultural resources inventory. 2-ER-135. It explained that the preferred alternative it was approving in the EIS was specifically designed "to avoid cultural and tribal resources in the West Canyon area on the north side of Howard Mountain . . . [and to] allow for a net gain of public lands and will make additional lands available for tribal uses." 2-ER-126. And the ROD also provides that a "patent will also be issued to Simplot subject to a deed restriction which would protect [a] National Register of Historic Places (NRHP)-eligible site . . . and provide tribal access to the site in perpetuity." 2-ER-125. And as the district court also held, the ROD adequately considered all of the other factors that make up the public-interest determination.

Finally, even if the district court's analysis on this point correctly identifies an error, any such error would obviously be harmless here. The APA itself provides that "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706. An error is harmless if it "had no bearing on the procedure used or the substance of [the] decision reached." *California Wilderness Coalition v. U.S. Department of Energy*, 631 F.3d 1072, 1092 (9th Cir. 2011) (alteration in original) (quoting *Paulsen v. Daniels*, 413 F.3d 999, 1006 (9th Cir. 2005)). Even if BLM should have replicated all the analysis in the EIS (analysis the district court itself credited) instead of expressly basing its decision on that same EIS, any such failure—if it is

45

appropriately characterized as a failure at all—did not affect the ultimate decision or call into question the procedure the agency followed.

Because there was no error in BLM's public-interest determination—let alone any prejudicial error—this Court should reject the district court's lone critique of the public-interest determination and hold that Interior is entitled to summary judgment as to that determination.

## IV.	BLM reasonably determined that consideration of Simplot's design options was not necessary to conduct an adequate analysis of environmental considerations.

Finally, the district court rejected almost all the Tribes' challenges to Interior's NEPA analysis—concluding that the EIS took the requisite hard look at environmental and health impacts of the preferred alternative (including water quality, air quality, visual resources, public health and safety, and socioeconomics), cultural resources, and environmental justice. 1-ER-43-53. The court also held that the agency considered a reasonable range of alternatives, that its no-action alternative was proper, that it was not required to prepare a supplemental EIS, and that it adequately responded to the Tribe's comments. 1-ER-42, 53-56.

The court, however, found one shortcoming in BLM's NEPA analysis, based on its consideration of Simplot's plans for gypstack and cooling-pond construction. The district court found that the EIS "thoroughly analyzed" the "the construction of cooling ponds, gypstacks, and the associated infrastructure" but should have

46

conducted a more detailed review of specific design options for Simplot's cooling ponds and expanded gypsum stacks. 1-ER-39-40.

This was error. BLM reasonably determined that "a more specific review of design options for the cooling ponds and expanded gypsum stacks, that may be necessary under existing or future consent orders with the IDEQ and/or EPA" was "beyond the scope" of the EIS because the facilities would be on private land and "Simplot would be responsible for determining final engineering and design details of the gypsum stack expansions and the cooling ponds and permitting these facilities in accordance with other Federal and State requirements." 3-ER-404. BLM determined that it could rely on oversight from IDEQ and EPA, and BLM "assume[d] that the transferred lands will be managed in conformance with all applicable statutes, regulations, and rules governing the actions and/or inactions of private local, State, tribal, and Federal interests that acquire jurisdiction in some capacity over said lands." 3-ER-384.

BLM's reasons for declining to consider specific design options were adequate. "[A]n agency may assume effective enforcement in the ordinary case." *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 803 (D.C. Cir. 2022).

*Gulf Restoration Network*, on which the district court relied, exemplifies the sort of extreme case in which that assumption may be overcome. In that decision, the D.C. Circuit held that the Bureau of Ocean Energy Management (BOEM)

47

unreasonably refused to consider possible deficiencies in environmental enforcement in approving two lease sales. BOEM had "repeatedly factored" in enforcement by the Bureau of Safety and Environmental Enforcement (BSEE) in approving the sales. 47 F.4th at 803. A report by the U.S. Government Accountability Office, however, had sharply criticized BSEE's enforcement practices, faulting BSEE for maintaining "outdated policies and procedures" and failing to develop "criteria to guide how it uses enforcement tools," and further finding that this lack of criteria "cause[d] BSEE to act inconsistently, create[d] uncertainty about BSEE's oversight approach and expectations, and risk[ed] undermining [agency] effectiveness." *Id.* (quotation marks omitted) (final alteration supplied by court). Indeed, "BOEM promised to address the asserted deficiencies at the leasing stage" but "later reneged, telling commenters that the issues were outside the scope of the EISs at that stage." *Id.*

This case is clearly distinguishable from *Gulf Restoration Network*. The district court reasoned that BLM could not rely on future enforcement absent further explanation because, as the court saw it, "there is a decades-long history of enforcement with mixed results." 1-ER-41. This is not a fair or complete summary of the enforcement history. In 1998, EPA made 2,530 acres of land—including the Simplot facility—part of a Superfund site after it had previously found contaminants in the groundwater, soil, and vegetation. 3-ER-385. In the decades since, the record

48

shows that EPA and IDEQ have taken a number of additional steps. In 2001, the EPA issued a consent decree requiring Simplot to install a groundwater extraction system to remove contaminated groundwater. 3-ER-385. In 2017, pursuant to a 2010 amendment to the 2001 consent decree and a 2008 consent order with IDEQ, Simplot installed a liner on top of its existing gypstack. 3-ER-386. In addition, in 2015 Simplot and the United States reached a settlement to resolve alleged Clean Air Act violations at the Don Plant and four other Simplot facilities, under which Simplot agreed to pay civil penalties and install various pollution controls and monitoring systems to reduce public health risks associated with its facilities. 3-ER-386. Indeed, the district court itself credited the EIS for "highlight[ing] the multiple consent decrees and orders that Simplot has entered into with IDEQ and EPA and remedial actions taken on the site to address past contamination and reduce future pollution," as well as for "accurately depict[ing] the historical contamination, the efforts to reduce pollution, and the results of those efforts." 1-ER-41.

More importantly, neither the Tribes nor the district court pointed to any evidence that, going forward, EPA and IDEQ would be unwilling or unable to ensure compliance with applicable legal requirements. The voluntary consent order with IDEQ also requires Simplot to install a liner in any *new* gypstack it constructs. 3-ER-386. In addition, a 2016 Consent Order between Simplot and IDEQ requires Simplot to reduce fluoride emissions by 2026. 3-ER-386. BLM did not act

49

arbitrarily or capriciously in determining in these circumstances that it could rely on oversight from IDEQ and EPA.

For related reasons, there is likewise no merit to the district court's conclusion that BLM was required to analyze Simplot's preliminary plans for the locations of the gypsum stacks and cooling ponds. 1-ER-40. The agency explained that these "preliminary conceptual designs" would be subject not only to permitting requirements but also "subject to change based on technical changes, final engineering, Don Plant production, and other factors." 3-ER-401-402. The agency appropriately deemed consideration of this an inherently preliminary and uncertain issue beyond the scope of the EIS.

Interior conducted a rigorous NEPA analysis and committed no error with respect to the single asserted defect the district court identified. This Court should reverse the district court's conclusion on this narrow issue as well.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's four rulings adverse to Defendants.

Respectfully submitted,

/s/ *Andrew M. Bernie*
TODD KIM
*Assistant Attorney General*
ROBERT J. LUNDMAN
DANIEL J. HALAINEN
ANDREW M. BERNIE
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Avenue N.W.
Washington, D.C. 20530
(202) 514-4010
andrew.m.bernie@usdoj.gov

Dated: January 17, 2024
DJ# 90-2-4-16201

## STATEMENT OF RELATED CASES

This case is related to No 23-35544, Simplot's appeal of the same underlying interlocutory order.

**Form 8.  Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)**        23-35543.

I am the attorney or self-represented party.

**This brief contains 12,190 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ X ]   complies with the word limit of Cir. R. 32-1.
[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
[  ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[]   complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties;
    [] a party or parties are filing a single brief in response to multiple briefs; or
    [  ] a party or parties are filing a single brief in response to a longer joint brief.
[  ] complies with the length limit designated by court order dated _____.
[]   is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**   s/ *Andrew M. Bernie*

**Date**        January 17, 2024

# ADDENDUM

Act of June 6, 1900, 31 Stat. 672 (1900) (excerpts) .................................................. 1a

An Act Relating to Ceded Lands on the Fort Hall Indian Reservation,
33 Stat. 153 (1904).................................................................................................... 2a

43 U.S.C. § 1701 (excerpts)...................................................................................... 3a

43 U.S.C. § 1702 (excerpts)...................................................................................... 4a

43 U.S.C. § 1716 (excerpts)...................................................................................... 5a

43 C.F.R. § 2200.0-5 (excerpts)................................................................................ 7a

43 C.F.R. § 2200.0-6 (excerpts)................................................................................ 8a

43 C.F.R. § 2201.3 .................................................................................................... 9a

43 C.F.R. § 2201.3-2................................................................................................ 10a

**Act of June 6, 1900, 31 Stat. 672 (1900)**

. . . .

SEC. 5. That on the completion of the allotments and the preparation of the schedule provided for in the preceding section, and the classification of the lands as provided for herein, the residue of said ceded lands shall be opened to settlement by the proclamation of the President, and shall be subject to disposal under the homestead, town-site, stone and timber, and mining laws of the United States only, excepting as to price and excepting the sixteenth and thirty-sixth sections in each Congressional township, which shall be reserved for common-school purposes and be subject to the laws of Idaho: *Provided*, That all purchasers of land lying under the canal of the Idaho Canal Company, and which are susceptible of irrigation from the water of said canal, shall pay for the same at the rate of ten dollars per acre; all agricultural lands not under said canal shall be paid for at the rate of two dollars and fifty cents per acre, and grazing lands at the rate of one dollar and twenty-five cents per acre, one-fifth of the respective sums to be paid at the time of original entry, and four-fifths thereof at the time of making final proof; but not purchaser shall be permitted in any manner to purchase more than one hundred and sixty acres of the land hereinbefore referred to; but the rights of honorably discharged Union soldiers and sailors, as defied and described in sections twenty-three hundred and four and twenty-three hundred and five of the Revised States of the United States, shall not be abridged, except as to the sum to be paid as aforesaid.

The classification as to agricultural and grazing lands shall be made by an employee of the General Land Office under the direction of the Secretary of the Interior.

No lands in sections sixteen and thirty-six now occupied, as set forth in article three on the agreement herein ratified, shall be reserved for school purposes, but the State of Idaho shall be entitled to indemnity for any lands so occupied: *Provided*, That none of said lands shall be disposed of under the town-site laws for less than ten dollars per acre: *And provided further*, That all of said lands within five miles of the boundary line of the town of Pocatello shall be sold at public auction, payable as aforesaid, under the direction of the Secretary of the Interior for not less than ten dollars per acre: *And provided further*, That any mineral lands within said five mile limit shall be disposed of under the mineral land laws of the United States, excepting that the price of such mineral lands shall be fixed at ten dollars per acre instead of the price fixed by said mineral land laws.

**An Act Relating to Ceded Lands**
**on the Fort Hall Indian Reservation, 33 Stat. 153 (1904).**

That all lands of the former Fort Hall Indian Reservation, in the State of Idaho, within five miles of the boundary line of the town of Pocatello, offered for sale at public auction on and after July seventeenth, nineteen hundred and two, in accordance with the provisions of the Act of Congress of June sixth, nineteen hundred (Thirty-first Statutes, page six hundred and seventy-two), and the proclamation of the President of May seventh, nineteen hundred and two, thereunder, and which remain unsold after such offering, shall be subject to entry under and in accordance with the provisions of section five of said Act and at the prices therein fixed, at a time and in accordance with regulations to be prescribed by the Secretary of the Interior: *Provided*, That the improvements made by certain Indians upon the following described lands, namely: Lot four, section one, township seven south, range thirty-four east, and the southeast quarter of the northeast quarter, section eighteen, township seven south, range thirty-five east, and the east half of the southeast quarter of section twenty-one, township six south, range thirty-four east, and which have heretofore been appraised, shall be paid for at the said appraised value, at the time of and by the person making entry of the respective tracts upon which such improvements are situated.

# 43 U.S.C. § 1701

## 43 U.S.C. § 1701. Congressional declaration of policy

**(a)** The Congress declares that it is the policy of the United States that--

. . . .

**(10)** uniform procedures for any disposal of public land, acquisition of non-Federal land for public purposes, and the exchange of such lands be established by statute, requiring each disposal, acquisition, and exchange to be consistent with the prescribed mission of the department or agency involved, and reserving to the Congress review of disposals in excess of a specified acreage;

. . . .

**43 U.S.C. § 1702. Definitions**

Without altering in any way the meaning of the following terms as used in any other statute, whether or not such statute is referred to in, or amended by, this Act, as used in this Act—

. . . .

**(c)** The term "multiple use" means the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output.

. . . .

**(e)** The term "public lands" means any land and interest in land owned by the United States within the several States and administered by the Secretary of the Interior through the Bureau of Land Management, without regard to how the United States acquired ownership, except—

> **(1)** lands located on the Outer Continental Shelf; and
>
> **(2)** lands held for the benefit of Indians, Aleuts, and Eskimos.

. . . .

# 43 U.S.C. § 1716

**43 U.S.C. § 1716. Exchanges of public lands or interests therein within the National Forest System**

**(a) Authorization and limitations on authority of Secretary of the Interior and Secretary of Agriculture**

A tract of public land or interests therein may be disposed of by exchange by the Secretary under this Act and a tract of land or interests therein within the National Forest System may be disposed of by exchange by the Secretary of Agriculture under applicable law where the Secretary concerned determines that the public interest will be well served by making that exchange: Provided, That when considering public interest the Secretary concerned shall give full consideration to better Federal land management and the needs of State and local people, including needs for lands for the economy, community expansion, recreation areas, food, fiber, minerals, and fish and wildlife and the Secretary concerned finds that the values and the objectives which Federal lands or interests to be conveyed may serve if retained in Federal ownership are not more than the values of the non-Federal lands or interests and the public objectives they could serve if acquired.

**(b) Implementation requirements; cash equalization waiver**

. . . .

The values of the lands exchanged by the Secretary under this Act and by the Secretary of Agriculture under applicable law relating to lands within the National Forest System either shall be equal, or if they are not equal, the values shall be equalized by the payment of money to the grantor or to the Secretary concerned as the circumstances require so long as payment does not exceed 25 per centum of the total value of the lands or interests transferred out of Federal ownership.

. . . .

**(d) Appraisal of land; submission to arbitrator; determination to proceed or withdraw from exchange; use of other valuation process; suspension of deadlines**

**(1)** No later than ninety days after entering into an agreement to initiate an exchange of land or interests therein pursuant to this Act or other applicable law, the Secretary concerned and other party or parties involved in the exchange shall arrange for appraisal (to be completed within a time frame and under such terms as are negotiated by the parties) of the lands or interests therein involved in the exchange in accordance with subsection (f) of this section.

. . . .

**(f) New rules and regulations; appraisal rules and regulations; "costs and other responsibilities or requirements" defined**

**(1)** Within one year after August 20, 1988, the Secretaries of the Interior and Agriculture shall promulgate new and comprehensive rules and regulations governing exchanges of land and interests therein pursuant to this Act and other applicable law. Such rules and regulations shall fully reflect the changes in law made by subsections (d) through (i) of this section and shall include provisions pertaining to appraisals of lands and interests therein involved in such exchanges.

**(2)** The provisions of the rules and regulations issued pursuant to paragraph (1) of this subsection governing appraisals shall reflect nationally recognized appraisal standards, including, to the extent appropriate, the Uniform Appraisal Standards for Federal Land Acquisitions…

. . . .

**43 C.F.R. § 2200.0–5**

**43 C.F.R. § 2200.0–5 Definitions.**

As used in this part:

. . . .

(c) Appraisal or Appraisal report means a written statement independently and impartially prepared by a qualified appraiser setting forth an opinion as to the market value of the lands or interests in lands as of a specific date(s), supported by the presentation and analysis of relevant market information.

. . . .

(n) Market value means the most probable price in cash, or terms equivalent to cash, that lands or interests in lands should bring in a competitive and open market under all conditions requisite to a fair sale, where the buyer and seller each acts prudently and knowledgeably, and the price is not affected by undue influence.

. . . .

## 43 C.F.R. § 2200.0–6

**43 C.F.R. § 2200.0–6 Policy.**

. . . .

(b) Determination of public interest. The authorized officer may complete an exchange only after a determination is made that the public interest will be well served. When considering the public interest, the authorized officer shall give full consideration to the opportunity to achieve better management of Federal lands, to meet the needs of State and local residents and their economies, and to secure important objectives, including but not limited to: Protection of fish and wildlife habitats, cultural resources, watersheds, wilderness and aesthetic values; enhancement of recreation opportunities and public access; consolidation of lands and/or interests in lands, such as mineral and timber interests, for more logical and efficient management and development; consolidation of split estates; expansion of communities; accommodation of land use authorizations; promotion of multiple-use values; and fulfillment of public needs. In making this determination, the authorized officer must find that:

> (1) The resource values and the public objectives that the Federal lands or interests to be conveyed may serve if retained in Federal ownership are not more than the resource values of the non-Federal lands or interests and the public objectives they could serve if acquired, and

> (2) The intended use of the conveyed Federal lands will not, in the determination of the authorized officer, significantly conflict with established management objectives on adjacent Federal lands and Indian trust lands. Such finding and the supporting rationale shall be made part of the administrative record.

(c) Equal value exchanges. Except as provided in § 2201.5 of this part, lands or interests to be exchanged shall be of equal value or equalized in accordance with the methods set forth in § 2201.6 of this part. An exchange of lands or interests shall be based on market value as determined by the Secretary through appraisal(s), through bargaining based on appraisal(s), or through arbitration.

. . . .

# 43 C.F.R. § 2201.3

## 43 C.F.R. § 2201.3 Appraisals.

The Federal and non-Federal parties to an exchange shall comply with the appraisal standards set forth in §§ 2201.3–1 through 2201.3–4 of this part and, to the extent appropriate, with the Department of Justice "Uniform Appraisal Standards for Federal Land Acquisitions" when appraising the values of the Federal and non-Federal lands involved in an exchange.

## 43 C.F.R. § 2201.3-2

**43 C.F.R. § 2201.3–2 Market value.**

(a) In estimating market value, the appraiser shall:

(1) Determine the highest and best use of the property to be appraised;

(2) Estimate the value of the lands and interests as if in private ownership and available for sale in the open market;

(3) Include historic, wildlife, recreation, wilderness, scenic, cultural, or other resource values or amenities that are reflected in prices paid for similar properties in the competitive market;

(4) Consider the contributory value of any interest in land such as minerals, water rights, or timber to the extent they are consistent with the highest and best use of the property; and

(5) Estimate separately, if stipulated in the agreement to initiate in accordance with § 2201.1 of this part, the value of each property optioned or acquired from multiple ownerships by the non-Federal party for purposes of exchange, pursuant to § 2201.1–1 of this part. In this case, the appraiser shall estimate the value of the Federal and non-Federal properties in a similar manner.

(b) In estimating market value, the appraiser may not independently add the separate values of the fractional interests to be conveyed, unless market evidence indicates the following:

(1) The various interests contribute their full value (pro rata) to the value of the whole; and

(2) The valuation is compatible with the highest and best use of the property.

(c) In the absence of current market information reliably supporting value, the authorized officer may use other acceptable and commonly recognized methods to determine market value.