# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SHOSHONE-BANNOCK TRIBES OF THE FORT HALL
RESERVATION,

*Plaintiff-Appellee*;

v.

U.S. DEPARTMENT OF THE INTERIOR; UNITED STATES BUREAU
OF LAND MANAGEMENT; LAURA DANIEL-DAVIS, Principle
Assistant Secretary for Land and Minerals Management,

*Defendants-Appellants*; and

J.R. SIMPLOT COMPANY,

*Intervenor-Defendant-Appellant*.

ON APPEAL FROM THE DISTRICT OF IDAHO
NO. 4:20-CV-00553-BLW
THE HONORABLE JUDGE B. LYNN WINMILL, PRESIDING

## BRIEF OF IDAHO AND UTAH AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLANTS, INTERVENOR-DEFENDANT-APPEALLANT, AND REVERSAL

RAÚL R. LABRADOR, ATTORNEY GENERAL OF IDAHO
SCOTT L. CAMPBELL, Chief of Energy and Natural Resources Division
700 W. State Street, 2nd Floor,
P.O. Box 83720, Boise, ID 83720-0010
(208) 334-2400, scott.campbell@ag.idaho.gov
            *Counsel for* Amicus *State of Idaho*

SEAN D. REYES, ATTORNEY GENERAL OF UTAH
MELISSA A. HOLYOAK, Solicitor General
350 N. State Steet, Suite 230,
P.O. Box 142320, Salt Lake City, UT 84114-2320
(801) 538-9600, melissaholyoak@agutah.gov
            *Counsel for* Amicus *State of Utah*

# TABLE OF CONTENTS

INTEREST OF AMICI CURIAE.................................................................1

SUMMARY OF THE ARGUMENT.............................................................2

BACKGROUND ......................................................................................4

ARGUMENT............................................................................................6

**I. The 1900 Act permits land exchanges under FLPMA.**................6

A. The 1900 Act permits disposal of ceded lands under the general body of public land laws as they have evolved over time, including FLPMA. .7

B. The district court's interpretation of the 1900 Act produces absurd results. ...........................................................................................12

**II. If no market competition exists, the appraised market value for the federal property cannot consider the value to the nonfederal party arising from its individually unique need for the federal land.** .............................................................................16

CONCLUSION....................................................................................20

CERTIFICATE OF SERVICE ................................................................22

FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS............................23

i

## Cases

*Ariz. State Bd. For Charter Schs. v. U.S. Dep't of Educ.*, 464 F.3d 1003 (9th Cir. 2006) ..................................................................................... 15

*Biden v. Sierra Club*, 142 S. Ct. 56 (2021) ............................................ 15

*Culver v. People ex rel. Kochersperger*, 43 N.E. 812 (1896) ................... 10

*Desert Citizens Against Pollution v. Bission*, 231 F.3d 1172 (9th Cir. 2000) ............................................................................................... 22, 23

*Food Mktg. Inst. v. Argus Leader Media*, 139 U.S. 2356 (2019) .............. 6

*Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564 (1982) ...................... 14

*Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759 (2019) ................................... 9, 10

*Lamie v. U.S. Tr.*, 540 U.S. 526 (2004) ................................................... 7

*Leo Sheep Co. v. United States*, 440 U.S. 668 (1979) ............................. 18

*McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020) ......................................... 8

*Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058 (9th Cir. 2010) ...................................................................... 22, 23

*Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997) ...................................... 7

*Schroeder v. United States*, 793 F.3d 1080 (9th Cir. 2015) ...................... 7

*Sierra Club v. Trump*, 977 F.3d 853 (9th Cir. 2020) ............................. 15

*The Wilderness Soc. v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051 (9th Cir. 2003) .......................................................................................... 7

*Tovar v. Sessions*, 882 F.3d 895 (9th Cir. 2018) .............................. 14, 15

*United States v. LKAV*, 712 F.3d 436 (9th Cir. 2013) ........................7, 14

**Statutes**

15 Stat. 198 ................................................................................5

17 Stat. 228 ................................................................................5

17 Stat. 633 ................................................................................5

18 Stat. 516 ................................................................................5

23 Stat. 76 ..................................................................................6

25 Stat. 113 ................................................................................6

25 Stat. 757 ................................................................................6

25 Stat. 980 ................................................................................6

26 Stat. 749 ................................................................................6

26 Stat. 989 ............................................................................3, 6

27 Stat. 120 ............................................................................3, 6

27 Stat. 557 ................................................................................6

27 Stat. 612 ................................................................................6

28 Stat. 286 ............................................................................3, 6

29 Stat. 321 ................................................................................6

30 Stat. 62 ..................................................................................6

30 U.S.C. § 22 ...........................................................................12

31 Stat 672 ............................................................................6

32 Stat. 245 ..........................................................................6

36 Stat. 367 ..........................................................................6

43 U.S.C. § 1701 ...................................................................1

43 U.S.C. § 1701(a)(10) ......................................................11

43 U.S.C. § 1701(a)(12) ......................................................13

43 U.S.C. § 1712(c)(9) ........................................................17

43 U.S.C. § 1716(a) .............................................................18

43 U.S.C. § 1716(b) .............................................................19

43 U.S.C. § 1716(d)(1) ........................................................19

43 U.S.C. § 321 ...................................................................12

Act of June 6, 1900, 31 Stat. 672 (1900) ........................... 1, 3, 8

Pub L. No. 72-118, 47 Stat. 146 ........................................11

Pub. L. No. 69-250, 44 Stat. 566 .......................................10

Pub. L. No. 94-579, §§ 702-703, 90 Stat. 2787-91 ..................13

## Other Authorities

2 J. SUTHERLAND, STATUTORY CONSTRUCTION §§ 5207-5208 (3d ed. 1943)
.......................................................................................9

H.R. No. 94-1163 (1976) ............................................... 12, 13

Schedule of Indian Land Cessions describing cession by or reservation for the Indian Tribes in the United States, available at https://library.law.northwestern.edu/ld.php?content_id=75088224 ..... 3

Uniform Appraisal Standards for Federal Land Acquisitions § 4.10 .... 21

Uniform Appraisal Standards for Federal Land Acquisitions § 4.3.1 ... 20

Utah Public Lands Policy Coordinating Office, State and County Resource Management Planning, https://publiclands.utah.gov/community/resources-management-planning/ ...................................................................................................... 17

**Rules**

Federal Rule of Appellate Procedure 29(a)(2) ........................................ 1

**Regulations**

43 C.F.R. § 2200.0-5(c) ........................................................................... 20

43 C.F.R. § 2201.3 ................................................................................... 21

43 C.F.R. § 2201.3-2(a)(1) ...................................................................... 21

43 C.F.R. § 2200.0-5(n) ........................................................................... 21

The State of Idaho has a significant interest in the correct interpretation of the 1900 Cession Act (the "1900 Act"), 31 Stat. 672, and the Federal Land Management and Policy Act of 1976 ("FLPMA"), 43 U.S.C. § 1701 *et seq.*[1] The State owns and manages millions of acres of lands, some of which fall within territories ceded by Shoshone Bannock Tribes of the Fort Hall Reservation (the "Tribes"). The district court's erroneous interpretation of the 1900 Act and FLPMA, if it stands, would disrupt more than a century of settled expectations regarding title to those lands, and hobble the effective management of public lands in the process.

The 1900 Act is not a one-off. To the contrary, it is merely one example of a common type of cession act passed during the late 1800s and early 1900s. Collectively, these cession acts returned tens of millions of acres of land to the public domain, subject to disposal by the federal government. Over the last century or more, the federal government transferred some of these lands to private owners, some of them to the

---

[1] The State of Idaho, through its Attorney General, and the State of Utah, through its Attorney General submit this amicus brief pursuant to Federal Rule of Appellate Procedure 29(a)(2).

states, and reserved others for itself. Settled expectations regarding ownership of these lands pervade public and private land management decisions large and small. Fundamentally, states like Idaho and Utah cannot effectively manage state-owned lands, properly inform the Bureau of Land Management ("BLM") about state-specific concerns related to public lands management, or otherwise perform proper state functions in ceded areas if they must guess whether they or another entity have jurisdiction over those lands. Accordingly, Idaho and Utah submit this amicus brief urging reversal of the district court's decision in order to protect the States' interests in managing state-owned lands and their citizens' interests in holding clean title to ceded lands that are now private property.

## SUMMARY OF THE ARGUMENT

The district court's holding that there are no laws of the United States in existence that can be used to dispose of ceded lands must be reversed.

The 1900 Act does not prevent disposal of ceded land under FLPMA. The plain meaning of the 1900 Act incorporates general land disposal statutes of the United States as they evolved over time,

2

including FLPMA. Moreover, the district court's interpretation must be rejected because it could lead to an absurd result – throwing millions of acres of lands into disarray regarding ownership and management authority.[2] For instance, in Idaho alone there are nearly 5 million acres of ceded lands that could be affected by the district court's erroneous ruling.[3]

Second, the district court erred in requiring an appraisal of the exchanged lands to reflect "market value" in light of the unique proposed use for the exchanged property. Established appraisal standards only require consideration of a proposed use if there is a competitive regional market for that use. Here, no such market exists for Simplot's proposed use, so the BLM did not act arbitrarily and capriciously by relying on an appraisal that did not account for the idiosyncratic use of the property.

If not corrected, the district court's decision threatens to upend management of hundreds of thousands of acres of public lands in Idaho,

---

[2] *See* Schedule of Indian Land Cessions describing cession by or reservation for the Indian Tribes in the United States, available at https://library.law.northwestern.edu/ld.php?content_id=75088224.

[3] At least four cession acts involve Idaho: 26 Stat. 989; 27 Stat. 120; 28 Stat. 286, and 31 Stat. 672. All told, these acts returned more than five million acres of land from the Coeur d'Alene, Nez Perce, and Fort Hall Reservations to the public domain.

and millions of acres of public lands in other states. This Court should reverse the district court's decision and reaffirm the settled expectations with respect to ownership of ceded lands and the ability of the federal government to dispose of those lands.

## BACKGROUND

In 1898, the Tribes agreed to "cede, grant, and relinquish to the United States all right, title, and interest" to more than 400,000 acres of land in Southeast Idaho, returning that land to the public domain for settlement purposes ("1898 Agreement"). 31 Stat. 672. Congress ratified that agreement in 1900, providing that "ceded lands shall be opened to settlement by proclamation of the President, and shall be subject to disposal under the homestead, townsite, stone and timber, and mining laws of the United States only." 31 Stat. 676. More than a century later, the BLM, pursuant to its authority under FLPMA, completed a land exchange (the "Blackrock Exchange") with the J.R. Simplot Company ("Simplot") to transfer public lands in the ceded area owned by the federal government to Simplot.

Notwithstanding the BLM's clear authority under FLPMA, the district court held that the Blackrock Exchange violated the 1900 Act. In

4

reaching this conclusion, the district court gave the 1900 Act an unnatural reading with staggering results, reasoning that "because Congress has repealed nearly all the homestead, townsite, stone and timber, and mining laws, the *federal government does not currently have a viable method for disposing of the ceded lands.*" Mem. Decision & Order at 12 (Dkt. 89) (emphasis added). The 1900 Act is exemplary of a type of cession act passed near the turn of the twentieth century in the Allotment Era. These cession acts, which contain materially similar and, in some cases, identical disposal language to the 1900 Act, cover nearly 50,000,000 acres of land in numerous states.[4] The district court's decision, if affirmed, promises to create legal crisis in these lands, leaving federal and state public land managers guessing as to the scope of their jurisdiction and private landowners questioning their title. As explained below, this Court should avoid that result, reverse the district court's decision, and reaffirm the BLM's authority to manage ceded lands pursuant to FLPMA.

---

[4] *See* 15 Stat. 198; 17 Stat. 228; 17 Stat. 633; 18 Stat. 516; 23 Stat. 76; 25 Stat. 113; 25 Stat. 757; 25 Stat. 980; 26 Stat. 749; 26 Stat. 989; 27 Stat. 120; 27 Stat. 557; 27 Stat. 612; 28 Stat. 286; 29 Stat. 321; 30 Stat. 62; 31 Stat 672; 32 Stat. 245; 36 Stat. 367 (partial listing of cession acts).

## I. The 1900 Act permits land exchanges under FLPMA.

Statutory interpretation begins with "a careful examination of the ordinary meaning and structure of the law itself." *Food Mktg. Inst. v. Argus Leader Media*, 139 U.S. 2356, 2364 (2019). When the statute's meaning is plain, "the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms." *Schroeder v. United States*, 793 F.3d 1080, 1083 (9th Cir. 2015) (citing *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004)). Understanding a statute's plain meaning requires an analysis of "the language itself, the specific context in which the language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). Thus, courts rely on "established rules of statutory construction" to understand a statute's meaning. *United States v. LKAV*, 712 F.3d 436, 440 (9th Cir. 2013); *see also The Wilderness Soc. v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1059 (9th Cir. 2003) ("Canons of statutory construction help give meaning to a statute's words."). Only if the language is ambiguous may the court look to extratextual sources to

construe the meaning of the act. *McGirt v. Oklahoma,* 140 S. Ct. 2452, 2469 (2020).

A. <u>The 1900 Act permits disposal of ceded lands under the general body of public land laws as they have evolved over time, including FLPMA.</u>

Section 5 of the 1900 Act provides that lands ceded under the 1898 Agreement "shall be opened to settlement . . . and shall be subject to disposal under the homestead, townsite, stone and timber, and mining laws of the United States only." 31 Stat. 676. This language does not prevent disposal of ceded lands under FLPMA because FLPMA is the successor statute to many of those general public land laws referenced in the 1900 Act. Rather than imposing a moratorium on federal land transfers in ceded areas, the text and structure of the 1900 Act reveals a plain meaning to incorporate federal public land disposal statutes as they may evolve over time. FLPMA – which established a cohesive and uniform system for federal land disposal – falls squarely within the land disposal requirements of the 1900 Act.

Congress's choice to reference general categories of public land laws, as opposed to specific statutes then in existence, incorporates federal land disposal authority as it may exist at any given time, as

opposed to the authority that existed as of the date the 1900 Act was passed. An enactment may incorporate another law, or body of law, either generally or specifically. *Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 769 (2019). A statute referencing a general body of law "adopts the law on that subject as it exists whenever a question under the statute arises." *Id.* (citing 2 J. SUTHERLAND, STATUTORY CONSTRUCTION §§ 5207-5208 (3d ed. 1943)). Conversely, if a statute references another statute "by specific title or section number," the referenced statute is incorporated into the referring statute "as it existed when the referring statute was enacted, without any subsequent amendments." *Id.* (citing *Culver v. People ex rel. Kochersperger*, 43 N.E. 812, 814-815 (1896)).

The 1900 Act's reference to "homestead, townsite, stone and timber, and mining laws of the United States" is a general, rather than specific, reference. The 1900 Act references those general bodies of law as they may evolve over time, as opposed to specifically cited provisions or section numbers of any then-existing public land law. If Congress had intended to incorporate the specific land disposal provisions of, for instance, the Homestead Act of 1862 or Mining Law of 1872, it could have done so by

reference to those Acts' locations in the United States Statutes at Large.[5]
It did not. Instead, Congress chose to generally reference categories of
laws allowing for disposal of federal lands, including ceded lands, into
private hands. This makes practical sense, given the shifting landscape
and frequent amendments to public land disposal laws at the turn of the
century. Thus, the 1900 Act is a general reference statute, naturally read
to incorporate general public land disposal authorities as they develop
over time.

The current law governing disposal of ceded lands is FLPMA. At
its core, FLPMA expresses a national policy to have "uniform procedures

---

[5] Indeed, Congress evidently knew how to specifically reference public
land statutes to facilitate the disposition of ceded lands, because it did so
twice with respect to the lands ceded under the 1900 Act. First, in 1926
Congress specifically applied the land disposal provisions of the Isolated
Tracts Act to the ceded lands, stating "the provisions of section 2455,
United States Revised Statutes, as amended by the Act of June 27, 1906
(Thirty-fourth Statutes at Large, page 517) and by the act of March 28,
1912 (thirty-seventh Statutes at Large, page 77) are made applicable to
the ceded lands on the former Fort Hall Indian Reservation." Pub. L. No.
69-250, 44 Stat. 566. Likewise, in 1932 Congress applied the land
disposal provisions of the Desert Lands Act of 1877 to the ceded lands,
providing "the provisions of the Act entitled 'An Act to provide for the sale
of desert lands in certain States and Territories,' approved March 3, 1877
(19 Stat. 377), and Act amendatory thereof, are made applicable to the
ceded lands on the former Fort Hall Indian Reservation." Pub L. No. 72-
118, 47 Stat. 146.

for any disposal of public land, acquisition of non-Federal land for public purposes, and the exchange of such lands . . . established by statute." 43 U.S.C. § 1701(a)(10). Rather than having public land disposal authorities scattered amongst the sundry bodies of law referenced in the 1900 Act, FLPMA established a uniform statutory structure for public land disposal. *See* H.R. No. 94-1163, at 1-2 (1976) (stating that FLPMA was intended to modernize the "thousands of public land laws" then in existence and refine them into a "coherent expression of Congressional policies adequate for today's national goals."). In providing uniformity, FLPMA did not effectuate a wholesale elimination of each body of law mentioned in the 1900 Act. It merely consolidated land disposal provisions from those laws into a single, unified framework.[6] Importantly, to the extent that FLPMA repealed certain public land disposal provisions, it also *replaced* them with a uniform and consistent set of public land disposal procedures.[7] Since the 1900 Act generally

---

[6] Indeed, FLPMA left some historic land disposal statutes untouched, such as the General Mining Act of 1872 and the Desert Lands Act of 1877. *See* 30 U.S.C. § 22; 43 U.S.C. § 321.

[7] Properly understood, there would be no need, as the district court stated, for FLPMA to have repealed (implicitly or otherwise) the 1900 Act to effectively allow the disposal of ceded lands. *See* Mem. Decision & Order at 13 (Dkt. 89). Instead, the 1900 Act's general reference to

incorporates public land disposal laws as they develop over time, FLPMA – the replacement for those laws – falls within the 1900 Act's disposal mandate.

Further, FLPMA encompasses at least part of the subject matter of the categories of laws referenced in the 1900 Act. To be sure, FLPMA repealed homestead laws that were obsolete following settlement of the West, and townsite laws because of the need for more robust land use planning provisions. H.R. No. 94-1163, at 23-25; *see also* FLPMA, Pub. L. No. 94-579, §§ 702-703, 90 Stat. 2787-91. However, FLPMA also addresses other subject areas referenced in the 1900 Act, by directing the BLM to manage public lands "in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands, including implementation of the Mining and Minerals Policy Act of 1970 . . . as it pertains to public lands." 43 U.S.C. § 1701(a)(12). With this in mind, the 1900 Act's general reference to "stone

---

disposal under various public land laws should be read to include FLPMA – the current public land law addressing disposal of the ceded lands. Moreover, repealing the 1900 Act outright would have indeterminate consequences relating to the Congressional ratification of the 1898 Agreement, and the 1900 Act's reservation of Sections 16 and 36 as Idaho state endowment lands under the Equal Footing Doctrine and the Idaho Admission Bill.

and timber, and mining laws of the United States" extends to include FLPMA because it is a public land law of the United States that addresses management of timber and mineral resources.

In concluding that the federal government has no viable means of disposing of ceded lands, the district court failed to appreciate how FLPMA dovetailed with the bodies of law referenced in the 1900 Act. Since the plain meaning of the 1900 Act is to incorporate public land disposal provisions as they evolve over time, FLPMA squarely fits within that incorporation because it provides the current authority for public land disposal.

B. <u>The district court's interpretation of the 1900 Act produces absurd results.</u>

The district court's conclusion that there is no legal authority permitting disposal of ceded lands leads to absurd results and must be rejected. This Court has consistently held that "interpretations which would produce absurd results are to be avoided." *See, e.g., United States v. LKAV*, 712 F.3d 436, 440 (9th Cir. 2013); *Tovar v. Sessions*, 882 F.3d 895, 904 (9th Cir. 2018) (citing *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982)). Where an alternative interpretation of a statute that is consistent with legislative intent is apparent, it should be adopted

in lieu of an interpretation with absurd consequences. *Tovar*, 882 F.3d at 904. Similarly, interpretations with "unnecessarily expansive results" should be avoided absent clear Congressional guidance. *See Sierra Club v. Trump*, 977 F.3d 853, 887 (9th Cir. 2020) (citing *Ariz. State Bd. For Charter Schs. v. U.S. Dep't of Educ.*, 464 F.3d 1003, 1008-09 (9th Cir. 2006) (cleaned up), *vacated on other grounds by Biden v. Sierra Club*, 142 S. Ct. 56 (2021).

It is difficult to overstate the detrimental impacts of the district court's decision on public land management and land ownership in the West. Holding that the federal government has no viable means to dispose of ceded lands may not only unwind the Blackrock Exchange – all but securing the shutdown of the Don Plant, a major economic driver in Southeast Idaho – but would also cloud title to untold amounts of land disposed out of the public domain after FLPMA's enactment. Cession acts governing almost 50,000,000 acres of land employed similar or identical disposal language to the 1900 Act. *See* note 4, *supra* (listing cession acts). Affirmance would open a multitude of unforeseen consequences that likely could only be addressed by remedial proceedings of the same evidentiary type the Tribes sought below, and that the

district court avoided by certifying this interlocutory appeal. There is no easy way to discern which lands may be affected. BLM would be left guessing about which lands it has management authority over and which have been transferred from the public domain. Likewise, innumerable legal conflicts will arise if the States are forced to validate ownership and management authority over lands they hold, or have held, recorded title to following disposal from the federal government. Private citizens' property rights will be thrown into disarray.

Likewise, holding that FLPMA's disposal provisions do not apply to ceded lands would deprive the States of their voice in federal land disposal decisions. FLPMA envisions robust dialogue between federal and State officials. 43 U.S.C. § 1712(c)(9). The Secretary of the Interior must keep apprised of State, local, and tribal land-use plans, assure that consideration is given to those plans, assist in resolving any inconsistencies, and provide "meaningful public involvement" of State and local officials. *Id*. For example, the State of Utah has developed

extensive state and county resource management plans,[8] which could be rendered powerless with regard to ceded lands now held by the State.

Further, FLPMA requires that the Secretary consider "the needs of the State and local people" in evaluating whether an exchange of public lands will serve the public interest. 43 U.S.C. § 1716(a). State agencies routinely serve as cooperating agents to provide expertise during the land exchange process, and did so here, with the Idaho Department of Fish and Game and Idaho Department of Environmental Quality providing input. Without FLPMA's disposal provisions, State input into local management decisions would be silenced.

The Supreme Court has recognized the "special need for certainty and predictability where land titles are concerned" and cautioned that settled expectations should not be upset lightly. *See Leo Sheep Co. v. United States*, 440 U.S. 668, 687-88 (1979). Affirming the district court's decision would upend more than a century of settled expectations regarding ownership of ceded lands and throw jurisdiction over those lands in this Circuit into chaos. Accordingly, this Court should reverse

---

[8] *See* Utah Public Lands Policy Coordinating Office, State and County Resource Management Planning, https://publiclands.utah.gov/community/resources-management-planning/.

the district court's decision, and adopt an interpretation of the 1900 Act that does not produce such far-reaching and absurd results.

## II. If no market competition exists, the appraised market value for the federal property cannot consider the value to the nonfederal party arising from its individually unique need for the federal land.

The district court's conclusion that the unique value of the exchanged land should have been included in the appraisal for that land is flawed because it ignores well-settled rules relating to calculating fair market value for federal property. This conclusion not only impacts the land exchange at the heart of this matter, but also would hamper the States of Idaho's and Utah's ability to effectively engage in future land exchanges with the BLM.

FLPMA requires the values of exchanged lands to be equal, "or if they are not equal, the values shall be equalized by payment of money to the grantor." 43 U.S.C. § 1716(b). An equal value determination requires an appraisal. 43 U.S.C. § 1716(d)(1). Appraisal is defined by regulation to mean "a written statement independently and impartially prepared by a qualified appraiser setting forth an opinion as to the market value of lands . . . supported by the presentation and analysis of relevant market information." 43 C.F.R. § 2200.0-5(c). Market value, in turn, is defined

16

as "the most probable price in cash, or terms equivalent to cash, that lands . . . should bring in a competitive and open market under all conditions requisite to a fair sale, where the buyer and seller each act prudently and knowledgably, and the price is not affected by undue influence." 43 C.F.R. § 2200.0-5(n).

A critical part of establishing market value is determining the "highest and best use" for the property being appraised. 43 C.F.R. § 2201.3-2(a)(1). "To the extent appropriate" an appraisal for exchanged lands must comply with the Department of Justice Uniform Appraisal Standard for Federal Land Acquisitions ("UAS"). 43 C.F.R. § 2201.3. The UAS defines "highest and best use" as "the highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future." UAS § 4.3.1 (available at https://www.justice.gov/file/408306/download). The UAS provides considerations for land exchanges, explaining that "[a]s a practical matter . . . federal lands to be exchanged are likely not being put to their highest and best use on the date of value, while the nonfederal party's proposed use may well be a feasible highest and best use that must be considered." *Id.* § 4.10. However, where the proposed use is unique to the

nonfederal party, that use cannot be considered *"unless there is competitive demand for that use in the private market." Id.* (emphasis added).

Here, the appraisal for the exchanged lands did not need to account for the highest and best use of the exchanged land as an expansion of the Don Plant's "gypstack" because that use was completely idiosyncratic to Simplot. There was no competitive demand for that use in the private market, thus it should not have been considered in the highest and best use analysis. Indeed, that fact is not in dispute. As the district court stated: "There is not a generalized demand for gypstacks. Nor are other parties competing to build gypstacks on the federal lands." Mem. Decision & Order at 27 (Dkt. 89). The district court erred, then, in concluding that the BLM's reliance on the appraisal was arbitrary and capricious. Instead, compliance with the UAS would require the appraisal to *exclude* use of the property for gypstack expansion since there was no competitive market for that use.

To that end, the district court's reliance on *Desert Citizens Against Pollution v. Bission*, 231 F.3d 1172 (9th Cir. 2000) and *National Parks & Conservation Association v. Bureau of Land Management*, 606 F.3d 1058

(9th Cir. 2010) is misplaced, as both cases are readily distinguishable. In each case, BLM land exchange decisions were set aside for failure to consider a proposed use as a landfill in the appraised value of a property. *Nat'l Parks & Conservation Ass'n*, 606 F.3d at 1068-69; *Desert Citizens Against Pollution*, 231 F.3d at 1186-87. Significantly, the courts determined that there was a regional market and competition relating to similar projects. *Nat'l Parks & Conservation Ass'n*, 606 F.3d at 1067; *Desert Citizens Against Pollution*, 231 F.3d at 1185.

Not so with respect to proposed use of the property here. Unlike either *Desert Citizens* or *National Parks & Conservation Association*, there is no regional market or competition relating to the construction of gypstacks. That proposed use is unique to Simplot and was not required to be considered in the appraisal. A contrary holding, requiring every proposed use – no matter how unique it is to the nonfederal party – to be considered in the market value determination of an exchanged property, would adversely impact the States of Idaho's and Utah's ability to exchange lands. Idaho and Utah own and manage a variety of properties and facilities adjacent to federal lands that have a uniquely public use made possible by the State's ownership. For instance, rest stops along

19

interstates and state highways, state parks that protect unique geological or aquatic features, or wildlife preserves that facilitate habitat or migration corridors. It may be advantageous for the States, for their citizens, to expand these facilities through a land exchange with the federal government. Requiring any appraisal of the lands exchanged to reflect their unique value to the States, however, would diminish those opportunities to the detriment of their citizens. Accordingly, the States of Idaho and Utah urge this Court to reverse the district court's decision and hold that a unique proposed use of a property need not be considered in an appraisal if there is no competitive regional market for that use.

### CONCLUSION

The district court's decision threatens to upend public land management in vast swaths of ceded territory both in the States of Idaho and Utah and throughout the Country. This Court should reverse the district court's decision and maintain the stability and certainty to land management within the ceded areas and across the United States pursuant to FLPMA.

20

Respectfully submitted this 24th day of January, 2024.

> */s/ Scott L. Campbell*
> SCOTT L. CAMPBELL (ISB # 2251)
> Deputy Attorney General
> Chief of the Energy and Natural
> Resources Division
> Office of the Idaho Attorney General
> 700 W. State Street – 2nd Floor
> P.O. Box 83720
> Boise, ID 83720-0010
> *Counsel for* Amicus *State of Idaho*
>
> SEAN REYES
> Attorney General
> MELISSA A. HOLYOAK
> Solicitor General
> Utah Attorney General's Office
> 350 N. State Street, Suite 230
> P.O. Box 142320
> Salt Lake City, UT 84114-2320
> (801) 538-9600
> melissaholyoak@agutah.gov
> *Counsel for* Amicus *State of Utah*

## CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: January 24, 2024.

*/s/ Scott Campbell*

SCOTT L. CAMPBELL (ISB # 2251)

# FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS

**9th Cir. Case Numbers** 23-35543, 23-35544

I am the attorney or self-represented party.

This brief contains 4,220 words, including zero words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

**Signature:** /s/ *Scott L. Campbell* **Date:** January 24, 2024

23