Nos. 23-35543, 23-35544

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

SHOSHONE-BANNOCK TRIBES OF THE FORT HALL RESERVATION,
*Plaintiff-Appellee,*

v.

U.S. DEPARTMENT OF THE INTERIOR; UNITED STATES BUREAU OF LAND MANAGEMENT; LAURA DANIEL-DAVIS, Principal Deputy Assistant Secretary for Land and Minerals Management,
*Defendants-Appellants,*

and

J.R. SIMPLOT COMPANY,
*Intervenor-Defendant-Appellant.*

---

On Appeal from the United States District Court for the District of Idaho
No. 4:20-cv-00553-BLW
The Honorable B. Lynn Winmill

---

***AMICI CURIAE* BRIEF OF THE CENTER FOR BIOLOGICAL DIVERSITY, WESTERN WATERSHEDS PROJECT, WILDEARTH GUARDIANS, SNAKE RIVER WATERKEEPER, SIERRA CLUB, WATERKEEPER ALLIANCE, PORTNEUF RESOURCE COUNCIL, PEOPLE FOR PROTECTING PEACE RIVER, BAYOU CITY WATERKEEPER, MANASOTA-88, RISE ST. JAMES, AND HEALTHY GULF IN SUPPORT OF PLAINTIFF-APPELLEE SEEKING TO AFFIRM THE DISTIRCT COURT**

---

Ragan Edward Whitlock
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 2155
Saint Petersburg FL, 33731
(727) 426-3653

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 29(a)(4)(A) and 26.1, the Center for Biological Diversity, Western Watersheds Project, WildEarth Guardians, Snake River Waterkeeper, Sierra Club, Waterkeeper Alliance, Portneuf Resource Council, People for Protecting Peace River, Bayou City Waterkeeper, ManaSota-88, RISE St. James, and Healthy Gulf state that they are non-profit corporations and no parent corporation, and no publicly held corporation owns 10% or more of stock.

Dated: April 12, 2024

*/s/ Ragan Edward Whitlock*
Ragan Edward Whitlock
Center for Biological Diversity
P.O. Box 2155
Saint Petersburg, FL 33731
(727) 426-3653

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ........................................................................ iii

IDENTIY AND INTEREST OF AMICI CURIAE ................................................ 1

SUMMARY OF ARGUMENT ........................................................................ 6

ARGUMENT ............................................................................................... 7

I. BLM's Exchange of Public Lands Does Not Serve the Public Interest Where It Extends Production and Storage of Radioactive, Hazardous Waste ........................................................................ 7

A. Radioactive, Toxic Phosphogypsum is the Direct Consequence of Producing Phosphoric Acid from Mined Phosphate Ore, and its Extended Production and Expanded Storage Harms the Public Interest ............................................ 9

B. The Harms to the Public Interest Are Exacerbated by the Fact That Phosphogypsum and Process Wastewater are not Adequately Regulated by Other Regulatory Mechanisms ........................................................................ 13

II. BLM's Reliance on Other Regulatory Mechanisms and Failure to Analyze the Indirect and Cumulative Effects of Fertilizer Production and Phosphate Mining Undercut the Very Purpose of NEPA ........................................................................ 22

A. BLM Unjustifiably Assumed It Could Rely on Other Agencies' Enforcement Capabilities Despite Conflicting State and Federal Regulation and a History of Environmental Contamination ............................................ 23

B. BLM Failed to Analyze the Indirect and Cumulative Effects of Fertilizer Production and Phosphate Mining ........... 24

CONCLUSION ........................................................................................... 26

CERTIFICATE OF SERVICE ........................................................................ 29

# TABLE OF AUTORITIES

## Cases

*Ctr. for Biological Diversity v. Bernhardt*,
982 F.3d 723 (9th Cir. 2020) ....................................................................26

*Ctr. for Biol. Diversity v. U.S. Dep't of Interior*,
623 F.3d 633 (9th Cir. 2010) ..............................................................13, 22

*Gulf Restoration Network v. Haaland*,
47 F.4th 795 (D.C. Cir. 2022)......................................................................24

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
668 F.3d 1067 (9th Cir. 2011) ....................................................................25

*United States v. J.R. Simplot Co. & Simplot Phosphates, LLC*, No. 20-CV-125-F (D. Wyo. July 9, 2020) ..........................................19

*WildEarth Guardians v. Provencio*,
923 F.3d 655 (9th Cir. 2019) ..............................................................23, 24

*WildEarth Guardians v. United States BLM*,
870 F.3d 1222 (10th Cir. 2017) ..................................................................26

## Statutes

43 U.S.C. § 1701(a)(8).....................................................................................7

43 U.S.C. § 1701(a)(1).....................................................................................7

43 U.S.C. § 1716(a) .........................................................................................7

42 U.S.C. § 6901(b) .......................................................................................13

Solid Waste Disposal Act Amendments of 1980, Public Laws 96-482
42 U.S.C. § 6921..........................................................................................14

**Regulations**

40 C.F.R. § 261 ........................................................................................ 14

40 C.F.R. § 1508.7 ........................................................................................ 24

40 C.F.R. § 1508.8 ........................................................................................ 24

40 C.F.R. § 1508.8(b) ........................................................................................ 25

**Other Sources**

Ardaman & Associates, Inc. on behalf of Mosaic, Application for FDEP Permit Renewal and Supporting Engineering Information, FDEP Permit No FL000761, Riverview Facility, Attachment I, Site Information ........................................................................................ 19

Ardaman & Associates, Inc. on behalf of Mosaic, FDEP Construction Operation Permit Application and Supporting Engineering Report, Volume I (October 25, 2019) ........................................................................................ 16

Laura E. Baum, *Neighborhood Perceptions of Proximal Industries in Progress Village, FL*, University of South Florida Scholar Commons (2016) ........................................................................................ 18, 19

Marcus W. Beck, et. al., *Initial estuarine response to inorganic nutrient inputs from a legacy mining facility adjacent to Tampa Bay, Florida.* Florida Pollution Bulletin, 178 (2022) https://doi.org/10.1016/j.marpolbul.2022.113598........................................ 17

EPA, Radiation Protection, TENORM: Fertilizer and Fertilizer Production Wastes, Statista, Production volume of phosphoric acid worldwide from 2009 to 2021, https://www.statista.com/statistics/ 1287057/ global-phosphoric-acid-production/ ........................................................................................ 9

EPA, Report to Congress on Special Wastes from Mineral Processing 12-1 (1990), https://www.epa.gov/sites/default/files/2015-05/documents/2000d96z.pdf........................................................... 14, 15, 18

Florida Department of Environmental Protection, 2021 Final Orders, OGC File No. 21-0323, https://floridadep.gov/sites/default/files/ 21-0323.pdf ........ 17

Florida Department of Environmental Protection, New Wales Sinkhole and Water loss Incident, https://floridadep.gov/comm/press-office/content/hot-topic-mosaic-new-wales-sinkhole-and-water-loss-incident ........ 16

Florida Department of Environmental Protection, Permit No FL000761, Riverview Facility, https://prodenv.dep.state.fl.us/DepNexus/ public/electronic-documents/MMR_ FL0000761/facility!search ........ 21

Florida Department of Environmental Protection, Permit No. FL0036421, New Wales Facility, https://prodenv.dep.state.fl.us/DepNexus/ public/electronic-documents/MMRFL0036421/facility!searche.fl.us ........ 21

DeSantis, Ron, News Releases*Governor Ron DeSantis Provides Update on Piney Point, Meets with DEP and FDEM Leadership, Local Officials and Emergency Response Teams* (April 4, 2021), ........ 17

Elise S. Morrison, et. al., *The response of Tampa Bay to a legacy mining nutrient release in the year following the event.* Frontiers Ecology and Evolution, 11 (2023), https://www.frontiersin.org/articles/ 10.3389/fevo.2023.1144778/full ........ 17

National Cancer Institute, Radon and Cancer, https://www.cancer.gov/ about-cancer/causes-prevention/risk/substances/radon/radon-fact-sheet ...... 15

National Primary Drinking Water Regulations, Announcement of the Results of EPA's Review of Existing Drinking Water Standards and Request for Public Comment and/or Information on Related Issues, 82 Fed. Reg. 3518 (Jan. 11, 2017) ........ 10

Notices of Critical Condition, FDEP Facility ID MMR, FL000761 ........ 19

Notice of Lodging of Proposed Consent Decree Under the Resource Conservation and Recovery Act, the Clean Air Act, the Comprehensive Environmental Response, Compensation, and Liability Act, and the Emergency Planning and Community Right-To-Know Act (Corrected), 88 Fed. Reg. 47907 (July 25, 2023) ....................20

Jaclyn Lopez, *EPA's Opportunity to Reverse the Fertilizer Industry's Environmental Injustices*, 52 Environmental Law Report 10125 (2022)....................12, 15, 19

Julian Mark, *Another 'red tide' left 15 tons of dead fish on Tampa Bay's shore, and experts warn of more destruction*, Washington Post (July 12, 2021). https://www.washingtonpost.com/nation/2021/07/12/red-tide-st-petersburg-dead-fish/ ....................18

Daljit Sandhu, et. al., *Fate and Transport of Radioactive Gypsum Stack Water Entering the Floridan Aquifer due to a Sinkhole Collapse*, Scientific Reports, 8: 11439 (2018), https://www.nature.com/articles/s41598-018-29541-0 ....................16

Special Wastes from Mineral Processing (Mining Waste Exclusion), Final Regulatory Determination and Final Rule, 56 Fed. Reg. 27300 (June 13, 1991)....................14

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

The Center for Biological Diversity (Center) is a nonprofit environmental organization headquartered in Tucson, Arizona, with offices in Alaska, Arizona, California, Colorado, Florida, Hawaii, Minnesota, New York, Oregon, and Washington, D.C., and in Mexico. The Center is dedicated to the preservation, protection, and restoration of biodiversity, ecosystems, and public health. On behalf of its more than 1.7 million members and supporters nationwide, including its more than 7,000 members and supporters in Idaho, the Center advocates against the use of public lands to expand corporate pollution and for the conservation of biodiversity threatened by phosphate mining and phosphogypsum.

Western Watersheds Project is a nonprofit organization headquartered in Hailey, Idaho with more than 14,000 members and supporters dedicated to protecting and conserving the public lands, watersheds, and native wildlife across the American west. Its staff and members use and enjoy these lands and their wildlife, cultural and natural resources for health, recreational, scientific, spiritual, educational, aesthetic, and other purposes. It has a direct interest in mineral development in areas with sensitive wildlife populations and habitat, and in keeping

[1] This brief is attached to a motion for leave to file. *See* Fed. R. App. P. 29(a)(3). No party's counsel authored this brief in whole or in part, and no entity or person, aside from *Amici*, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E).

waters free from chemical contamination.

WildEarth Guardians (Guardians) is a non-profit, public interest, education and conservation organization based in Santa Fe, New Mexico, with additional offices in Colorado, Idaho, Washington, Montana and Oregon. Guardians mission is to protect and restore the wildlife, wild places, wild rivers, and health of the American West. Guardians has approximately 120,000 members and supporters across the United States. Guardians has members, supporters, and staff who regularly visit and enjoy public lands managed by the Bureau of Land Management. Guardians' members, supporters, and staff use public lands for various purposes, including scientific study, hiking and recreation, wildlife viewing, photography, floating, quiet contemplation, and aesthetic appreciation.

Snake River Waterkeeper is an Idaho nonprofit public interest and environmental advocacy organization committed to protecting water quality and fish habitat in the Snake River and its surrounding watershed. Snake River Waterkeeper is a licensed Waterkeeper Alliance Member Organization and uses water-quality monitoring, investigation of citizen concerns, advocacy, and litigation to enforce environmental laws and hold polluters accountable.

The Sierra Club is a national nonprofit environmental organization with more than 670,000 members, including over 2,500 in Idaho. The Sierra Club is dedicated to exploring, enjoying, and protecting the wild places of the earth and to practicing

and promoting the responsible use of the earth's ecosystems and resources. In pursuit of those goals, the Sierra Club has been fighting against phosphate mining and its impacts for many years.

Waterkeeper Alliance is a 501(c)(3) nonprofit organization and a global movement uniting more than 300 community based Waterkeeper Organizations and Affiliates around the world, including more than 150 groups in the United States, focusing citizen action on issues that affect our waterways, from pollution to climate change. The Waterkeeper movement patrols and protects nearly six million square miles of rivers, lakes, and coastlines in the Americas, Europe, Australia, Asia, and Africa. Waterkeeper Alliance defends our shared public lands and waters from pollution and destruction, and frequently engages in public advocacy, administrative proceedings, and litigation aimed at reducing the ecological and public health impacts of polluting activities on public lands.

The Portneuf Resource Council (PRC) is an Idaho non-profit corporation organized in Southeast Idaho and operated out of Pocatello. PRC works to protect and enhance Idaho's unique way of life by empowering residents to actively facilitate the wellbeing of their communities. PRC advocates for responsible stewardship of Idaho's water, land, air, and natural resources. PRC's primary focus is supporting clean water, clean energy, and responsible management of public lands initiatives in Southeast Idaho.

People for Protecting Peace River is a nonprofit organization committed to educating the public on the extraordinary value of natural and agricultural lands of the Peace and Myakka River watersheds in Florida. In furtherance of its mission, it advocates for the preservation of rural quality of life, intact natural soils, and to educate decisionmakers and the public about the harms caused by phosphate mining and fertilizer production.

Bayou City Waterkeeper protects the waters and people across the greater Houston, Texas, region through bold legal action, community science, and creative, grassroots policy to further justice, health, and safety. Their region includes phosphogypsum stacks that have failed and created an environmental disaster.

ManaSota-88 is a Florida-based nonprofit dedicated to protecting the public's health and preservation of the environment. It is committed to safeguarding air, land and water quality and seeks to educate the public and decisionmakers about the harms posed by phosphate mining and fertilizer production.

RISE St. James is a non-profit, grassroots, faith-based organization formed to advocate for racial and environmental justice in St. James Parish, Louisiana.

Healthy Gulf's purpose is to collaborate with and serve communities who love the Gulf of Mexico by providing research, communications and coalition-building tools needed to reverse the over-exploitation of the Gulf's natural resources. Healthy Gulf advocates for the protection of the environment and Gulf communities against

the expansion of phosphogypsum stacks along the Mississippi River.

Amici's interests in this case arise because the Bureau of Land Management's approval of an exchange of public lands as "in the public's interest"—where the approval enables a corporation to grow its known polluting operations at a Superfund site—sets dangerous precedent for communities near the 69 other phosphogypsum stacks across the country. Furthermore, the agency's failure to adequately analyze the indirect and cumulative effects of fertilizer production and phosphate mining is contrary to this Court's treatment of the National Environmental Policy Act and would likewise set a dangerous precedent for federal actions that facilitate increased industrial pollution—most notably from fertilizer production—that threatens ecosystems and communities.

Amici have worked for decades across the United States to ensure the protection of imperiled species and vulnerable communities from the harms of phosphate mining and fertilizer production and have acute and unique interests in preserving the safeguards these federal laws provide. The brief offers a unique perspective on the damage caused by phosphogypsum, and the inability of existing regulatory mechanisms to safeguard communities, species, and the environment from contamination. The brief also contextualizes the land swap at issue within the scope of phosphogypsum production and storage. Finally, it highlights this Court's precedent regarding the implementation of the National Environmental Policy Act, in

particular agencies' obligations to analyze and disclose the indirect and cumulative effects of their actions within a dependent-facility chain.

## SUMMARY OF ARGUMENT

The Bureau of Land Management (BLM), through the United States Department of the Interior (DOI), unlawfully approved a public lands exchange that would enable the J.R. Simplot Company (Simplot) to grow its fertilizer-production operations at a Superfund site, and its inextricably linked and destructive phosphate mining operations at another Superfund site.

Amici support Plaintiff-Appellee's opening brief before this Court and provide context that underscores the unlawful nature of the Blackrock Land Exchange where: 1) it is not in the public interest under the Federal Land Policy and Management Act (FLPMA) to facilitate the private use of public lands to extend phosphate processing operations and increase the associated, perpetual storage of radioactive, toxic waste; 2) the action agency relied on demonstrably deficient regulatory mechanisms and did not adequately analyze indirect and cumulative effects as required under the National Environmental Policy Act (NEPA) when its action increases and extends phosphate processing and toxic waste generation, including upstream open-pit phosphate mining.

Amici respectfully request that this Court affirm the District Court's decision holding that the Blackrock Land Exchange was unlawful and remand for entry of a

just remedy.

## ARGUMENT

### I. BLM's Exchange of Public Lands Does Not Serve the Public Interest Where It Extends Production and Storage of Radioactive, Hazardous Waste.

BLM's "organic act," FLPMA, declares United States policy that public lands be managed to "protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8). It requires that federal agencies retain public lands unless they determine that disposal "will serve the national interest." *Id.* § 1701(a)(1). Therefore, FLPMA limits BLM's authority to swap public lands with private lands to only those exchanges that the Secretary determines are in the public's interest. 43 U.S.C. § 1716(a). Specifically, the statute requires BLM to determine that "the public interest will be well served by making that exchange" giving "full consideration" to "the needs of State and local people," and ensuring "that the values and the objectives which Federal lands or interests to be conveyed may serve if retained in Federal ownership are not more than the values of the non-Federal lands or interests of the public objectives they could serve if acquired." *Id.*

Amici represent thousands of members living near phosphate mines and phosphogypsum stacks (gypstacks) and have a unique perspective on the harms these activities can cause to the environment and nearby communities.

Phosphogypsum releases, leaks, and migrations have fueled deadly fish kills, required state-ordered evacuation of communities, and contaminated both the aquifer, groundwater, and surface water resources across the nation. Ranging from Florida's gulf coast to Simplot's operations in Idaho, phosphate mining and storage of phosphogypsum inevitably lead to environmental contamination and injustice.

The Blackrock Land Exchange will expand the operational life of J.R. Simplot's Don Plant (Don Plant) by 65 years, 3-FedER-392,[2] enabling it to create millions of tons of additional radioactive, corrosive, carcinogenic waste that existing regulatory mechanisms have proven inadequate to prevent from contaminating the environment and jeopardizing communities. The Don Plant's phosphogypsum is expected to remain in the stack system for "several decades post-closure," 3-FedER-397, meaning threats to the environment and the Shoshone-Bannock Tribes (Tribes) from the Blackrock Land Exchange will extend for a century. The Don Plant's contamination may last even longer given the known migration of pollutants into surface and groundwater resources, which will persist "in perpetuity," even "with existing remedial activities." 2-FedER-166.

---

[2] Following Plaintiff-Appellee's convention, citations to Federal Defendants-Appellants' Excerpts of Record, filed in Docket No. 23-35543, are cited as "FedER." Citations to Simplot's Excerpts of Record, filed in Docket No. 23-35544, are cited as "SimplotER." Citations to the Plaintiff-Appellee's Excerpts of Record are cited as "SER."

### A. Radioactive, Toxic Phosphogypsum Is the Direct Consequence of Producing Phosphoric Acid from Mined Phosphate Ore, and its Extended Production and Expanded Storage Harms the Public Interest.

The Blackrock Land Exchange will directly lead to the expanded production and storage of phosphogypsum on federal lands. Phosphogypsum threatens adverse impacts to groundwater, surface water, and soils; exposes nearby communities and Tribal nations to a variety of contaminants; and presents an inhalation pathway for arsenic, fluoride, chromium, and radionuclides. The general waste-to-product ratio at phosphoric acid plants, including the one at the Don Plant, is significant: Facilities generate approximately 5.2 tons of phosphogypsum for every 1 ton of phosphoric acid created,[3] with global production climbing to approximately 441 million tons of phosphogypsum in 2021, up from approximately 332 million tons in 2009.[4]

In the case of the Don Plant, the Smoky Canyon Mine about two hours east of Pocatello, is currently its sole supplier of phosphate ore. 2-FedER-206. Once that rock is processed and the phosphogypsum created, the slurry is pumped into a settling pond impoundment atop the gypstack. 4-FedER-567.

Analytical testing of the Don Plant's gypstack slurry confirmed ammonia concentrations at 318mg/L, a highly acidic pH of less than 2, and estimated fluoride

---

[3] EPA, Radiation Protection, TENORM: Fertilizer and Fertilizer Production Wastes, https://www.epa.gov/radiation/tenorm-fertilizer-and-fertilizer-production-wastes.
[4] Statista, Production volume of phosphoric acid worldwide from 2009 to 2021, https://www.statista.com/statistics/ 1287057/global-phosphoric-acid-production/.

concentrations at 8580mg/L.[5] 3-FedER-448-49. It is well-documented that fluoride emissions within a 1-to-2-mile radius of the Don Plant unsafe and require significant reductions in accordance with a 2016 consent decree. ShoBan Br. at 5; 1-FedER-11.

EPA's Maximum Contaminant Level (MCL) for Fluoride is 4mg/L. National Primary Drinking Water Regulations; Announcement of the Results of EPA's Review of Existing Drinking Water Standards and Request for Public Comment and/or Information on Related Issues, 82 Fed. Reg. 3518, 3520 (Jan. 11, 2017).[6] Exposure to fluoride beyond 4mg/L may induce the severe stage of skeletal fluorosis, while exposure beyond the secondary MCL of 2mg/L may cause moderate and severe dental fluorosis. *Id.* at 3531.

The Don Plant gypstack was originally constructed directly on the ground with no liner, meaning contaminants such as arsenic, cadmium, lead, mercury, nickel, and nitrate percolated down through the gypstack and into the groundwater. 1-FedER-9. The Environmental Protection Agency (EPA) found that "[t]here are plumes of groundwater under and around the plant contaminated with arsenic phosphorus and nitrate among other constituents of concern." 2-FedER-166. The groundwater under and around the plant also exceeds Safe Drinking Water Act MCLs for arsenic, antimony, barium, beryllium, copper, lead, radium-226, mercury,

---

[6] Also available at https://www.epa.gov/ground-water-and-drinking-water/national-primary-drinking-water-regulations#one.

nickel, selenium, thallium, gross alpha, and gross beta. 2-FedER-118, 166; 3-FedER-503.

This groundwater services agricultural, industrial, and domestic uses. SER-6-8. The Portneuf River, and the American Falls Reservoir it flows into, are used for recreation, including fishing. *Id*; 3-FedER-440. The Tribes heavily use this area and a large wetland that is downgradient from the site. *Id*. There is no end in sight for the groundwater contamination, even without expansion of the system. EPA noted in its comments on the Blackrock Land Exchange that, "the predicted total phosphorous concentration in the Portneuf River at Siphon Road will remain above 0.075 mg/L [the regulatory target] in perpetuity with the existing remedial activities." 2-FedER-166.

BLM's own record findings underscore the harm the Don Plant's waste inflicts on the environment and the public. In its record of decision (ROD), BLM explained that "[t]he Federal lands have lower resource values since they are located directly adjacent to the Don Plant and are within the off-site operable unit of the Eastern Michaud Flats Superfund Site." 2-FedER-127. That is because "[p]ast and present actions associated with the Don Plant have resulted in adverse impacts to groundwater and surface water in close proximity to the plant," and "expansion within the Federal lands would result in incremental additions to phosphorous and arsenic loading." 2-FedER-128. Furthermore, "[p]ast, present, and ongoing activities

at the Don Plant . . . have contributed to the cumulative degradation and contamination of surface soils, vegetation, and water resources within the Off Plant Operable Unit of the EMF Superfund Site." 3-FedER-453.

The federal land to be exchanged is adjacent to the Don Plant on Howard Mountain, a place of Tribal historical and cultural significance. 3-FedER-446; 2-FedER-158; Shoshone-Bannock Tribes' Answering Brief (ShoBan Br.), No 23-35543, ECF No. 43 at 11. The federal land consists entirely of Tribal lands ceded to the United States under the 1898 Agreement. ShoBan Br. at 11.

The environmental and human health harms of phosphogypsum storage are not unique to the Don Plant, which is why BLM's decision in this case risks setting dangerous public policy precedent. Many of the systems that store gypstacks in the U.S. are situated near low-wealth communities and communities of color, and many are characterized by "extensive groundwater contamination, dike breaches, leakage, unexplained seepage, sinkholes, instability that threatens outright collapse, and excess process water balances in the event of a plant shutdown or abandonment necessitating intentional large-volume releases of process water to prevent further catastrophe." Jaclyn Lopez, *EPA's Opportunity to Reverse the Fertilizer Industry's Environmental Injustices*, 52 Environmental Law Report 10125, 10126 (2022).

In view of the specific information about the Don Plant and the harm caused by its toxic, radioactive waste, it was arbitrary for BLM to conclude that the

expansion of a fertilizer facility and associated gypstack that have already degraded the environment and threatened nearby communities would serve the public's interest. *See Ctr. for Biol. Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 647 (9th Cir. 2010).

### B. The Harms to the Public Interest Are Exacerbated by the Fact That Phosphogypsum and Process Wastewater are not Adequately Regulated by Other Regulatory Mechanisms.

While the ROD suggests that other agencies adequately regulate the Don Plant, in an apparent effort to either discharge BLM's regulatory responsibility or to portray the foreseeable harms of gypstack expansion as mitigated by other agencies' actions, 2-FedER-128, this faulty premise is disproven by the disjointed state and federal regulation of phosphate mining and phosphogypsum storage, and the lengthy history of environmental contamination and injustices associated with those activities.

First, the Resource Conservation and Recovery Act (RCRA) fails to adequately regulate phosphogypsum such that the environment and communities are protected from harm. In passing RCRA into law in 1976, Congress determined that land is "too valuable a national resource to be needlessly polluted by discarded materials," 42 U.S.C. § 6901(b), and set out to regulate industrial and municipal waste. The purpose of RCRA is to reduce the amount of solid waste generated,

including hazardous waste, and to ensure it is managed to protect human health and the environment.

Unfortunately, EPA does not manage phosphogypsum and process wastewater under its hazardous waste regulations. Special Wastes from Mineral Processing (Mining Waste Exclusion); Final Regulatory Determination and Final Rule, 56 Fed. Reg. 27300, 27316 (June 13, 1991). Despite the fact that phosphogypsum and process wastewater, including the waste generated at the Don Plant, meet the statutory and regulatory definitions of hazardous waste under RCRA, 40 C.F.R. § 261, an antiquated regulatory loophole has allowed the fertilizer industry to avoid the law's cradle-to-grave hazardous waste regulation. 56 Fed. Reg. at 27303. Instead, phosphate mining, beneficiation, and ore processing wastes are considered "special wastes," because in 1980, the "Bevill Amendment" to RCRA suspended EPA's authority to regulate these wastes until EPA's completion of a study on the human health and environmental effects and a so-called "Bevill Determination." Solid Waste Disposal Act Amendments of 1980, Public Laws 96-482, 42 U.S.C. § 6921.

After a decade of delay, EPA's 1990 study found widespread groundwater contamination from gypstacks, including off-site wells, drinking water sources, and an increased air pathway cancer risk for those living near stacks. EPA, Report to Congress on Special Wastes from Mineral Processing, 12-24 (1990). EPA's air

pathway concerns center on radium-226, a radionuclide from uranium and thorium generally found in phosphogypsum and process wastewater. Lopez at 10126. The Final Environmental Impact Statement (FEIS) for the Blackrock Land Exchange recognizes radioactive materials are present at higher concentrations in phosphogypsum than the original phosphate ore. 3-FedER-394. Radium-226 decays into radon gas, a leading cause of lung cancer second only to smoking.[7] Lopez at 10145. Radium-226 has a 1,600-year half-life, and there is no known safe level of exposure to radon. *Id.*

Construction vehicles driving over the stacks and wind erosion cause fugitive dust emissions that create a second inhalation pathway for arsenic, chromium, and radionuclides, especially in Idaho where gypstacks do not crust and do not receive the same level of natural dust suppression from rainfall that other parts of the country with gypstacks receive. Lopez at 10137, 10140. EPA calculated this maximally exposed individual cancer risk at approximately nine in 10,000. EPA, Report to Congress on Special Wastes from Mineral Processing, note 3 at 12-24 (1990).

---

[7] National Cancer Institute, Radon and Cancer, https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/radon/radon-fact-sheet (last accessed April 8, 2024).

EPA's study also found varied and inadequate state regulation and predicted an increased hazard and contaminant release potential with industry expansion absent Subtitle C regulation, which would allow EPA to regulate these wastes as hazardous during generation, transportation, treatment, storage, and disposal. 56 Fed. Reg. at 27303-06. Nonetheless, citing concerns about costs to the regulated industry, EPA decided to not regulate phosphogypsum and process wastewater as hazardous wastes under Subtitle C, opting for minimal Subtitle D federal regulation, which merely encourage states to develop and implement their own plans to manage non-hazardous solid waste. *Id*. at 23704.

As a result, regulation of phosphogypsum occurs on a state-by-state basis, and this haphazard approach has led to disastrous results across the nation. For example, in 2016, a major sinkhole[8] occurred at a gypstack in Mosaic's New Wales facility in Florida causing 215 million gallons process wastewater and an unknown quantity of phosphogypsum to collapse into the Floridan aquifer.[9] That toxic waste likely

[8] Florida Department of Environmental Protection, New Wales Sinkhole and Water loss Incident, https://floridadep.gov/comm/press-office/content/hot-topic-mosaic-new-wales-sinkhole-and-water-loss-incident.

[9] Daljit Sandhu, et. al., *Fate and Transport of Radioactive Gypsum Stack Water Entering the Floridan Aquifer due to a Sinkhole Collapse*, Scientific Reports, 8: 11439 (2018), https://www.nature.com/articles/s41598-018-29541-0.

remains in the aquifer to this day, even as Mosaic continues to pump from recovery wells over seven years later in an attempt to recover contaminated groundwater.[10]

In 2021, Florida officials ordered the discharge of hundreds of millions of gallons of water from the top of the Piney Point gypstack into Tampa Bay to avert a catastrophic collapse that threatened to send a wall of phosphogypsum and wastewater onto the nearby community.[11] Florida Governor Ron DeSantis declared a state of emergency for the surrounding counties, and more than 300 homes and the Manatee County Jail were evacuated.[12]

The wastewater discharge into Tampa Bay contained high levels of inorganic nutrients, including orthophosphate,[13] as well as 186 metric tons of nitrogen, which, in just one release event, far exceeded the typical total external nitrogen load estimates for all of the Bay in any given year.[14] The discharge of Piney Point

---

[10] Ardaman & Associates, Inc. on behalf of Mosaic, FDEP Construction Operation Permit Application and Supporting Engineering Report, Volume I at 1-17 (October 25, 2019).

[11] Florida Department of Environmental Protection, 2021 Final Orders, OGC File No. 21-0323, https://floridadep.gov/sites/default/files/21-0323.pdf.

[12] DeSantis, Ron, News Release, *Governor Ron DeSantis Provides Update on Piney Point, Meets with DEP and FDEM Leadership, Local Officials and Emergency Response Teams* (April 4, 2021), https://www.flgov.com/ 2021/04/04/governor-ron-desantis-provides-update-on-piney-point-meets-with-dep-and-fdem-leadership-local-officials-and-emergency-response-teams/.

[13] Elise S. Morrison, et. al., *The response of Tampa Bay to a legacy mining nutrient release in the year following the event.* Frontiers Ecology and Evolution, 11 (2023), https://www.frontiersin.org/articles/10.3389/fevo.2023.1144778/full.

[14] Marcus W. Beck, et. al., *Initial estuarine response to inorganic nutrient inputs from a legacy mining facility adjacent to Tampa Bay, Florida.* Florida Pollution

wastewater fueled one of the worst red tide events the area has experienced in 50 years, killing so much marine life that the death toll could only be measured in tonnage of dead flesh and bone (600 tons in Tampa Bay alone).[15] This pollution event occurred more than 20 years after Piney Point ceased operating as a processing plant, further contextualizing the extension of the Don Plant's operations.

A gypstack stack near a predominantly Black environmental justice community, Mosaic's Uncle Sam facility in St. James Parish, Louisiana, has been moving laterally since 2019, putting surrounding communities and downstream Mississippi River at risk.[16] EPA determined that Louisiana stacks should be no more than 40 feet tall because of weak soil,[17] but the Uncle Sam stack, under state regulation and not federal hazardous waste regulation, is now nearly 200 feet tall.[18]

Another gypstack, at Mosaic's Riverview facility, is adjacent to the historically Black environmental justice community of Old Progress Village,

Bulletin, 178 (2022), https://doi.org/10.1016/j.marpolbul.2022.113598.

[15] Julian Mark, *Another 'red tide' left 15 tons of dead fish on Tampa Bay's shore, and experts warn of more destruction*, Washington Post (July 12, 2021), https://www.washingtonpost.com/nation/2021/07/12/red-tide-st-petersburg-dead-fish/.

[16] Louisiana Department of Environmental Quality, Uncle Sam Facility, Government Review of Root Cause Analysis (Mar. 2, 2020).

[17] EPA, Report to Congress on Special Wastes from Mineral Processing, note 3 at 12-19 (1990).

[18] Louisiana Department of Environmental Quality, Mosaic-Uncle Sam Phosphogypsum Management Area and Appurtenances, Permit No. P-0103-R2. https://edms.deq.louisiana.gov/app/doc/view?doc=14082975.

Florida. Progress Village was designed in the 1950s as a means to provide home ownership to Tampa's segregated Black residents, who lived primarily in housing projects and were purposefully displaced by construction of an interstate.[19] The community fought against the approval of the gypstack intended to be located near a school, but Hillsborough County Commissioners ultimately approved the proposal in 1984.[20] The community has been subject to the hazards imposed by the Riverview gypstacks for decades,[21] and there is no end in sight as active stack expansion construction activities continue despite concentrated seepage outbreaks in January and August of 2022,[22] continued exceedances of groundwater standards,[23] and multiple recent liner tears, including a confirmed tear in October of 2023.[24]

Making matters worse, gypstacks have frequently been abused as repositories for illegal dumping of other hazardous wastes. Lopez 2022 at 10126-27. For example, in 2020, Simplot agreed to pay a civil penalty of $775,000 for illegally dumping Subtitle C regulated-hazardous wastes in the Bevill-exempt gypstack system at the Don Plant and failing to report to the Toxic Release Inventory

---

[19] Laura E. Baum, *Neighborhood Perceptions of Proximal Industries in Progress Village, FL*, University of South Florida Scholar Commons (2016), 7-8.
[20] *Id*. at 74.
[21] *Id*. at 67.
[22] Ardaman & Associates for Mosaic, Application for FDEP Permit Renewal and Supporting Engineering Information, FDEP Permit No FL000761, Riverview Facility, Attachment I, Site Information, 6.
[23] *Id*. at 5-9.
[24] Notices of Critical Condition, FDEP Facility ID MMR, FL000761.

following an EPA enforcement action. *United States v. J.R. Simplot Co. & Simplot Phosphates, LLC*, No. 20-CV-125-F (D. Wyo. July 9, 2020).

EPA lodged yet another consent decree last year regarding Simplot's additional violations, this time including failure to report releases of hazardous substances in violation of CERCLA. ShoBan Br. at 58; Notice of Lodging of Proposed Consent Decree Under the Resource Conservation and Recovery Act, the Clean Air Act, the Comprehensive Environmental Response, Compensation, and Liability Act, and the Emergency Planning and Community Right-To-Know Act (Corrected), 88 Fed. Reg. 47907 (July 25, 2023). The Don Plant has also experienced phosphogypsum leaks in 2013, 2015, and 2016, totaling more than 300,000 gallons of gypsum and stack process water released onto Federal lands adjacent to the gypsum stack. 3-FedER-446.

Despite a lengthy record of pollution and environmental injustices, states continue to promote expansion of phosphogypsum stacking operations. For example, the Louisiana Department of Environmental Quality recently noticed a proposed permit approving an expansion of Mosaic's Uncle Sam Plant, further putting the RISE St. James community at risk.[25] The Florida Department of

[25] Louisiana Department of Environmental Quality, Public Notices, Mosaic Fertilizer LLC - Uncle Sam Plant - Gypsum Management Area and Appurtenances (February 15, 2024), https://edms.deq.louisiana.gov/app/doc/view?doc=14171343&key=925b8907-1cec-472d-a8d0-4b51d86fa1c0.

Environmental Protection has recently permitted expansions to the New Wales[26] and Riverview[27] stack systems.

In addition to framing the public policy impacts from the Blackrock Land Exchange, these examples underscore a troubling trend when it comes to how the fertilizer industry and industry regulators treat marginalized communities and Tribal nations in the absence of comprehensive regulation. The Don Plant's current operations are well documented to have contaminated land that holds cultural significance for the Tribes and on which the Tribes retain usufructuary rights. 1-FedER-20; ShoBan Br. at 29.

BLM callously described these harmful impacts to the public interest in the FEIS, declaring the land exchange would "dispos[e] of Federal lands that generally have lower resource values due to their proximity to the existing Don Plant and are more difficult to manage due to the surrounding land uses and land ownership." 3-FedER-446. Further, BLM's decision document under FLPMA, the ROD, neglected to mention many of these considerations. As the District Court noted "the ROD did

---

[26] Florida Department of Environmental Protection, Permit No. FL0036421, https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/MMR _FL0036421/facility!searche.fl.us.

[27] Florida Department of Environmental Protection, Permit No FL000761, Riverview Facility, https://prodenv.dep.state.fl.us/DepNexus/ public/electronic-documents/MMR_ FL0000761/facility!search.

not discuss how the public interest determination weighed the 'great intrinsic value [that the Tribes place on] the Federal lands offered for exchange . . .'" 1-FedER-28.

This disposal of Federal lands with immense Tribal significance perpetuates a concerning public policy trend—the prioritization of private, polluting enterprises over the public interest, rather than rightfully giving "full consideration" to "the needs of State and local people." BLM has set FLPMA's public interest standard on its head by favoring the operations of a private corporation over the clear public interest in healthy ecosystems and safe communities.

In view of the woefully inadequate regulatory scheme governing phosphate mining and phosphogypsum storage, BLM's conclusion that the harms from the expansion of the gypstack and fertilizer facility operations enabled by the Blackrock Land Exchange are mitigated by other regulatory mechanisms is arbitrary and capricious. *See Ctr. for Biol. Diversity v. U.S. Dep't of Interior* 623 F.3d at 647 (finding BLM's public interest analysis under FLPMA was arbitrary and capricious where the analysis was not based on an accurate analysis of environmental consequences of the land exchange).

## II. BLM's Reliance on Other Regulatory Mechanisms and Failure to Analyze the Indirect and Cumulative Effects of Fertilizer Production and Phosphate Mining Undercut the Very Purpose of NEPA.

BLM's analysis under NEPA was also deficient. As it did with its FLPMA public interest determination, BLM acted "on incomplete information" in violation

of NEPA. *WildEarth Guardians v. Provencio*, 923 F.3d 655, 668 (9th Cir. 2019). The District Court correctly held that BLM's reliance on other agency enforcement was unjustified. 1-FedER-40. However, BLM also failed to consider the indirect and cumulative impacts from the Blackrock Land Exchange on its interdependent facilities.

### A. BLM Unjustifiably Assumed It Could Rely on Other Agencies' Enforcement Capabilities Despite Conflicting State and Federal Regulation and a History of Environmental Contamination.

Whether looking to the deficient regulatory framework or to the concomitant harm perpetuated by it, the patchwork of federal and state regulation described in this brief is entirely inadequate to abate environmental contamination and injustices caused by the creation and storage of phosphogypsum waste. Yet, BLM assumed it could rely on other agencies' enforcement capabilities in two major instances during NEPA review. First, BLM determined that NEPA would not require analysis of the Alternative B gypstack plans because the agency could rely on oversight from Idaho Department of Environmental Quality and EPA. 1-FedER-40. Second, BLM assumed that the transferred lands will be managed in conformance with all applicable statutes, regulations, and rules. *Id.*

The District Court rightly found, "there is a decades-long history of enforcement with mixed results." 1-Fed-ER-41. As demonstrated in this brief and observed by the District Court, "BLM's assumption of effective enforcement was

not justified." 1-Fed-ER-40. "Although 'an agency may assume effective enforcement in the ordinary case,' that reliance is not appropriate 'when credible evidence seems to undercut the assumption.'" 1-FedER-1, *quoting Gulf Restoration Network v. Haaland*, 47 F.4th 795, 803 (D.C. Cir. 2022).

Given the abundant credible evidence of phosphogypsum's ineffective patchwork of regulation—and detailed history of environmental contamination—the District Court was correct to find that BLM "failed to 'carefully consider detailed information concerning significant environmental impacts' of the Blackrock Land Exchange." 1-FedER-41; *quoting WildEarth Guardians*, 923 F.3d at 668.

### B. BLM Failed to Analyze the Indirect and Cumulative Effects of Fertilizer Production and Phosphate Mining.

BLM must also consider direct, indirect, and cumulative impacts of federal agency actions. 40 C.F.R. §§ 1508.7–1508.8 Indirect and cumulative impacts include those that are "reasonably foreseeable." *Id.* Extension of the Don Plant's life by 65 years is necessarily the extension of Simplot's network of interdependent facilities. For example, Simplot's Smoky Canyon Mine is currently the sole supplier of phosphate ore to its Don Plant fertilizer facility, yet BLM failed to consider this relationship and analyze indirect and cumulative effects in its ROD approving the Blackrock Land Exchange. 2-FedER-121-218.

The Don Plant can only operate if it has (1) phosphate ore to process; and (2) space to put the new phosphogypsum and process wastewater it generates. The

Blackrock Land Exchange will enable the continued operation of the fertilizer facility by giving Simplot the space to grow its toxic gypstack. The Don Plant will need phosphate ore, and Simplot's Smoky Canyon Mine, also on public lands within a Superfund site, is where Simplot will get that ore if the facility continues operations. The Blackrock Land Exchange may also increase the likelihood of development of a proposed new mine, Dairy Syncline, to accommodate the extended operating life of the Don Plant. 3-FedER-522; 5-SimplotER-981; ShoBan Br. at 7.

The impacts from the Don Plant's phosphogypsum storage will also extend for decades beyond the potentially extended life of the facility itself. Simplot expects the "drainage and treatment" process for phosphogypsum and process wastewater to "last for several decades post-closure." 3-FedER-397. Even without new incident at the stack systems, Simplot's own modeling and assessment estimates "residual effects on groundwater and surface water lasting until about 2130." 6-SimplotER-1187.

This type of growth-inducing effect is an indirect impact that must be considered but was not. 40 C.F.R. § 1508.8(b); 3-FedER-418. Growth inducing effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air, water, and other natural systems, are all examples of indirect effects. *Id.*; *see, e.g.*, *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1081-82 (9th Cir. 2011) (finding that NEPA review

must consider induced coal production at mines, which was a reasonably foreseeable effect of a project to expand a railway line that would carry coal, especially where company proposing the railway line anticipated induced coal production in justifying its proposal). Indeed, numerous cases in recent years dictate that agencies must consider in their indirect effects analysis both the upstream effects (e.g., induced growth in minerals extraction) and downstream effects (e.g., combustion effects of oil and gas). *See WildEarth Guardians v. United States BLM*, 870 F.3d 1222, 1235 (10th Cir. 2017) (faulting EIS for assuming that proposed coal leasing alternative and no-leasing alternative would have the same greenhouse gas emissions from coal combustion, on the unsupported basis that coal leasing's effect on price and demand for coal would be "inconsequential"); *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 740 (9th Cir. 2020) (explaining EIS "cannot ignore basic economics principles and state—without citations or discussion—that the impact of the [oil drilling] project on foreign oil consumption will be negligible").

In authorizing the Blackrock Land Exchange, BLM must—but failed to—consider the indirect impacts, which necessarily includes the extended lifespan of the Don Plant's supplier of phosphate ore, the Smoky Canyon Mine.

## CONCLUSION

In the interest of upholding strong public policy regarding private manufacturing practices on public lands and vindicating the critical environmental

and public protections under FLMPA and NEPA, this Court should affirm the district court's judgment.

Dated: April 12, 2024

Respectfully submitted,

*/s/ Ragan Edward Whitlock*
Ragan Edward Whitlock
Center for Biological Diversity
P.O. Box 2155
Saint Petersburg, FL 33731
(727) 426-3653

*Counsel for Amici Curiae*

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

## FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 23-35543, 23-35544

I am the attorney or self-represented party.

**This brief contains 6,193 words,** including [n/a] words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
- [ ] it is a joint brief submitted by separately represented parties.
- [ ] a party or parties are filing a single brief in response to multiple briefs.
- [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated ______________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Ragan Edward Whitlock **Date** **April 12, 2024**
*(use "*s/[typed name]*" to sign electronically-filed documents)*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 12, 2024, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system, which will send notice of such filing to all registered users.

Dated: April 12, 2024

*/s/ Ragan Edward Whitlock*
Ragan Edward Whitlock
Center for Biological Diversity
P.O. Box 2155
Saint Petersburg, FL 33731
(727) 426-3653

*Counsel for Amici Curiae*