No. 23-35543

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

SHOSHONE-BANNOCK TRIBES OF THE FORT HALL RESERVATION,
*Plaintiffs/Appellees*,

v.

UNITED STATES DEPARTMENT OF THE INTERIOR, UNITED STATES
BUREAU OF LAND MANAGEMENT, AND LAURA DANIEL-DAVIS,
PRINCIPAL DEPUTY ASSISTANT SECRETARY FOR LAND AND
MINERALS MANAGEMENT,
*Defendants/Appellants*,

AND

J.R. SIMPLOT COMPANY
*Defendant-Intervenor*.

On Petition for Permission to Appeal from the United States District Court for the
District of Idaho (No. 4:20-cv-553) (Hon. B. Lynn Winmill)

**FEDERAL APPELLANTS' REPLY BRIEF**

TODD KIM
*Assistant Attorney General*
ROBERT J. LUNDMAN
DANIEL J. HALAINEN
ANDREW M. BERNIE
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Avenue N.W.
Washington, D.C. 20530
(202) 514-4010
andrew.m.bernie@usdoj.gov

i

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ARGUMENT .................................................................................................... 4

I.     The 1900 Act does not bar the Exchange. ....................................... 4

II.    BLM's appraisal was proper. ......................................................... 18

III.   BLM committed no error in its public-interest determination
and any such error was harmless. ................................................. 21

IV.   BLM's NEPA analysis was sufficient. ......................................... 25

CONCLUSION ................................................................................................ 28

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Angle v. United States,*
  709 F.2d 570 (9th Cir. 1983) .............................................................15

*Atlantic Richfield Co. v. Christian,*
  140 S. Ct. 1335 (2020).....................................................................13

*California Wilderness Coalition v. U.S. Department of Energy,*
  631 F.3d 1072 (9th Cir. 2011) ...........................................................23

*Culver v. People ex rel. Kochersperger,*
  43 N.E. 812 (Ill. 1896) .....................................................................10

*Desert Citizens Against Pollution v. Bission,*
  231 F.3d 1172 (9th Cir. 2000) ...........................................................19

*Deutsche Bank National Trust Co. v. FDIC,*
  744 F.3d 1124 (9th Cir. 2014) ...........................................................14

*Electronic Privacy Information Center v. Presidential Advisory Commission on
  Election Integrity,*
  878 F.3d 371 (D.C. Cir. 2017)...........................................................15

*Garland v. Ming Dai,*
  593 U.S. 357 (2021)..........................................................................23

*Gaston v. Lamkin,*
  21 S.W. 1100 (Mo. 1893) .................................................................10

*Gulf Restoration Network v. Haaland,*
  47 F.4th 795 (D.C. Cir. 2022)......................................................27, 28

*Hoonah Indian Association v. Morrison,*
  170 F.3d 1223 (9th Cir. 1999) ...........................................................13

*Jam v. International Finance Corporation,*
  586 U.S. 199 (2019)....................................................................7, 8, 9

*Montana v. Blackfeet Tribe of Indians,*
  471 U.S. 759 (1985)..........................................................................13

*National Parks & Conservation Association v. BLM,*
    606 F.3d 1058 (9th Cir. 2010) ....................................................................19, 21

*New Mexico v. BLM,*
    565 F.3d 683 (10th Cir. 2009) ..................................................................28

*Newman v. City of North Yakima,*
    34 P. 921 (Wash. 1893)..............................................................................10

*Rancheria v. Jewell,*
    776 F.3d 706 (9th Cir. 2015) ....................................................................13

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989)....................................................................................26

*Rocky Mountain Oil & Gas Association v. Watt,*
    696 F.2d 734 (10th Cir. 1982) ....................................................................9

*San Francisco v. United States,*
    615 F.2d 498 (9th Cir. 1980) ....................................................................26

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
    747 F.3d 581 (9th Cir. 2014) ....................................................................28

*Wisconsin Central Ltd. v. United States,*
    585 U.S. 274 (2018)......................................................................................9

## Statutes

25 U.S.C. § 5103 ..............................................................................................11

28 U.S.C. § 1292(a)(1) ....................................................................................15

43 U.S.C. § 1701 ................................................................................................9

43 U.S.C. § 1701(a)(1) ......................................................................................8

43 U.S.C. § 1701(a)(10) ....................................................................................8

43 U.S.C. § 1702(e) ............................................................................................5

43 U.S.C. § 1702(e)(1)-(2) ................................................................................5

43 U.S.C. § 1713 ......................................................................9, 18

43 U.S.C. § 1715 ...........................................................................18

43 U.S.C. § 1715(a).........................................................................5

43 U.S.C. § 1716 ......................................................................9, 18

43 U.S.C. § 1716(a).........................................................................5

43 U.S.C. § 1716(f)(2)....................................................................18

Pub. L. No. 94-579 ..........................................................................6

Act of June 6, 1900, 31 Stat. 672 (1900)..........................4, 11, 14, 15, 17

Timber and Stone Act of 1878, 20 Stat. 89 (June 3, 1878) .....................4

Indian Homestead Act of 1875, 18 Stat. 420 (March 3, 1875) ................4

Homestead Act of 1862, 12 Stat. 392 (May 20, 1862)...........................4

**Regulations**

43 C.F.R. § 2200.0-5(n) ...........................................................18, 19

43 C.F.R. § 2200.0-6(b)(2)........................................................21, 22

**Other Authorities**

16 Fed. Prac. & Proc. Juris. § 3929 ..................................................15

Uniform Appraisal Standards for Federal Land Acquisitions...........18, 19

Webster's Dictionary of the English Language Unabridged (1886 ed.) .............17

ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE
   INTERPRETATION OF LEGAL TEXTS .......................................17

H.R. Rep. No. 57-3161 (1903) .........................................................5

S. Comm. on Energy & Nat. Resources, 95th Cong., 2d Sess.,
Legislative History of the Federal Land Policy and Management
Act of 1976 (1978) .........................................................................6

**INTRODUCTION**

The district court concluded that the challenged exchange (Exchange) was unlawful because a 124-year-old statute (1900 Act) bars the Department of the Interior from exchanging the ceded lands under the Federal Land Policy and Management Act (FLPMA). That holding—which the district court said means "the federal government does not currently have a viable method for disposing of the ceded lands"—is contrary to the text and purposes of the 1900 Act and FLPMA. The 1900 Act authorized disposal under essentially the full range of general statutes then applicable to public domain lands. FLPMA stands as the successor statute to these categories of disposal authority. Indeed, FLPMA itself repealed the previous homestead and townsite acts and replaced those acts and the remaining patchwork of laws governing public lands with a comprehensive scheme providing uniform standards for land exchanges and other forms of disposal. Under the well-established reference canon, this means that FLPMA stands in the shoes of, and serves as the modern version of, the sources of authority identified in the 1900 Act.

Plaintiffs dispute this, insisting that FLPMA is not "another disposal law" but reflects a "policy of retention" of federal lands. But while FLPMA reflects a general policy of retention, it is also obviously a disposal law—it sets forth "uniform procedures" for disposing of public lands. If FLPMA is narrower or imposes greater limitations on disposal than analogous 1900 authorities, that is just an argument for

*applying* FLPMA's limitations to the Exchange. Plaintiffs' contrary argument—that the 1900 Act provided broader disposal authority than FLPMA, but that FLPMA's enactment requires reading the 1900 Act as erecting a total bar on disposition of the ceded lands—does not make sense.

BLM's interpretation is also the only interpretation consistent with the factual and legal context. Plaintiffs do not dispute that they did not negotiate the relevant language of the 1900 Act. And they provide no evidence that the 1900 Act's all-encompassing (for its time) disposal language was intended to impose meaningful restrictions on BLM's disposal authority, let alone restrictions intended for their benefit. Nor do they explain why Congress would have wanted (in 1900 or 1976) to require BLM to retain the ceded lands in perpetuity. Plaintiffs' alternative argument based on the 1900 Act—if this Court has jurisdiction to consider it—lacks merit. The 1900 Act does not bar the Exchange.

Plaintiffs fare no better on the remaining issues. BLM was not required to consider the "unique value" of the lands to Simplot in its valuation determination. Plaintiffs do not dispute that there is no "competitive demand" for Simplot's proposed use on the lands. No one else is interested in these lands to build a gypstack, and no other entity would seek to acquire them for that purpose if they were sold in a competitive open market.

The district court also incorrectly held that BLM's Record of Decision (ROD) did not sufficiently weigh the protection of cultural resources—a conclusion dependent on that court's refusal to consider BLM's analysis of this issue in the Environmental Impact Statement (EIS), which the ROD incorporated by reference. That refusal has no basis in FLPMA and is contrary to this Court's precedent. Plaintiffs insist that BLM failed to balance protection of cultural resources in the ROD, but that is wrong: BLM made the determination required by the regulations and analyzed cultural resources in detail. Indeed, the EIS selected a preferred alternative *specifically designed* to protect cultural resources. The agency just chose to expressly incorporate the EIS's more detailed analysis rather than repeat it verbatim, which it was not required to do. And any "error" here was harmless anyway, as it had no plausible effect on the decision to approve the Exchange.

Finally, there is no basis for the district court's critique of BLM's National Environmental Policy Act (NEPA) analysis. The court held that BLM "thoroughly analyzed" the effects of Simplot's future construction but held that BLM needed to conduct more review of Simplot's specific design options. But Simplot's designs were preliminary and subject to change, and its facilities would be built years from now, on private lands, pursuant to consent orders with and oversight from the Environmental Protection Agency (EPA) and the Idaho Department of Environmental Quality (IDEQ). An agency is ordinarily permitted to rely on future

enforcement of legal requirements from responsible state and federal officials. This is not the rare case where that presumption is rebutted.

This Court should reverse on each of the issues raised.

## ARGUMENT

### I. The 1900 Act does not bar the Exchange.

#### A. The Exchange is consistent with Section 5.

Section 5 provides that the ceded lands "shall be subject to disposal under the homestead, townsite, stone and timber, and mining laws of the United States only." Act of June 6, 1900, 31 Stat. 672, 676 (1900). This language is broad. Assuming that "only" modifies the list of methods and not just the immediately preceding phrase ("laws of the United States"), *but see* Simplot Br.34-35 (plausibly arguing otherwise), these categories represented essentially the full range of general statutes authorizing Interior to dispose of public domain lands in 1900. Opening Br.26. And notably, Congress did not identify specific laws (such as the Homestead Act of 1862, 12 Stat. 392 (May 20, 1862), the Indian Homestead Act of 1875, 18 Stat. 420 (March 3, 1875), or the Timber and Stone Act of 1878, 20 Stat. 89 (June 3, 1878)). Instead, Congress simply referenced broad categories of disposal authority, recognizing that the existing authorities within those categories might change or be superseded over time.

Plaintiffs claim that Congress intended to limit disposal to particular "types of disposal statutes to be included and referred to them specifically, rather than incorporating the public land laws generally." Plaintiffs' Br.20. But their only evidence of this supposed choice is that Congress *added* stone and timber laws to the Act—reinforcing its breadth—when a prior draft did not include them. *See id*. Nothing about this language suggests that it was intended to be restrictive. Indeed, a later House Report described Section 5 as opening the ceded lands "to settlement and appropriation *under the general laws of the United States*," H.R. Rep. No. 57-3161, at 2 (1903) (emphasis in original), and Congress repeatedly enacted subsequent land disposition methods that applied to the ceded lands without ever amending the Act or suggesting that doing so was in tension with it, Opening Br.27.

FLPMA's relevant language is also broad. It authorizes exchange of a "tract of public land" whenever the agency concludes that "the public interest will be well served" by the exchange. 43 U.S.C. § 1716(a). FLPMA defines "public land" as "any land and interest in land owned by the United States within the several States and administered by [BLM], without regard to how the United States acquired ownership." *Id.* § 1702(e). There are two exceptions—"lands located on the Outer Continental Shelf" and "lands held for the benefit of Indians, Aleuts, and Eskimos," *id.* § 1702(e)(1)-(2)—which do not apply here. And FLPMA's exchange authority applies "[n]otwithstanding any other provisions of law." *Id.* § 1715(a).

But in addition to the breadth of each, FLPMA was intended as a *substitute* for the categories of land disposal authority—"the homestead, townsite, stone and timber, and mining laws of the United States"—identified in the 1900 Act. FLPMA's purpose was to replace the then-existing patchwork of disposal statutes with "uniform procedures for any disposal of public land, acquisition of non-Federal land for public purposes, and the exchange of such lands." Pub. L. No. 94-579, § 102(a)(10); *see also* S. Comm. On Energy & Nat. Resources, 95th Cong., 2d Sess., Legislative History of the Federal Land Policy and Management Act of 1976 (Legislative History), at VI (1978) ("For the first time in the long history of the public lands, one law provides comprehensive authority . . . for the administration and protection of the Federal lands."). To that end, FLPMA *repealed* the old homestead and townsite acts. Opening Br.23-24; 90 Stat. at 2786-89. It took these and other steps as part of a "congressional recognition of a need to review and reassess the entire body of law governing Federal lands." Legislative History at 211. FLPMA thus serves as—and *was intended* to serve as—the substitute for the sources of authority identified in Section 5 of the 1900 Act.

Plaintiffs do not seriously dispute any of this. To be sure, they contend that "FLPMA does not substitute for the disposal statutes discussed in the 1900 Act." Plaintiffs Br.25. But their argument on this point amounts to a claim that FLPMA takes a somewhat different approach to land disposal than the prior categories of

disposal statutes did. *Id.* at 26-27. But that is of course true whenever the law is amended or changed. Plaintiffs do not plausibly contest the basic point that FLPMA was intended as the successor statute to the old categories of disposal authority. Section 5 thus does not prevent the United States from exchanging the lands under FLPMA.

The reference canon confirms this commonsense conclusion. "[W]hen a statute refers to a general subject, the statute adopts the law on that subject as it exists whenever a question under the statute arises," while "a statute that refers to another statute by specific title or section number in effect cuts and pastes the referenced statute as it existed when the referring statute was enacted." *Jam v. International Finance Corporation*, 586 U.S. 199, 209 (2019). The 1900 Act falls into the first category; it is a "reference . . . to an external body of potentially evolving law." *Id.* at 210. And "[f]ederal courts have often relied on the reference canon, explicitly or implicitly, to harmonize a statute with an external body of law that the statute refers to generally." *Id.* That is what the 1900 Act does.

As *Jam* illustrates, the Supreme Court has applied the reference canon even when the relevant law has changed in fundamental ways: in that case, a 1945 statute referred to "the same immunity from suit and every form of judicial process as is enjoyed by foreign governments," and foreign government immunity at that time was "virtually absolute" under State Department practice. *Id.* at 203-04. In 1952, the

State Department adopted a more restrictive view of sovereign immunity, and Congress subsequently enacted the Foreign Sovereign Immunities Act (FSIA), which set forth a comprehensive immunity framework (largely codifying that restrictive view) and transferred responsibility for immunity determinations from the Executive Branch to the courts. *Id.* at 204-05. The Supreme Court nonetheless held that the 1945 statute picked up these subsequent developments, holding that the 1945 statute was "an instruction to look up the applicable rules of foreign sovereign immunity, wherever those rules may be found—the common law, the law of nations, or a statute." *Id.* at 211.

Plaintiffs insist that the reference canon does not apply because "FLPMA is not . . . another disposal law." Plaintiffs' Br.26. But of course it is. It provides "uniform procedures for any disposal of public lands, . . . and the exchange of such lands." 43 U.S.C. § 1701(a)(10). Plaintiffs note that FLPMA states that lands are to "be retained in Federal ownership, unless as a result of the land use planning procedure provided for in this Act, it is determined that disposal of a particular parcel will serve the national interest." *Id.* § 1701(a)(1). But that the general policy of FLPMA is to retain lands in federal ownership does not mean that FLPMA is not a disposal statute—FLPMA is *the* comprehensive modern disposal statute.

Plaintiffs also appear to emphasize that FLPMA reflects a more balanced approach to land disposal than older public land statutes. Plaintiffs Br.26-27; *Rocky*

*Mountain Oil & Gas Association v. Watt*, 696 F.2d 734, 738 (10th Cir. 1982). But this does not help Plaintiffs because the reference canon picks up both significant and insignificant changes to external bodies of law that the statute refers to generally. *Jam*, 586 U.S. at 211.

Indeed, Plaintiffs' characterization of FLPMA and the 1900 Act reinforces that their interpretation of the interaction between these two statutes cannot be right. Plaintiffs argue that the categories of disposal authority identified in Section 5 were *broader* in 1900 than they are today under FLPMA. But that underscores how Plaintiffs' interpretation of the 1900 Act—which converts a statute intended to *enable* disposal into a total *bar* on disposition—is inconsistent with the original public meaning of that Act. And they contend that Congress made this conversion through its adoption of FLPMA, another statute that broadly *enables* disposal of public lands. 43 U.S.C. §§ 1701, 1713, 1716.

Plaintiffs also contend that "the statutes referenced in the 1900 Act should be interpreted as they were at the time they were referenced," Plaintiffs Br.28 n.13, because statutes should be interpreted according to their "ordinary meaning . . . at the time Congress enacted the statute." *Wisconsin Central Ltd. v. United States*, 585 U.S. 274, 277 (2018). But the point of the reference canon is that it is *consistent* with original public meaning—because when Congress refers in a statute to an external body of potentially evolving law, Congress expects that statute to pick up subsequent

changes to that external body of law. The Congress that enacted the 1900 Act acted under the backdrop of that settled principle. As the Chamber of Commerce notes, the reference canon was well-established by 1900. Chamber Br.9.[1]

In any event, Plaintiffs *do not want* this Exchange to be governed by "the homestead, townsite, stone and timber, and mining laws" as those laws existed in 1900. Plaintiffs are not arguing that the Exchange's legality should be judged by reference to those older laws. Plaintiffs instead argue that the Exchange cannot go forward because these old laws have been repealed. In other words, Plaintiffs think the law *should* pick up one subsequent development (repeal of the old laws) but not the *corresponding* development (replacement of those laws with FLPMA's comprehensive land disposal framework). That selective approach has no basis in the reference canon or common sense.

Plaintiffs also focus on FLPMA's provision stating that the statute does "not repeal any existing law by implication." 90 Stat. at 2786. But that is beside the point. We have not argued that FLPMA repealed the 1900 Act. 2-ER-64. And although Simplot plausibly argues that FLPMA supersedes Section 5 to the extent of any inconsistency, Simplot Br.41-47, we take no position on these arguments, and there

---

[1] *See also Culver v. People ex rel. Kochersperger*, 43 N.E. 812, 814 (Ill. 1896); *Gaston v. Lamkin,* 21 S.W. 1100, 1103 (Mo. 1893); *Newman v. City of North Yakima*, 34 P. 921, 921-22 (Wash. 1893).

is no need for this Court to address them. There is no conflict because Section 5 does not bar disposition of the ceded lands under FLPMA.

Because the text of both FLPMA and the 1900 Act are clear, this Court need not address the 1900 Act's context, history, and purpose—nor does the Court need to address the unusual consequences of Plaintiffs' (and the district court's) contrary interpretation. But these considerations only underscore the district court's error. As to history and context, Plaintiffs do not dispute that the language of Section 5 "was not negotiated as part of the 1898 Agreement." Plaintiffs' Br.29. Indeed, the Tribes *declined* proposals under which they would have had an interest in how the lands were disposed. Opening Br.28-29.

Plaintiffs respond that "the 1900 Act nevertheless limited disposal, which is beneficial to the Tribes."[2] Plaintiffs' Br.29. But although the 1900 Act provides that Tribal members living on the Reservation retain certain usufructuary rights on the ceded lands, those rights apply only so long as the affected lands remain part of the public domain. 31 Stat. at 674. And the 1900 Act provides that the United States

---

[2] The Tribes, citing 25 U.S.C. § 5103, suggest that, so long as the ceded lands remain in the public domain, Interior could restore them to tribal ownership. Plaintiffs' Br.29-30. This provision did not exist in 1900, so it is irrelevant in understanding what Congress was intending to accomplish in 1900. In any event—and assuming this statute applies to lands the Tribes ceded outright—Plaintiffs' view is that the categories of land disposal identified in the 1900 Act are exclusive as to the ceded lands here and that there are no modern substitutes for those older laws. Thus, under Plaintiffs' *own theory* of this case, it would seem that this authority cannot be applied to the ceded lands.

could dispose of the lands through broad categories of disposition methods. Insofar as statutory purpose is concerned then, Congress in 1900 *did not* intend for the ceded land to be forever part of the public domain. There is thus no doubt that the Tribes' position—which leaves BLM without a means of disposing of the ceded lands— dramatically alters the practical framework envisioned by both the Cession Agreement and the 1900 Act.

Nor can Plaintiffs deny that their interpretation creates anomalous consequences. It creates a total bar to the disposition of the ceded lands, as the district court recognized. 1-ER-18. Plaintiffs insist that "[i]nvalidating the Exchange should not be seen as a problematic result" and that Simplot can explore "alternative methods of waste disposal and contaminant reduction." Plaintiffs Br.38. But the wisdom of the Exchange is irrelevant to the 1900 Act issue: Plaintiffs' interpretation would also bar any other disposal of the lands (by sale or exchange), for any other purpose, to any other entity (including the Tribes). Plaintiffs nowhere explain why Congress would have wanted these particular lands—which the Tribes ceded outright in exchange for fixed sums—to be excepted from the same disposal framework that applies to public lands generally. Of course, if the 1900 Act and FLPMA compelled such an interpretation, this Court would be obligated to give effect to it. But in deciding between two plausible readings of a statute, courts should

"avoi[d]" creating "anomalies." *Atlantic Richfield Co. v. Christian*, 140 S. Ct. 1335, 1353 (2020). Our interpretation creates no anomalies, and Plaintiffs' does.

Finally, Plaintiffs rely on the principle that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985). As previously explained, that canon does not apply here. For one, only statutes passed for the benefit of dependent Indian Tribes implicate this canon. *Hoonah Indian Association v. Morrison*, 170 F.3d 1223, 1228-29 (9th Cir. 1999). FLPMA was not passed for the benefit of the Tribes and the relevant language of Section 5 was not either.

This Court has also explained that the "canon has been applied only when there is a choice between interpretations that would favor Indians on the one hand and state or private actors on the other," not merely when an interpretation would benefit a "particular tribe." *Rancheria v. Jewell*, 776 F.3d 706, 713 (9th Cir. 2015). For example, in *Blackfeet Tribe*, the Supreme Court held that the Mineral Leasing Act did not allow Montana to tax Indian royalty income from mineral leases. 471 U.S. at 767. By contrast, the question here—whether BLM may lawfully dispose of these particular lands—is not one that inevitably or even naturally pits Indians against state or private actors. To the extent the Tribes' interpretation favors Indians, that is happenstance: these Tribes oppose this Exchange. But their interpretation

would bar any other disposition of these lands (or any of the other ceded lands): to another tribe, to these Tribes, or for a project that the Tribes support. And to the extent the district court's decision threatens BLM's disposition authority under other tribal cession acts, *see* Simplot Br.50-52, that interpretation will have implications beyond this case which will not invariably benefit other tribes. In any event, this Court should reverse even if the canon applies. Section 5 does not bar the Exchange.[3]

## B. Plaintiffs' alternative 1900 Act argument, to the extent this Court has jurisdiction to resolve it, lacks merit.

Plaintiffs alternatively contend that the Exchange was inconsistent with the 1900 Act based on a provision of that Act stating that "no purchaser shall be permitted in any manner to purchase more than one hundred and sixty acres of the" ceded lands. 31 Stat. at 676. The district court declined to reach this argument, 1-ER-18, and this Court cannot address it in this interlocutory appeal, Opening Br.31 n.5; *Deutsche Bank National Trust Co. v. FDIC*, 744 F.3d 1124, 1134 (9th Cir. 2014). Plaintiffs note that this Court's jurisdiction extends to the entire certified order, but this does not mean that "all issues raised below are ripe for consideration." Plaintiffs' Br.21. Rather, in a section 1292(b) appeal, "the court of appeals will not

---

[3] Plaintiffs fault the United States for not addressing their "breach of trust" claim. Plaintiffs' Br.40. But as they themselves note, that claim is entirely based on their argument that the Exchange violated the 1900 Act. To the extent Plaintiffs contend that the Exchange would violate trust duties *even if the Exchange is consistent with the 1900 Act*, any such argument would lack merit.

consider matters not yet ruled upon by the district court." 16 Fed. Prac. & Proc. Juris. § 3929 (3d ed.) (citing cases). Plaintiffs' cited authority does not establish otherwise. In *Angle v. United States*, 709 F.2d 570, 573 (9th Cir. 1983), the district court *decided* the issue the court of appeals chose to address—that issue just was not asserted by the appellee on appeal. *Electronic Privacy Information Center v. Presidential Advisory Commission on Election Integrity*, 878 F.3d 371 (D.C. Cir. 2017), involved the denial of a preliminary injunction, which is appealable as of right. 28 U.S.C. § 1292(a)(1). Nonetheless, if this Court concludes that it has jurisdiction to address this issue, we agree with Plaintiffs that this Court should resolve it now. For multiple reasons, Plaintiffs' argument is without merit.

Initially, the 160-acre provision does not apply to an exchange conducted in 2020. Section 5 states that "the residue of said ceded lands shall be open to settlement by the proclamation of the President," 31 Stat. at 676, which occurred in 1902. Then, immediately before the 160-acre clause, the Act sets forth the price to be paid for particular lands. "[A]ll purchasers of land lying under [a canal], and which are susceptible of irrigation from the water of said canal, shall pay for the same at the ratio of ten dollars per acre," "all agricultural lands not under said canal shall be paid for at the rate of two dollars and fifty cents per acre, and grazing lands at the rate of one dollar and twenty-five cents per acre." *Id.* The Act specifies the mechanics of payment ("one-fifth of the respective sums to be paid at time of original entry, and

four-fifths thereof at the time of making final proof"). *Id.* And then right after that, the relevant language: "but no purchaser shall be permitted in any manner to purchase more than one hundred and sixty acres of the land hereinbefore referred to." *Id.*

Read in context then, the 160-acre provision is best read as a limitation only on *initial* disposition of the ceded lands under the 1902 proclamation. It appears in a section addressing how the lands were to be initially opened for settlement after Tribal allotments were accounted for. And the payment and price provisions *right before* the 160-acre provision obviously only apply to initial disposition: no one would read them as requiring Interior *today* to offer the listed lands for between $1.25 and $10 per acre.[4] It would thus make no sense to read the *immediately adjacent* 160-acre provision as a permanent limitation. And the apparent purpose of the 160-acre limitation—to secure a meaningful opportunity for the public to purchase lands newly opened for settlement that were initially sold at public auction, by preventing a single purchaser from dominating the market—has no application to dispositions by the United States via exchange more than a century later.

But even if the 160-acre limitation applied in 2020, Simplot was not a "purchaser" of the ceded lands because Simplot did not "purchase" the lands.

---

[4] Indeed, it is not even clear that the 160-acre provision applies to initial disposition of all the ceded lands. It might reasonably be read as applying only to the subcategories of lands in the "*Provided*" clause.

Plaintiffs insist that the Exchange here—of 713.67 acres of Federal land for 666.46 acres of non-Federal land, along with a 160-acre mitigation parcel—qualifies as a "purchase" under dictionary definitions defining "purchaser" as someone who acquires property by any means other than descent or inheritance. Plaintiffs Br.22 n.7. But even Plaintiffs' cited dictionary defines purchaser as "one who acquires property for a consideration, *generally of money*." Purchaser, Webster's Complete Dictionary of the English Language Unabridged (1886 ed.) (emphasis added). In any event, textualism is not hyperliteralism. ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 356 (2012) ("Adhering to the *fair meaning* of the text (the textualist's touchstone) does not limit one to the hyperliteral meaning of each word in the text."). Assuming the terms "purchaser" and "purchase" can technically extend to a land exchange, a reasonable person (in 1900 and today) would understand the references to "purchaser" and "purchase" in the context of real property to involve the acquisition of real property by a buyer with money or its equivalent.

And even if "purchaser" and "purchase" sometimes have a broader meaning, that narrower meaning is the sense in which the *1900 Act* used the term. As noted, the Act specifies the price at which particular lands should be purchased, the payment schedule, and then provides that lands within five miles of Pocatello "shall be sold at public auction." 31 Stat. at 676. This language and structure is

incompatible with treating a land exchange as a "purchase." And as previously noted, Opening Br.32 n.5, FLPMA recognizes sales and exchanges as distinct concepts. 43 U.S.C. §§ 1713, 1715, 1716. This alternative argument should be rejected if the Court concludes it has jurisdiction to reach it.

## II.    BLM's appraisal was proper.

The district court also erred in concluding that the land appraisal was required to consider that the land "is uniquely valuable to Simplot." 1-ER-34. FLPMA's regulations define "[m]arket value" as the lands' value "in a competitive and open market." 43 C.F.R. § 2200.0-5(n). That means what multiple buyers would pay for the property based on its objective value, not the unique value that one buyer assigns to the land based on idiosyncratic incentives that no one else shares. The Uniform Appraisal Standards (UAS), which FLPMA directs should be used "to the extent appropriate," 43 U.S.C. § 1716(f)(2), confirm this point: "neither an existing federal use nor a nonfederal party's proposed use can be considered unless there is competitive demand for that use in the private market." UAS at 186. As the district court noted, "a gypstack is only valuable to Simplot," "[t]here is not a generalized demand for gypstacks," and there are no "other parties competing to build gypstacks on the federal lands." 1-ER-33. BLM thus was not required to consider that unique use in valuing the lands. And in any event, as previously discussed, the appraiser did not turn a blind eye to Simplot's intended use of the property. The appraisal stated

that "the property has appeal to an adjacent property owner for expansion and investment purposes," 2-ER-275, which obviously refers to Simplot and its gypstack.

This case is thus the polar opposite of *Desert Citizens Against Pollution v. Bission*, 231 F.3d 1172 (9th Cir. 2000), and *National Parks & Conservation Association v. BLM*, 606 F.3d 1058 (9th Cir. 2010). Both of those cases rested on "the presence of competing proposals" for the use at issue. 606 F.3d at 1067-68. Here, by contrast, there is simply no evidence of other gypstack proposals (past, present, or future) that would indicate a general market for gypstack development in the area. Indeed, the district court acknowledged that "the Blackrock Land Exchange is distinguishable from the landfill cases because a gypstack is only valuable to Simplot." 1-ER-33.

Plaintiffs nonetheless insist that those cases are like this one because this Court examined existing proposals on other nearby lands and that here "there are other industrial waste facilities in the region." Plaintiffs' Br.43 n.25. But putting aside that this was not the district court's rationale, it makes no sense. FLPMA's regulations direct BLM to consider how *the particular land* would be valued in a competitive and open market. 43 C.F.R. § 2200.0-5(n). The UAS similarly explains that "[i]f it is solely the government's need that creates a market *for the property*, this special need must be excluded from consideration by the appraiser." UAS at 23

(emphasis added). As Simplot notes, the UAS sometimes uses government-focused language because it was developed to govern appraisals in connection with federal acquisitions of real property; but there is no reason to abandon that reasoning where, as here, it applies equally to a non-federal party who would use the land for a purpose no one else would. Simplot Br.59.

Relatedly, Plaintiffs (discussing condemnation cases) purport to draw a distinction "between the permissible consideration of a proposed use as evidence of market demand and the impermissible consideration in condemnation cases of values unique to the project proponent *that do not inform market value*." Plaintiffs' Br.44-45 (emphasis added). But Plaintiffs never explain *when*, under their view, value unique to the project proponent "would not inform market value" and thus could be excluded, since their position is that value to Simplot is *itself sufficient* to establish market value. *See* Plaintiffs' Br.43 ("the project proponent's intended use should be considered even if that entity has a unique ability to implement that use"). The UAS and regulations explain how to resolve this distinction: a proponent's proposal may be *evidence* of a highest and best use, but when other evidence makes clear that there could be no demand for that use on the property from any other party, it should be excluded. This Court should reverse the district court's holding that the appraisal violated FLPMA's valuation requirements.

**III.  BLM committed no error in its public-interest determination and any such error was harmless.**

In finding BLM's public-interest determination deficient on one topic (cultural resources), the district court stated that it would "consider[] the ROD only." 1-ER-27. True to its word, the court examined only the ROD and did not mention the EIS in this section of its opinion—other than to say that the ROD "neglected many of the considerations noted in the EIS," 1-ER-28, which the ROD *incorporated by reference*, 2-ER-124.[5]

That court's refusal to consider the expressly incorporated EIS was wrong. Neither FLPMA nor the relevant regulation requires that the public-interest determination be set forth in any particular document, let alone a single document. *See* 43 C.F.R. § 2200.0-6(b)(2) (requiring only that the "finding and the supporting rationale shall be made part of the administrative record"). And this Court's decision in *National Parks* is squarely on point: there, this Court reversed because the district court's analysis was "constrained by its decision to review only the" ROD and not the EIS, even though BLM's final action "incorporate[d] the EIS." 606 F.3d at 1069.

Plaintiffs insist that "BLM failed to balance protection of cultural resources in its public interest determination in the ROD." Plaintiffs' Br.49-50. But BLM

---

[5] Plaintiffs obscure this point, contending that "[a]n *implied* reference to a discussion in the EIS does not discharge BLM's responsibility." Plaintiffs' Br.51 (emphasis added). There was nothing "implied": the ROD *expressly* incorporated the EIS as the basis for the decision. 2-ER-124.

concluded "that the public interest will be served by completing the Blackrock Land Exchange because the resource values and the public objectives served by the lands to be acquired outweigh those of the lands to be conveyed," 2-ER-126, the precise determination the FLPMA regulations require, 43 C.F.R. § 2200.0–6(b)(2). The ROD further explained that the preferred alternative in the EIS had been developed "to adjust the boundary of the Federal lands to avoid cultural and tribal resources in the West Canyon area on the north side of Howard Mountain." 2-ER-126. And the ROD recounted BLM's extensive analysis of cultural resources in the EIS, including its consultations with the Tribes and the Class III cultural resources inventory it conducted. 2-ER-135. Contra Plaintiffs, BLM obviously *made* the required balancing determination. The only question is whether BLM *reasonably* balanced the protection of cultural resources.

Considering the whole record—including the EIS the ROD incorporated by reference—it clearly did. The district court itself recognized elsewhere that "the EIS considered and fully disclosed the impacts of the proposed project on cultural resources" as well as "adequately discussed corresponding mitigation measures." 1-ER-52. BLM exhaustively considered the effect of the action on cultural resources, conducted an inventory, and responded to the Tribes' comments on the issue. Opening Br.43-44. The agency then structured the preferred alternative specifically to minimize the impact on cultural resources, explaining that the preferred

alternative would "[r]esult in BLM retention of 368 acres of Federal lands . . . including identified cultural and tribal resources," that several important cultural sites "would be retained in Federal ownership," and that Interior had reconfigured the layout of the gypsum stack expansion and cooling ponds to avoid a National Register of Historic Places site. 3-ER-370-371.

At the very least "a reviewing court must 'uphold' even 'a decision of less than ideal clarity if the agency's path may reasonably be discerned,'" which it can be here. *Garland v. Ming Dai*, 593 U.S. 357, 369 (2021). Given BLM's extensive analysis of the action's effects on cultural resources—and its efforts to minimize those effects through the preferred alternative—it blinks reality to contend that BLM engaged in a "black box decision-making process" that "gives the Court no basis to review the public interest determination." 1-ER-28.

Finally, any error was harmless. Opening Br.45-46. An error is harmless if it "had no bearing on the procedure used or the substance of [the] decision reached." *California Wilderness Coalition v. U.S. Department of Energy*, 631 F.3d 1072, 1092 (9th Cir. 2011) (alteration in original). The asserted error here had no effect on the agency's procedures since the agency made the public-interest determination the regulations require and did so in the document (the ROD) the district court concluded must contain that determination.

Nor could it possibly have affected the substance of the decision. Plaintiffs insist otherwise, contending that "BLM must be held accountable to the public to show its work and explain itself." Plaintiffs' Br.53. But the examples Plaintiffs invoke of the ROD's supposed shortcomings show that BLM already did that. Plaintiffs state that the ROD "did not consider the cultural significance of land exchanged" and did not weigh the "great intrinsic value" the Tribes place on the lands. Plaintiffs. Br.50. But the EIS did. It stated that "[t]he Tribes place great intrinsic value on the Howard Mountain area and the Federal lands offered for exchange" and explained why. 3-ER-440. The agency conducted a cultural resources inventory, identified cultural sites, examined the direct and indirect impacts and cumulative effects of each alternative on cultural resources, and ultimately chose the preferred alternative partially on that basis. Opening Br.43-44. Plaintiffs also state that the ROD "did not discuss the likely disturbance of burial grounds." Plaintiffs' Br.50. Again, the EIS did. It stated that the surveys conducted on the Federal lands did not identify any burial sites, and "[t]here have been no specifically documented or recorded burial sites on the Federal lands." 3-ER-532-33.

There was thus no error here at all. But if there was, BLM's decision not to repeat verbatim the EIS's extensive analysis in the ROD does not warrant any relief, and certainly would not warrant vacatur of the ROD for the Exchange.

## IV. BLM's NEPA analysis was sufficient.

The district court also erred in finding a (narrow) NEPA deficiency. Initially, and contrary to Plaintiffs' argument, BLM did not wave "off any responsibility" for the effects of Simplot's facilities; nor did it merely make "[g]eneral statements about possible effects and risks." Plaintiffs' Br.55. The EIS's preferred alternative included all reasonably foreseeable actions related to Simplot's planned expansion, "including cooling ponds, expanded gypsum stacks, and associated infrastructure." 3-ER-401. The EIS extensively considered the environmental and health impacts of these reasonably foreseeable actions, including effects on water quality, air quality, visual resources, public health and safety, and socioeconomics, as well as cultural resources, and environmental justice. 1-ER-43-53; Opening Br. 43-44. Plaintiffs argued that BLM did not take the requisite hard look at environmental consequences, and the district court correctly held that "[n]one of these arguments are persuasive." 1-ER-42. Plaintiffs did not cross-petition for review of these holdings and make no argument that the district court erred in rejecting their arguments.

The district court nonetheless concluded that NEPA required BLM to specifically analyze Simplot's design options for its cooling ponds and expanded gypsum stacks. 3-ER-401. Plaintiffs insist that BLM was required to consider these specific options merely because they existed at the time of the EIS. Plaintiffs' Br.55. But BLM explained that these options were based on "preliminary conceptual

designs" and "[a]dditional research and engineering is necessary to ensure that these preliminary configurations would be technically and economically feasible." 3-ER-401. These preliminary conceptions are thus "subject to change based on technical changes, final engineering, Don Plant production, and other factors." 3-ER-402. BLM reasonably determined that consideration of this issue was beyond the scope of the EIS, as NEPA does not "demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 353 (1989). Neither the district court nor Plaintiffs meaningfully engage with this aspect of the agency's analysis, let alone show it was arbitrary and capricious.

BLM also sensibly determined that review of specific design options was unnecessary because Simplot is subject to consent orders with IDEQ and EPA and must obtain approvals from these regulators before commencing its gypstack-expansion project. 3-ER-404. This too was reasonable. *See Methow Valley Citizens Council*, 490 U.S. at 352-53 ("it would be incongruous to conclude that the Forest Service has no power to act until the local agencies have reached a final conclusion on what mitigating measures they consider necessary"); *San Francisco v. United States*, 615 F.2d 498, 501 (9th Cir. 1980) (agency reasonably noted that lessee "would be required to conform to all applicable pollution control laws and regulations as a condition of tenancy"). As the district court acknowledged, "an

agency may assume effective enforcement" by the responsible regulators in its NEPA analysis. 1-ER-36.

Plaintiffs, echoing the district court, contend that the agency could not rely on this assumption here because of what it describes as "the agencies' past ineffective enforcement and Simplot's past compliance history." Plaintiffs' Br.56-57. But there is no logical connection between this characterization and the demand that BLM review Simplot's preliminary design proposals. Even if Plaintiffs are right that "there is a legitimate objection that enforcement has not been effective in addressing past contamination," Plaintiffs' Br.57, that simply has nothing to do with whether the responsible federal and state regulators will ensure that Simplot's *chosen design* complies with state and federal law *before* they approve any such proposal. As we previously explained, *see* Opening Br.49, there is no evidence that *going forward*, EPA and IDEQ would be unwilling or unable to ensure compliance with applicable legal requirements.

More fundamentally, neither Plaintiffs nor the district court cite any authority for the proposition that an agency cannot assume *faithful enforcement* merely because *the regulated party* has a flawed compliance history (as many regulated parties do). *Gulf Restoration Network v. Haaland*, 47 F.4th 795 (D.C. Cir. 2022), on which the district court relied, does not support any such argument. In that case, the action agency had "repeatedly factored" in enforcement by a second agency, but the

U.S. Government Accountability Office had issued a scathing report about the second agency's regulatory work, and the action agency promised to address these alleged deficiencies but then never did. *Id.* at 803; Opening Br.47-48.[6]

This case is nothing like *Gulf Restoration Network*. Plaintiffs acknowledge that EPA and IDEQ have both brought enforcement actions against Simplot and, as explained in our Opening Brief, have taken a number of other measures to ensure compliance with environmental requirements. Opening Br.48-49. Plaintiffs also note that EPA recently moved the district court to approve and enter a proposed consent decree against Simplot. Plaintiffs' Br.58 & n.29. But if anything, this underscores that the responsible federal regulators are enforcing legal requirements related to the environment and public health, and will continue to do so in the future. *See San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (agency decisionmaking entitled to presumption of regularity). BLM did not violate NEPA.

## CONCLUSION

This Court should reverse.

---

[6] Plaintiffs' reliance on *New Mexico v. BLM*, 565 F.3d 683 (10th Cir. 2009), is also misplaced. In that case, the agency had said the existing state and federal regulatory scheme would prevent contamination but the record showed that this scheme, as a practical matter, was insufficient to always prevent such contamination. *Id.* at 715. That case has nothing to do with the question of whether an agency can reasonably assume that state and federal regulators will enforce legal requirements that do exist.

Respectfully submitted,

/s/ *Andrew M. Bernie*
TODD KIM
*Assistant Attorney General*
ROBERT J. LUNDMAN
DANIEL J. HALAINEN
ANDREW M. BERNIE
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Avenue N.W.
Washington, D.C. 20530
(202) 514-4010
andrew.m.bernie@usdoj.gov

Dated: May 24, 2024
DJ# 90-2-4-16201

**Form 8. Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)**        23-35543.
        I am the attorney or self-represented party.

        **This brief contains 6,915 words,** excluding the items exempted by Fed. R.

App. P. 32(f). The brief's type size and typeface comply with Fed. R. App.

P. 32(a)(5) and (6).

        I certify that this brief *(select only one)*:

[x ] complies with the word limit of Cir. R. 32-1.
[ ]  is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
[ ]  is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5),
      Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
[ ]  is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
      [ ]  it is a joint brief submitted by separately represented parties;
      [] a party or parties are filing a single brief in response to multiple briefs; or
      [ ]  a party or parties are filing a single brief in response to a longer joint brief.
[ ]  complies with the length limit designated by court order dated _____.
[] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**   s/ *Andrew M. Bernie*

**Date**        May 24, 2024