No. 23-35543

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

SHOSHONE-BANNOCK TRIBES OF THE FORT HALL RESERVATION,
*Plaintiffs/Appellees*,

v.

UNITED STATES DEPARTMENT OF THE INTERIOR, UNITED STATES
BUREAU OF LAND MANAGEMENT, AND LAURA DANIEL-DAVIS,
PRINCIPAL DEPUTY ASSISTANT SECRETARY FOR LAND AND
MINERALS MANAGEMENT,
*Defendants/Appellants*,

and

J.R. SIMPLOT COMPANY,
*Defendant-Intervenor*.

On Petition for Permission to Appeal from the United States District Court for the
District of Idaho (No. 4:20-cv-553) (Hon. B. Lynn Winmill)

**PETITION FOR REHEARING EN BANC**

ADAM R.F. GUSTAFSON
  *Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
  *Deputy Assistant Attorney General*
ROBERT J. LUNDMAN
DANIEL HALAINEN
  *Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Avenue N.W.
Washington, D.C. 20530
(202) 598-3329
daniel.j.halainen@usdoj.gov

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................. ii

INTRODUCTION ........................................................................................... 1

BACKGROUND .............................................................................................. 3

     A.     Statutory and historical background........................................ 3

     B.     Factual and procedural background ........................................ 4

ARGUMENT .................................................................................................... 8

     A.     The majority wrongly held that the 1900 Act barred
              Congress from authorizing a land exchange under
              FLPMA. ..................................................................................... 8

     B.     This panel's decision raises important questions about the
              Bureau's authority over public lands that warrant en banc
              review. ..................................................................................... 14

CONCLUSION ............................................................................................... 18

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Blackfeet Indian Tribe v. Mont. Power Co.*,
838 F.2d 1055 (9th Cir. 1988) .........................................................................12

*Dorsey v. United States*,
567 U.S. 260 (2012)..........................................................................................17

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018)..........................................................................................12

*Herrera v. Wyoming*,
587 U.S. 329 (2019)..........................................................................................14

*Jam v. Int'l Finance Corp.*,
586 U.S. 199 (2019)......................................................................................12, 13

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
526 U.S. 172 (1999)..........................................................................................14

*Rocky Mountain Oil & Gas Ass'n v. Watt*,
696 F.2d 734 (10th Cir. 1982) ...........................................................................4

*Shoshone-Bannock Tribes of Fort Hall Reservation v. Dep't of Interior*,
No. 10-cv-004, 2011 WL 1743656 (D. Idaho May 3, 2011) ...........................5

*Shoshone-Bannock Tribes of the Fort Hall Reservation v. Daniel-Davis*,
No. 20-cv-553, 2023 WL 2744123 (D. Idaho Mar. 31, 2023) ..................6, 15

*Shoshone-Bannock Tribes of the Fort Hall Reservation v. Daniel-Davis*,
No. 20-cv-553, 2023 WL 5345102 (D. Idaho June 30, 2023) ........................6

## Statutes

28 U.S.C. § 1292(b) ..................................................................................................6

43 U.S.C. § 1701(a)(10)............................................................................................4

43 U.S.C. § 1702(e) .........................................................................................4, 9, 11

43 U.S.C. § 1716(a) ...............................................................................................9

Act of May 1, 1888, ch. 213, 25 Stat. 113 ...............................................................16

Act of Mar. 2, 1889, ch. 412, 25 Stat 980................................................................17

Act of June 6, 1900, 31 Stat. 672 ......................................................3, 7, 9, 10, 12, 14

Act of May 12, 1920, 41 Stat. 596 ..........................................................................10

Act of May 19, 1926, ch. 337, 44 Stat. 566 ............................................................10

Act of May 4, 1932, ch. 164, 47 Stat. 146 ..............................................................10

Consolidated Appropriations Act, 2024,
    Pub. L. No. 118-42, 138 Stat. 25 ...................................................................15

Dep't of Interior and Related Agencies Appropriations Act, 1995,
    Pub. L. No. 103-332, 108 Stat. 2499 (1994) ................................................15

Federal Land Policy and Management Act,
    Pub. L. No. 94-579, 90 Stat. 2743 (1976) .......................................1, 4, 11, 13

Indian Homestead Act of 1875, 18 Stat. 420 ...........................................................12

Homestead Act of 1862, 12 Stat. 392 .......................................................................12

## Other Authorities

Agreement with the Shoshone and Bannock Indians of the Fort Hall Reservation,
    31 Stat. 672 (Feb. 5, 1898) .......................................................................3, 14

# INTRODUCTION

The Bureau of Land Management administers 245 million acres of public lands, roughly one tenth of all land in the United States. Until 1976, the Bureau's authority over this vast expanse was pieced together through a multitude of public-land statutes enacted over more than a hundred years of the Nation's history. To bring order to this jumble of statutes, Congress provided the Bureau with comprehensive authority over public lands in the Federal Land Policy and Management Act (FLPMA), Pub. L. No. 94-579, 90 Stat. 2743. FLPMA established "uniform procedures for any disposal of public land" and granted the Bureau broad authority to exchange public land for non-federal lands. *Id.* § 102(10), 90 Stat. 2745.

In 2020, the Bureau engaged in just such a land exchange with the J.R. Simplot Co., an agribusiness in Idaho. The Shoshone-Bannock Tribes of the Fort Hall Reservation challenged the exchange, arguing that a site-specific statute enacted in 1900 barred the Bureau from exercising its FLPMA exchange authority over this parcel of land. The district court agreed with the Tribes, and a divided panel of this Court affirmed. The majority reasoned that the 1900 Act adopted an exclusive list of methods for disposing of these lands in Idaho, which prevented the Bureau from exercising its later-enacted FLPMA authority to conduct a land exchange. If Congress wanted to enable the use of FLPMA's uniform procedures, the majority reasoned, the statute needed to specifically address this parcel in Idaho.

The majority's decision is wrong. As Judge Bumatay explained in dissent, the Congress of 1900 could not prevent the Congress of 1976 from authorizing additional means of disposing of public lands, and the later-enacted FLPMA sits comfortably alongside the 1900 Act in authorizing additional means for disposing of these lands. Moreover, FLPMA steps into the shoes of the disposal methods authorized in the 1900 Act, which FLPMA largely repealed and replaced. The majority counterintuitively held that Congress's enactment of FLPMA, a statute that expressly authorizes the discretionary disposal of lands, left the Bureau with no means of disposing of these lands in Idaho. But more importantly, the majority's skeptical view of what Congress accomplished in FLPMA could potentially call into question the Bureau's authority over millions of acres of public lands that are still subject to various statutes that remain on the books from centuries past.

The ramifications of the majority's decision raise a question of exceptional importance. The Court should grant rehearing en banc to consider whether Congress's adoption of uniform procedures for the disposal of public lands in FLPMA can be limited by an earlier statute, and the Court should clear up the uncertainty over the Bureau's authority to administer millions of acres of public lands, many of which are located in this Circuit.

# BACKGROUND

## A.   Statutory and historical background

**1.**   The Tribes' permanent home is the Fort Hall Reservation in southeastern Idaho, established by treaty in 1868. Thirty years after the establishment of the reservation, the Tribes agreed to cede a portion of the land to the United States for $600,000. Agreement with the Shoshone and Bannock Indians of the Fort Hall Reservation, arts. I & II, 31 Stat. 672-73 (Feb. 5, 1898). This 1898 cession agreement imposed no restriction on the United States' ability to dispose of the land, and it authorized the Tribes to use the land for hunting, grazing, fishing, and logging only so long as the land "remain[ed] part of the public domain." *Id.* art. IV, 31 Stat. 674.

Congress ratified the cession agreement two years later in the Act of June 6, 1900, 31 Stat. 672. Section 5 of the 1900 Act additionally provides that, after allotments were made to Indians who had settled in the ceded area, "the residue of said ceded lands shall be opened to settlement by the proclamation of the President, and shall be subject to disposal under the homestead, townsite, stone and timber, and mining laws of the United States only." 31 Stat. 676. These provisions for settlement and disposal were not part of the 1898 agreement.

**2.**   In 1976, Congress enacted FLPMA to "provide guidance and a comprehensive statement of congressional policies concerning the management of

the public lands." *Rocky Mountain Oil & Gas Ass'n v. Watt*, 696 F.2d 734, 737 (10th Cir. 1982). Through FLPMA, Congress established "uniform procedures for any disposal of public land," 43 U.S.C. § 1701(a)(10), and to that end, repealed and replaced a host of earlier statutes related to public lands. *See* 90 Stat. 2787-93. Congress further provided that nothing in FLPMA "shall be deemed to repeal any existing law by implication." § 701(f), 90 Stat. 2786.

FLPMA defines "public lands" broadly to include "any land and interest in land owned by the United States . . . and administered by the Secretary of the Interior though the Bureau of Land Management, without regard to how the United States acquired ownership." 43 U.S.C. § 1702(e). Section 206 of FLPMA authorizes the disposal of public lands through land exchanges. Under this provision, "[a] tract of public land or interests therein may be disposed of by exchange" if the Bureau "determines that the public interest will be well served by making that exchange." *Id.* § 1716(a).

**B.     Factual and procedural background**

**1.**     Simplot has operated a fertilizer plant next to the Fort Hall Reservation since the 1940s. The Don Plant, located about two miles from Pocatello, processes phosphate ore to manufacture phosphate fertilizer. This process yields a byproduct known as phosphogypsum, which Simplot stores in a 240-foot-tall storage facility called a gypstack. Until 2017, Simplot's gypstack was unlined and discharged

contaminants into the Portneuf River, which flows onto the reservation. Partially as a result, Simplot is subject to multiple consent decrees and administrative consent orders with the United States, the Environmental Protection Agency, and the Idaho Department of Environmental Quality.

Simplot has long sought to acquire additional land adjacent to the Don Plant because its gypstack is projected to reach capacity by 2031. Simplot first proposed a land exchange with the United States in 1994, but this proposal stalled because of the Environmental Protection Agency's then-pending designation of a Superfund site including the Simplot facility. *Shoshone-Bannock Tribes of Fort Hall Reservation v. Dep't of Interior*, No. 10-cv-004, 2011 WL 1743656, at *2 (D. Idaho May 3, 2011). Simplot renewed its proposal in 2004, and the Bureau approved an exchange. The Tribes then successfully challenged the exchange under the Administrative Procedure Act for failure to comply with the National Environmental Policy Act, and the court ordered the Bureau to complete an environmental impact statement. *Id.* at *11-12.

In response, Simplot renewed its land exchange proposal in 2019. The Bureau completed an environmental impact statement under the National Environmental Policy Act in May 2020. In August 2020, the Bureau issued a record of decision authorizing the exchange of 713.67 acres of federal land for 666.46 acres of non-

federal land, along with a 160-acre mitigation parcel. The Bureau and Simplot closed on the land exchange in December 2020.

2. The Tribes brought this action challenging the exchange. Their complaint alleged that the exchange violated the 1868 treaty, the 1898 agreement, the Administrative Procedure Act, the National Environmental Policy Act, and FLPMA. For the first time, the Tribes alleged that the 1900 Act bars an exchange of the ceded lands. Simplot intervened, and the parties moved for summary judgment. In March 2023, the district court granted summary judgment to the Tribes in part, concluding that the exchange violated the 1900 Act, FLPMA, and the National Environmental Policy Act. *Shoshone-Bannock Tribes of the Fort Hall Reservation v. Daniel-Davis*, No. 20-cv-553, 2023 WL 2744123 (D. Idaho Mar. 31, 2023).

The court deferred the issue of remedy pending further briefing. Simplot then moved to certify the liability order for interlocutory appeal under 28 U.S.C. § 1292(b), and the district court granted certification. *Shoshone-Bannock Tribes of the Fort Hall Reservation v. Daniel-Davis*, No. 20-cv-553, 2023 WL 5345102 (D. Idaho June 30, 2023). This Court subsequently granted Simplot's petition for permission to appeal and the Bureau's parallel petition, which was conditional on the grant of Simplot's petition. *See* Order, Nos. 23-80058, 23-80059 (9th Cir. Aug. 16, 2023).

**3.** A divided panel of this Court affirmed. The majority held that the plain text of the 1900 Act bars the exchange under FLPMA. Op. 12-18. Section 5 of the 1900 Act provides that the ceded lands "shall be subject to disposal under the homestead, townsite, stone and timber, and mining laws of the United States only," 31 Stat. 676, the majority reasoned, and FLPMA does not fit into any of these categories. Because the term "only" prohibits disposal under other authorities, the listed set of laws are the exclusive means of disposing of the ceded lands. Op. 12-13. The majority rejected arguments that FLPMA provides independent authority to dispose of the ceded lands alongside the methods identified in the 1900 Act or, in the alternative, that FLPMA steps into the shoes of the listed disposal authorities. Op. 14, 18-27. The majority purported to bolster its conclusion by invoking the Indian canons of statutory construction. Op. 30-33.

Judge Bumatay dissented. Op. 37-69. In his view, FLPMA governed the exchange and provided independent authority for the Bureau to dispose of the lands. Although the 1900 Act provided "another way to dispose of the land involved in the exchange, it coexists with FLPMA." Op. 41. He reasoned that the court can and should reconcile these two statutes as complementary grants of authority. He rejected the majority's effort to "manufacture[] a clash" by overreading the term "only" in the 1900 Act, which effectively created an "enduring bar on the federal government's ability to dispose of the ceded land." Op. 47. Judge Bumatay also

would have reversed the district court on the other three issues presented (the appraisal, the public-interest determination, and the environmental analysis). The majority did not reach these issues.

## ARGUMENT

Congress authorized land exchanges under FLPMA, and the 1900 Act does not bar the Bureau from exercising that later-enacted authority to exchange the ceded lands with Simplot. Through FLPMA, Congress sought to enable the disposal of lands, but the majority concluded that FLPMA had the opposite effect—leaving the Bureau without any viable means of disposing of the ceded lands. And the panel's reasoning could potentially be applied to any number of other statutes that were part of the pre-1976 patchwork of authorities that Congress sought to address in FLPMA. These potential ramifications raise a question of exceptional importance warranting this Court's review en banc. Fed. R. App. P. 40(b)(2)(D).

**A.    The majority wrongly held that the 1900 Act barred Congress from authorizing a land exchange under FLPMA.**

The majority erred in holding that the 1900 Act bars the Bureau from exchanging the ceded lands. The Bureau had authority to enter into the land exchange under both FLPMA and the 1900 Act, and the majority's decision creates an artificial conflict between these two statutes that can and should be harmonized.

**1.**    There is no dispute that the land exchange comports with the plain language of FLPMA. *See* Op. 19, 42. FLPMA authorizes the exchange of "public

8

land," 43 U.S.C. § 1716(a), meaning "any land and interest in land owned by the United States within the several States and administered by the Secretary of the Interior through the Bureau of Land Management," *id.* § 1702(e). The ceded lands unquestionably meet this definition. And the United States' acquisition of lands through an agreement with the Tribes does not alter the Bureau's authority; FLPMA's definition of "public lands" applies "without regard to how the United States acquired ownership" of the land. *Id.* Provided the requirements for a land exchange are met, *see id.* § 1716, the Bureau has authority under the plain text of FLPMA to exchange the ceded lands.

Despite FLPMA's broad application, the majority construed the 1900 Act to bar the Bureau's use of FLPMA's land-exchange provisions. On the majority's reading, Section 5 of the 1900 Act was intended to establish an exclusive list of disposal authorities. When Congress provided that the ceded lands would "be subject to disposal under the homestead, townsite, stone and timber, and mining laws of the United States only," the appended "only" limited Congress's authority to create new disposal methods, according to the majority. But as the dissent explained, the 1900 Act should be read as a grant of authority that sits comfortably alongside the parallel grant of authority in the land-exchange provisions in FLPMA, not a limitation on that grant. Op. 41.

Section 5 of the 1900 Act laid out only the initial procedures for disposing of the ceded lands and did not impose a permanent limit Congress's ability to authorize additional means for the government to dispose of its own property. The best reading of the term "only" in Section 5 is not that the listed set of laws are the "only" laws that could ever be used to dispose of the ceded lands; rather, those are the "only" laws Congress initially authorized for disposal—subject to supplementation through further legislation. The surrounding text in the 1900 Act makes clear that Section 5 is focused on establishing an orderly process for making an initial disposal of lands. Section 4 prioritizes allotments to Indians, and Section 5 then lays out the process to be followed after "the completion of the allotments." 31 Stat. 676. And Section 5 sets forth fixed prices for certain plots of land—$10 for some acres, $2.50 for others, and so on—in line with a focus on initial disposals after enactment.

That is the best reading of the statute because Congress did, in fact, add to the United States' authority to dispose of the ceded lands through later-enacted statutes referencing those lands. *E.g.*, Act of May 4, 1932, ch. 164, 47 Stat. 146 (making existing authority for the disposal of "desert lands" applicable to the ceded lands); Act of May 19, 1926, ch. 337, 44 Stat. 566 (making existing authority for the disposal of "isolated tracts" applicable to the ceded lands); Act of May 12, 1920, 41 Stat. 596 (authorizing grant of lands to Pocatello and the State of Idaho); *see also* Op. 45-47 (dissent). In enacting these laws in 1920, 1926, and 1930, Congress didn't

10

need to strike "only" from the 1900 Act or otherwise address the use of that term in Section 5 to make the new disposal authorities effective. Congress simply created additional authority that sat alongside the initial procedures authorized in 1900 Act.

The majority reasoned that FLPMA and its uniform procedures are different in kind from these other laws because FLPMA does not expressly reference the ceded lands and disclaimed any intent to repeal statutes by implication. Pub. L. No. 94-579, § 701(f), 90 Stat. 2786. The 1900 Act's "exclusive" list of disposal methods bars the adoption of additional methods unless Congress "specifically refer[s] to the Fort Hall lands and therefore express[es] an intent to add to the disposal methods," according to the majority. Op. 21. But Congress clearly intended for FLPMA to apply to the ceded lands. Not only do the ceded lands meet the broad definition of "public lands," 43 U.S.C. § 1702(e), FLPMA expressly repealed a 1926 disposal statute applicable to the ceded lands, which would have been unnecessary if FLPMA had no application in the first place. Op. 50-51 (dissent); Pub. L. No. 94-579, § 703(a)(6), 90 Stat. 2790 (repealing 1926 law). When Congress unequivocally replaced the 1926 statute with FLPMA, Congress necessarily authorized application of FLPMA's uniform procedures to the ceded lands. And the notion of implied repeal is a red herring; FLPMA's adoption of additional land-disposal authority did not "repeal" the 1900 Act any more than the other later-enacted authorities.

11

Regardless, in construing the 1900 Act and FLPMA, the statutes should be harmonized to avoid any tension. *See Blackfeet Indian Tribe v. Mont. Power Co.*, 838 F.2d 1055, 1058-59 (9th Cir. 1988). "When confronted with two Acts of Congress allegedly touching on the same topic," a court must "strive to give effect to both." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (cleaned up). The majority instead went out of its way to elevate the 1900 Act over the later-enacted FLPMA, depriving the Bureau of disposal authority over the ceded lands. That was error. There is a straightforward way to interpret these two statutes to sit comfortably alongside one another.

2.    Even if the majority were right that the 1900 Act should be construed as a permanent restriction on disposal, FLPMA is the direct successor of the categories of disposal methods listed in Section 5, and the exchange may therefore proceed under the terms of the 1900 Act itself. When "a statute refers to a general subject, the statute adopts the law on that subject as it exists whenever a question under the statute arises." *Jam v. Int'l Finance Corp.*, 586 U.S. 199, 209 (2019). In Section 5, Congress provided for disposal of the ceded lands under broad categories of laws—"the homestead, townsite, stone and timber, and mining laws," 31 Stat. 676—rather than specific statutes, like (for example) the Homestead Act of 1862, 12 Stat. 392, or the Indian Homestead Act of 1875, 18 Stat. 420. By deploying references to these broad categories, Congress implicitly recognized that specific

statutes and authorities within those categories might change or be superseded over time.

Through FLPMA, Congress replaced the patchwork of disposal statutes with "uniform procedures for any disposal of public land, acquisition of non-Federal land for public purposes, and the exchange of such lands." Pub. L. No. 94-579, § 102(a)(10), 90 Stat. 2745; *see also* S. Comm. On Energy & Nat. Resources, 95th Cong., 2d Sess., Legislative History of the Federal Land Policy and Management Act of 1976, at vi (1978) ("For the first time in the long history of the public lands, one law provides comprehensive authority . . . for the administration and protection of the Federal lands."). To that end, FLPMA repealed many of the homestead and townsite statutes, and FLPMA now applies to lands used for timber and mineral resources, covering the general span of subject matter listed in the 1900 Act.

Congress chose to repeal these sundry disposal laws, consolidating that authority in FLPMA. Because the laws listed in Section 5 of the 1900 Act are "reference[s] . . . to an external body of potentially evolving law," *Jam*, 586 U.S. at 210, the appropriate referent for these categories in 2020 was FLPMA. Courts "often" rely on this "reference canon, explicitly or implicitly, to harmonize a statute with an external body of law that the statute refers to generally." *Id.* Rather than construing FLPMA's adoption of uniform procedures as disabling disposal under

13

the 1900 Act, the statute is best read to provide that FLPMA steps into the shoes of the listed disposal laws and enables disposal under the terms of Section 5.

3. The majority also erred in invoking the Indian canons of construction, relying mainly on the principle that Congress "must clearly express its intent" to abrogate Indian treaty rights. *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 202 (1999). In the majority's view, FLPMA lacked a requisite clear statement abrogating the Tribes' treaty rights under the 1898 agreement as ratified in the 1900 Act. Op. 31. But as the dissent explained, that canon has no application here, as there is no abrogation and no ambiguity to be resolved. Op. 55-58. The 1898 agreement granted the Tribes usufructuary rights only "[*s*]*o long as* any of the lands ceded . . . remain part of the public domain." Art. IV, 31 Stat. 674 (emphasis added). The agreement does not establish an independent limitation on disposal. The majority relied on *Herrera v. Wyoming*, 587 U.S. 329 (2019), to argue that taking land out of the public domain nonetheless required a clear statement, but *Herrera* differentiated between abrogation of treaty rights and the separate question whether a "termination point identified in the treaty itself has been satisfied." *Id.* at 341.

**B.      This panel's decision raises important questions about the Bureau's authority over public lands that warrant en banc review.**

Although this case focuses specifically on the 1900 Act, the majority's decision raises broader questions about the application of FLPMA's uniform

procedures to other public lands subject to older statutes with similar language. Given the scope of the public lands managed by the Bureau under FLPMA and the consequences of the majority's decision in application, this case presents a question of exceptional importance. Fed. R. App. P. 40(b)(2)(D).

1. Most immediately, the majority's understanding of FLPMA would effectively bar the Bureau from disposing of the ceded lands under any method. The disposal authorities listed in the 1900 Act have been repealed or would otherwise not authorize disposal of the ceded lands.[1] Under the majority's view, Congress's effort to comprehensively reform federal land management and provide for uniform disposal procedures in FLPMA would leave the Bureau without any means of disposing of the ceded lands. The majority disputed this outcome—stating that its holding "is limited to this particular exchange," Op. 34—but the district court and the dissent both recognized that the court's holding would leave the Bureau without options. Op. 44; *see also Shoshone-Bannock Tribes*, 2023 WL 2744123, at *4 ("[B]ecause Congress has repealed nearly all the homestead, townsite, stone and timber, and mining laws, the federal government does not currently have a viable

---

[1] Although "mining laws" remain in effect, there has been a moratorium on patenting land under the United States mining laws since 1994. *See* Dep't of Interior and Related Agencies Appropriations Act, 1995, Pub. L. No. 103-332, § 112, 108 Stat. 2499, 2519 (1994); Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, § 404, 138 Stat. 25, 284.

method for disposing of the ceded lands."). This result is particularly strange given that the Bureau had limited discretion to control disposal under some older laws—for example, homestead laws that granted claimants title when certain requirements were met—and Congress sought to give the Bureau greater control in FLPMA.

**2.** More broadly, the majority's view of FLPMA could yield significant problems for the Bureau's management of land throughout the western United States. Many other laws contain provisions comparable to the language in Section 5 of the 1900 Act that the majority held to bar application of FLPMA's uniform procedures.

> For example, the Act of May 1, 1888, ch. 213, 25 Stat. 113, provides:

> That lands to which the right of the Indians is extinguished under the foregoing agreement are a part of the public domain of the United States and are open to the operation of the laws regulating homestead entry . . . and to entry under the town site laws and the laws governing the disposal of coal lands, desert lands, and mineral lands; but are not open to entry under any other laws regulating the sale or disposal of the public domain.

This 1888 statute—which the majority cites in comparison to the 1900 Act, Op. 18—implicates millions of acres in Montana, potentially including as much as 2.6 million acres of land subject to public management. Like the 1900 Act, this statute enables disposal under the homestead and townsite laws replaced by FLPMA while also limiting the use of other laws. Although the United States would likely argue that the 1888 law can be distinguished in application, the majority's decision could be

understood by the district courts to restrict the Bureau's use of FLPMA to dispose of these lands.

The 1888 statute represents just one example. A number of other statutes contain similar language that could significantly restrict the Bureau's authority under FLPMA. *E.g.*, Act of Mar. 2, 1889, ch. 412, 25 Stat 980; *see also* Simplot Opening Brief Addendum 31-64. Given the vast patchwork of public-lands laws that predated FLPMA, the consequences of the majority's decision could be sweeping, as new challenges emerge to the Bureau's authority under pre-1976 statutes that remain on the books. This inevitable uncertainty over the Bureau's authority to dispose of lands under FLPMA is fundamentally inconsistent with Congress's express intent to adopt uniform procedures that clarify the Bureau's authority over 245 million acres of public lands.

Under the broadest understanding of the majority's approach, Congress would need to have satisfied an express-reference rule to ensure that FLPMA's generally applicable and uniform procedures apply in each of these cases where public lands were previously subject to a limited or specific set of disposal methods. *See* Op. 47-49, 53-54 (dissent). And as the dissent explains, construing the patchwork of pre-1976 disposal statutes in this fashion—imposing a heightened burden on a future Congress in its exercise of legislative power—would be a troubling result. Op. 48-49 (discussing *Dorsey v. United States*, 567 U.S. 260, 274 (2012)). The Court should

17

grant rehearing en banc to make clear that Congress meant what it said in FLPMA, and that these uniform procedures for disposal of land are indeed uniform.

**CONCLUSION**

For these reasons, the petition for rehearing en banc should be granted.

Respectfully submitted,

/s/ *Daniel Halainen*
ADAM R.F. GUSTAFSON
 *Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
 *Deputy Assistant Attorney General*
ROBERT J. LUNDMAN
DANIEL HALAINEN
 *Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Avenue N.W.
Washington, D.C. 20530
(202) 598-3329
daniel.j.halainen@usdoj.gov

December 1, 2025
90-2-4-16201

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form: https://www.ca9.uscourts.gov/forms/form11instructions.pdf*

**9th Cir. Case Number(s)** 23-35543

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 40-1, the attached petition for panel

rehearing/petition for rehearing en banc/response to petition is *(select one)*:

⦿ Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words:** 4,174 .
*(Petitions and responses must not exceed 4,200 words)*

**OR**

◯ In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** s/Daniel Halainen     **Date** 12/1/2025
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 11**                                              *Rev. 12/01/24*